No. 19-3142

# In the
# United States Court of Appeals
# for the Third Circuit

## ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.; BLAKE ELLMAN; ALEXANDER DEMBOWSKI,

*Plaintiffs-Appellants*,

v.

## ATTORNEY GENERAL NEW JERSEY; SUPERINTENDENT NEW JERSEY STATE POLICE; THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department; JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 3:18-cv-10507
The Honorable Peter G. Sheridan

### BRIEF OF APPELLANTS

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, N.J. 07450
Telephone: (201) 967-8040
dschmutter@hartmanwinnicki.com

John Parker Sweeney
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 719-8216
jsweeney@bradley.com

*Counsel for Plaintiffs-Appellants*

**CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellant Association of New Jersey Rifle & Pistol Clubs, Inc. has no parent corporation, and no publicly held corporation owns its stock. No publicly held corporation that is not a party to this proceeding has a financial interest in this proceeding's outcome.

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants ("Plaintiffs") respectfully request oral argument. The Court is not bound by its earlier decision in this case because this appeal arises in a different procedural posture with a different standard of review, and reconsideration is necessary to prevent clear error and manifest injustice. Counsel's responses to inquiries from the Court may aid the Court in its resolution of the important constitutional issues raised by this appeal. *See* Fed. R. App. P. 34(a)(1).

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

TABLE OF AUTHORITIES ................................................................................ vi

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ........................................................................2

STANDARD OF REVIEW ...................................................................................3

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................4

STATEMENT OF RELATED CASES AND PROCEEDINGS ............................5

STATEMENT OF THE CASE...............................................................................6

    I. Factual Background ........................................................................................6

        A. New Jersey bans standard-capacity magazines that are capable of
           holding more than ten rounds of ammunition. ...........................................6

        B. The banned magazines are typically possessed by law-abiding,
           responsible citizens for lawful purposes like self-defense, and there is
           no longstanding history of their regulation. ................................................7

        C. Plaintiffs include law-abiding, responsible citizens who seek to
           exercise their fundamental right to acquire and keep the banned
           magazines. ..................................................................................................9

    II. Procedural History .......................................................................................10

SUMMARY OF THE ARGUMENT ....................................................................12

ARGUMENT .....................................................................................................13

    I. The Court is not bound by the earlier panel's decision because this appeal
       arises in a different procedural posture, and reconsideration is necessary
       to prevent clear error and manifest injustice. ................................................13

II. New Jersey's magazine ban violates the Second, Fifth, and Fourteenth Amendments to the United States Constitution. ..........................................16

    A. New Jersey's magazine ban violates the Second Amendment because it bans the acquisition and possession of constitutionally protected arms by law-abiding, responsible citizens..................................................16

        1. New Jersey's magazine ban violates the Second Amendment under Supreme Court precedent because it is inconsistent with the Second Amendment's text, history, and tradition...........................................16

        2. Alternatively, New Jersey's magazine ban violates the Second Amendment under this Court's two-step framework because it fails constitutional muster under any of the standards of scrutiny applied to enumerated constitutional rights. ....................................................21

    B. New Jersey's magazine ban violates the Fifth Amendment Takings Clause because it is an unconstitutional taking of private property without just compensation.........................................................................24

    C. New Jersey's magazine ban violates the Fourteenth Amendment Equal Protection Clause because it draws impermissible distinctions between similarly situated people. ..........................................................27

CONCLUSION ....................................................................................................31

CERTIFICATE OF COMPLIANCE........................................................................33

CERTIFICATE OF SERVICE ................................................................................34

CERTIFICATE OF VIRUS SCAN .........................................................................35

CERTIFICATE OF BAR MEMBERSHIP, PRIVACY REDACTIONS, AND IDENTICAL ELECTRONIC AND HARD COPY VERSIONS .................36

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Mukasey*,
    534 F.3d 181 (3d Cir. 2008) .................................................. 14, 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).................................................................3, 4

*Ash v. Baker*,
    392 F. Supp. 368 (E.D. Pa. 1975)................................................16

*Ashcroft v. Free Speech Coal.*,
    *535 U.S. 234 (2002)* ...............................................................24

*Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Att'y Gen. N.J.*,
    910 F.3d 106 (3d Cir. 2018) .................................................. *passim*

*Brown v. Legal Found. of Washington*,
    538 U.S. 216 (2003).................................................................25

*Caetano v. Massachusetts*,
    136 S. Ct. 1027 (2016)............................................... 8, 17, 20, 21

*City of Cleburne v. Cleburne Living Ctr.*,
    473 U.S. 432 (1985).................................................................28

*City of Los Angeles v. Alameda Books, Inc.*,
    535 U.S. 425 (2005).................................................................24

*Clark v. Jeter*,
    486 U.S. 456 (1988).................................................................29

*District of Columbia v. Heller*,
    554 U.S. 570 (2008)............................................................. *passim*

*Duncan v. Becerra*,
    265 F. Supp. 3d 1106 (S.D. Cal. 2017) ................................. 27, 28

*Duncan v. Becerra*,
    366 F. Supp. 3d 1131 (S.D. Cal. 2019) ................................. 6, 9, 23

*Edenfield v. Fane*,
    507 U.S. 761 (1993)....................................................................24

*Foehl v. United States*,
    238 F.3d 474 (3d Cir. 2001) .................................................. 3, 15

*Friedman v. City of Highland Park*,
    784 F.3d 406 (7th Cir. 2015) ...........................................................9

*Horne v. Dep't of Agric.*,
    135 S. Ct. 2419 (2015)........................................... 25, 26, 27

*In re City of Philadelphia Litig.*,
    158 F.3d 711 (3d Cir. 1998) .......................................................16

*Jackson v. City & Cty. of San Francisco*,
    746 F.3d 953 (9th Cir. 2014) .......................................................21

*Kelo v. City of New London*,
    545 U.S. 469 (2005)....................................................................26

*Lawrence v. Nat'l Westminster Bank N.J.*,
    98 F.3d 61 (3d Cir. 1996) .............................................................3

*Lingle v. Chevron USA, Inc.*,
    544 U.S. 528 (2005)....................................................................26

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)........................................................... 26, 27

*Lorillard Tobacco Co. v. Reilly*,
    533 U.S. 525 (2001)....................................................................25

*McCullen v. Coakley*,
    573 U.S. 464 (2014)....................................................................24

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010).......................................................... *passim*

*Melrose, Inc. v. City of Pittsburgh*,
    613 F.3d 380 (3d Cir. 2010) .......................................................30

*Murr v. Wisconsin*,
  137 S. Ct. 1933 (2017)....................................................................27

*New York State Rifle & Pistol Ass'n v. City of New York*,
  139 S. Ct. 939 (2019)......................................................................12

*Pemberthy v. Beyer*,
  19 F.3d 857 (3d Cir. 1994) .............................................................29

*Ramirez v. Commonwealth*,
  479 Mass. 331, 94 N.E.3d 809 (2018)............................................20

*San Antonio Ind. Sch. Dist. v. Rodriguez*,
  411 U.S. 1 (1973)............................................................................23

*Silveira v. Lockyer*,
  312 F.3d 1052 (9th Cir. 2002) ......................................................30

*Tahoe-Sierra Pres. Council, Inc. v. Tahor Reg'l Planning Agency*,
  535 U.S. 302 (2002)................................................................ 26, 28

*Tolchin v. Supreme Court of N.J.*,
  111 F.3d 1099 (3d Cir. 1997) .........................................................29

*Turner Broad. Sys., Inc. v. F.C.C.*,
  512 U.S. 622 (1994).........................................................................24

*Turner Broad. Sys., Inc. v. F.C.C.*,
  520 U.S. 180 (1997)................................................................ 23, 24

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) .............................................................22

*United States v. Virginia*,
  518 U.S. 515 (1996)........................................................... 24, 29, 30

*Worman v. Healey*,
  922 F.3d 26 (1st Cir. 2019)..............................................................6

*Yancey v. United States*,
  915 F.2d 1534 (Fed. Cir. 1990) ......................................................27

**Statutes**

28 U.S.C. § 1291 ....................................................................................3

28 U.S.C. § 1331 ....................................................................................2

Act A2761 .................................................................................... *passim*

Act A2761 § 1 ........................................................................................7

Act A2761 § 2 .................................................................................. 7, 31

Act A2761 § 4 ........................................................................................7

N.J.S.A. § 2C:39-1 ................................................................................7

N.J.S.A. § 2C:39-17 ...................................................................... 7, 8, 31

N.J.S.A. § 2C:39-19 ................................................................... 7, 26, 27

N.J.S.A. § 2C:39-3 ................................................................................7

**Rules**

Fed. R. App. P. 32 ...............................................................................34

Fed. R. App. P. 34 ................................................................................. iii

Fed. R. Civ. P. 56 ..................................................................................3

**Secondary Source**

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015)..................................................... 9, 10

Gary Kleck, How Many Large Capacity Magazines (LCMs) Are Possessed By Americans?, SSRN (2018) ..............................................................8

GIFFORDS LAW CENTER,SUMMARY OF STATE LAW (2018) .....................8

Roland W. Ouelette, *Management of Aggressive Behavior Instructor Manual* at 23 (2006)................................................................................................9

U.S. Bureau of Justice Statistics, *Criminal Victimization in the United States, 2008 Statistical Tables* tbl. 37 (2010)...................................................10

# INTRODUCTION

The State of New Jersey amended its laws to criminalize possession of ammunition magazines capable of holding more than ten rounds. These magazines are common items, kept for lawful purposes by millions of law-abiding, responsible citizens. Under Supreme Court precedent, New Jersey's ban is unconstitutional.

While this Court previously reviewed the denial of Plaintiffs' 2018 motion for preliminary injunction, those rulings are not binding on this appeal; the burdens and presumptions for reviewing a summary judgment ruling are different from the burdens and presumptions for reviewing a preliminary injunction ruling. As explained more fully below, when the proper test—the Supreme Court's text, history, and tradition test—is applied to the undisputed facts of this case, the only result can be that the ban is unconstitutional under the Second Amendment.[1]

The challenged ban also offends the Fifth and Fourteenth Amendments. New Jersey requires those who lawfully possessed magazines with a capacity of more than ten rounds to sell those magazines, turn them over to the government, or destroy them. This is a paradigmatic taking under the Fifth Amendment, for which no

---

[1] Furthermore, the Supreme Court recently heard argument in a Second Amendment challenge, *New York State Rifle & Pistol Association v. City of New York*, No. 18-280. Counsel anticipates the Court's opinion in that case will reinforce the standard of review to be used in Second Amendment challenges. Plaintiffs have asked this Court to briefly stay this case until the Supreme Court issues its opinion in *New York State Rifle & Pistol Association*. (Doc. 003113401851). This Court has not yet ruled on Plaintiffs' motion, and Plaintiffs renew it here.

compensation was given. Finally, the ban exempts all retired law-enforcement officers from its sweep, regardless of whether those officers have any training, or even familiarity, with the banned magazines. Similarly situated law-abiding, responsible citizens, who have varying degrees of experience and training just like retired law-enforcement officers, are treated differently in violation of the Equal Protection clause of the Fourteenth Amendment.

For all these reasons, the challenged ban cannot stand.

## JURISDICTIONAL STATEMENT

The United States District Court for the District of New Jersey had subject-matter jurisdiction over this lawsuit under 28 U.S.C. § 1331 because Plaintiffs' facial challenge to New Jersey's ban on magazines capable of holding more than ten rounds of ammunition arises under the Second, Fifth, and Fourteenth Amendments to the United States Constitution. *See* JA. 44. Plaintiffs include law-abiding, responsible citizens who seek to exercise their fundamental right to acquire and keep the banned magazines for lawful purposes like self-defense. The district court entered summary judgment in favor of Defendants Attorney General of New Jersey; Superintendent of the New Jersey State Police; Thomas Williver, in his official capacity as Chief of Police of the Chester Police Department; and James B. O'Connor, in his official capacity as Chief of Police of the Lyndhurst Police Department ("Defendants") and denied Plaintiffs' cross-motion for summary

judgment on August 19, 2019. JA. 2–3. Plaintiffs timely noticed this appeal on September 17, 2019. JA. 1. This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal is from a final judgment that disposes all parties' claims.

## STANDARD OF REVIEW

"This Court exercises *de novo* review over a district court's grant of summary judgment," *Foehl v. United States*, 238 F.3d 474, 477 (3d Cir. 2001), applying "the same test as the district court should have applied initially," *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 65 (3d Cir. 1996). Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing the district court's grant of summary judgment, the Court must "view the facts in the light most favorable to the party against whom summary judgment was entered." *Foehl*, 238 F.3d at 477. In reviewing the district court's grant of a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *See Liberty Lobby*, 477 U.S. at 255.

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**

1.  The Second Amendment prohibits banning arms that are typically possessed by law-abiding, responsible citizens for lawful purposes. New Jersey bans ammunition magazines that are typically possessed for lawful purposes, including self-defense, hunting, and target shooting. Is New Jersey's ban unconstitutional under the Second Amendment?

2.  The Fifth Amendment Takings Clause prohibits depriving citizens of their private property without just compensation. Without offering any compensation, New Jersey's magazine ban requires citizens to surrender, transfer, or permanently alter their property to comply with the ban. Is New Jersey's ban unconstitutional under the Fifth Amendment Takings Clause?

3.  The Fourteenth Amendment Equal Protection Clause prohibits treating similarly situated people differently without a constitutionally adequate justification. New Jersey's magazine ban exempts retired law-enforcement officers but applies to other similarly situated citizens, including retired members of the armed forces. Is New Jersey's ban unconstitutional under the Fourteenth Amendment Equal Protection Clause?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This Court previously decided an appeal in this case from the district court's denial of a preliminary injunction. *See Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) (affirming the district court's decision).

The United States District Court for the Southern District of California recently decided a similar issue, holding that California's ban on magazines capable of holding more than ten rounds is unconstitutional under the Second and Fifth Amendments. *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019). That case is currently pending appeal in the United States Court of Appeals for the Ninth Circuit. *See Duncan, et al. v. Becerra*, No. 19-55376. Earlier this year, the United States Court of Appeals for the First Circuit reached the opposite conclusion on the Second Amendment issue. *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019). The *Worman* plaintiffs petitioned the Supreme Court of the United States to grant a writ of certiorari; that petition is currently pending. *Worman, et al. v. Healey, et al.*, No. 19-404 (2019).

The Supreme Court recently heard argument in a Second Amendment challenge, *New York State Rifle & Pistol Association v. City of New York*, No. 18-280. While this case does not involve the constitutionality of a ban on magazines capable of holding more than ten rounds, counsel anticipate the Court will reinforce the standard of review to be used in Second Amendment challenges.

## STATEMENT OF THE CASE

### I.    Factual Background

### A. New Jersey bans standard-capacity magazines that are capable of holding more than ten rounds of ammunition.

For thirty years, New Jersey defined and banned "large capacity" magazines that are "capable of holding more than 15 rounds" of ammunition. N.J.S.A. §§ 2C:39-1(y), 2C:39-3(j). In 2018, the New Jersey legislature passed Assembly Bill No. 2761 ("Act A2761"), which arbitrarily redefines "large capacity" magazines as those capable of holding more than ten rounds of ammunition. Act A2761 § 1(y), *codified at* N.J.S.A. § 2C:39-1(y). Nearly all the magazines redefined and banned as "large capacity" are the type of standard-capacity magazines routinely sold and used with ordinary firearms purchased and possessed by millions of law-abiding, responsible Americans.

Governor Philip Murphy signed Act A2761 into law on June 13, 2018. New Jersey citizens who lawfully possessed the banned magazines had until December 13, 2018, to comply with the new ban by surrendering their banned arms to the government, transferring them to another owner, destroying them, or permanently altering them so that they no longer fall within the scope of the ban. Act A2761 §§ 4(c), 5, *codified at* N.J.S.A. § 2C:39-19(a)–(c). Failure to comply with the ban results in criminal penalties. *See* N.J.S.A. § 2C:39-17 (Editors' Notes). The ban exempts retired law-enforcement officers, *see* Act A2761 § 2, *codified at* N.J.S.A. § 2C:39-

6

17, but not law-abiding, responsible New Jersey citizens, including retired members of the armed forces.

**B. The banned magazines are typically possessed by law-abiding, responsible citizens for lawful purposes like self-defense, and there is no longstanding history of their regulation.**

This Court has already found that the banned magazines are "typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense, . . . and there is no longstanding history of [their] regulation." *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116.

This finding was correct. Americans own approximately 60 million magazines capable of holding more than ten rounds of ammunition. *See* Gary Kleck, How Many Large Capacity Magazines (LCMs) Are Possessed By Americans?, SSRN (2018), https://goo.gl/XFYkpc. These magazines come standard on some of the most popular handguns and rifles sold in the United States. *See* JA. 486–525. They are legal under federal law and under the laws of 42 states. GIFFORDS LAW CENTER, SUMMARY OF STATE LAW (2018) (entries for New Jersey and Vermont not yet updated); *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032–33 (2016) (Alito, J., concurring) (noting that stun guns are "widely owned and accepted as a legitimate means of self-defense" because "hundreds of thousands of [them] have been sold" and they are legal in 45 states).

7

The banned magazines are typically possessed by Americans for a variety of lawful purposes, including recreational and competitive target shooting, home defense, collecting, and hunting. JA 544; *see also Duncan*, 366 F. Supp. 3d at 1134 (recounting situations in which law-abiding citizens defending themselves with firearms needed more than ten rounds of ammunition). The sheer number of these magazines confirms that they are typically possessed for lawful purposes: "Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 871 (2015); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting) ("The fact that a statistically significant number of Americans use … large-size magazines demonstrates *ipso facto* that they are used for lawful purposes.").

The banned magazines are necessary for self-defense because they decrease the risk of running out of ammunition before repelling a criminal attack. Law-abiding victims rarely have a spare magazine available in a self-defense situation because of surprise, noise, multiple assailants, lighting conditions, nervousness, and fatigue. *See* Roland W. Ouelette, *Management of Aggressive Behavior Instructor Manual* at 23 (2006). Criminals, by contrast, are not subject to these stresses because they plan their attack in advance and often execute their attack in concert with others.

8

*See* U.S. Bureau of Justice Statistics, *Criminal Victimization in the United States, 2008 Statistical Tables* tbl. 37 (2010) (nearly 20% of the violent crimes involve multiple offenders). While the magazine ban does little to affect criminals' effectiveness, magazine bans like New Jersey's diminish victims' ability to defend themselves.

The magazine ban not only increases the risk to public-safety, it also lacks historical tradition. *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116–17. "Magazines of more than ten rounds are older than the United States," yet "[a]t the time the Second Amendment was adopted, there were no laws restricting ammunition capacity." Kopel, *supra*, at 851, 864. The same was true "by the time ratification of the Fourteenth Amendment was completed in 1868," and by then the banned magazines "were in common use." *Id*. at 869.

### C. Plaintiffs include law-abiding, responsible citizens who seek to exercise their fundamental right to acquire and keep the banned magazines.

The Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC") is a non-profit membership organization that was incorporated in the State of New Jersey in 1936. JA. 31. ANJRPC represents the interests of law-abiding, responsible firearm and magazine owners who wish to use their firearms and magazines for lawful purposes like self-defense, hunting, and target shooting. JA. 31–32. Plaintiff Ellman is a law-abiding, responsible citizen who has training and experience with the

banned magazines and is a member of ANJRPC. JA. 380. Plaintiff Ellman and members of ANJRPC wish to purchase or otherwise acquire magazines banned by New Jersey but have refrained from doing so because of the threat of prosecution. JA 381–82.

## II.    Procedural History

Plaintiffs challenge New Jersey's magazine ban under the Second, Fifth, and Fourteenth Amendments to the United States Constitution. JA. 44. Plaintiffs allege that the ban violates the Second Amendment because it bans an entire class of arms that are typically possessed by law-abiding, responsible citizens for lawful purposes like self-defense. JA. 41–42. Plaintiffs also allege that the ban violates the Fifth Amendment Takings Clause because it deprives people of private property without just compensation (JA. 42–43) and the Fourteenth Amendment Equal Protection Clause because it draws impermissible distinctions between similarly situated people (JA. 43–44).

Plaintiffs moved for a preliminary injunction shortly after filing suit. JA. 13. At that time, New Jersey citizens had less than six months to choose between exercising their constitutional rights and complying with the ban. *See* JA. 13. The district court denied the preliminary injunction. JA. 21. This Court affirmed the district court's denial of a preliminary injunction, "constru[ing] everything in favor of the government." *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 130 (Bibas, J.,

10

dissenting). Judge Bibas dissented from the Court's earlier opinion affirming denial of a preliminary injunction on Plaintiffs' Second Amendment claim because the Court "treat[ed] the Second Amendment differently" than "other enumerated rights" by effectively subjecting Plaintiffs' challenge to rational-basis review—an approach categorically foreclosed by the Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Id*. at 126 (Bibas, J., dissenting).

The district court separately granted Defendants' Motion for Summary Judgment and denied summary judgment in favor of Plaintiffs, holding that "binding Third Circuit precedent" precluded the entry of judgment in Plaintiffs' favor. JA. 8–9. The district court also denied Plaintiffs' request for a stay of these proceedings pending the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. City of New York*, 139 S. Ct. 939 (2019) (granting certiorari). JA. 3, 7.

Plaintiffs timely noticed this appeal. JA. 1. Before briefing began, Defendants moved this Court to summarily affirm the district court's order granting summary judgment in their favor, arguing that the earlier panel decision resolved all legal and factual issues in this case. (Doc. 003113382422). The motion was fully briefed, and this Court declined Defendants' request for summary affirmance. (Doc. 003113408052). Plaintiffs moved this Court to briefly stay this proceeding pending the Supreme Court's resolution of *New York State Rifle & Pistol Ass'n v. City of*

*New York*, No. 18-280. (Doc. 003113401851). This Court has not yet ruled on that motion, and Plaintiffs renew it here.

## SUMMARY OF THE ARGUMENT

Because Plaintiffs appeal the entry of summary judgment, this Court should review this appeal de novo, disregarding the earlier panel's affirmance of a denial of a preliminary injunction. The earlier panel reviewed the denial of a preliminary injunction for an abuse of discretion, drawing all inferences in Defendants' favor. This Court, by contrast, reviews de novo the district court's entry of summary judgment, drawing all reasonable inferences in Plaintiffs' favor. In addition, the earlier panel decision is clearly erroneous to the extent that it upheld a ban on standard-capacity magazines that it determined are typically possessed by law-abiding, responsible citizens and do not have a longstanding history of regulation. The earlier panel's holding should be disregarded to prevent manifest injustice. The Court should review Plaintiffs' challenge like any other summary judgment appeal.

New Jersey's magazine ban should be struck down because it violates three constitutional provisions. The ban violates the Second Amendment because it deprives law-abiding, responsible citizens of their right to own and possess standard-capacity magazines that are typically possessed for lawful purposes like self-defense. The ban violates the Fifth Amendment Takings Clause because it requires citizens to relinquish, destroy, or permanently alter their private property without

12

providing any compensation. And the ban violates the Fourteenth Amendment Equal Protection Clause because it draws impermissible distinctions between similarly situated people: retired law-enforcement officers are exempt while ordinary law-abiding citizens, including retired members of the armed forces, are not exempt.

## ARGUMENT

**I.    The Court is not bound by the earlier panel's decision because this appeal arises in a different procedural posture, and reconsideration is necessary to prevent clear error and manifest injustice.**

The district court incorrectly concluded that this Court's earlier panel decision "resolve[d] all legal issues" and was "binding Third Circuit precedent." JA. 8–9. Two well-established exceptions to the law-of-the-case doctrine preclude this Court's earlier decision from binding this panel. First, the earlier panel applied a standard of review inapplicable here. *See ACLU v. Mukasey*, 534 F.3d 181, 192 (3d Cir. 2008). Second, the prior panel decision is clearly erroneous and should be disregarded to prevent manifest injustice. *See id*. at 188.

The earlier panel decision is not binding because this appeal arises in a different procedural context. The earlier panel decision reviewed the denial of Plaintiffs' request for a preliminary injunction, so the Court was bound to draw all factual inferences in Defendants' favor and review the decision for abuse of discretion. *Ass'n of N.J. Rifle and Pistol Clubs, Inc.*, 910 F.3d at 114 ("The ultimate decision to grant or deny the injunction is reviewed for abuse of discretion."); *but*

13

*see id.* at 130 (Bibas, J., dissenting) (noting that the majority "construe[d] [the evidence] in favor of the government, effectively flipping the burden onto the challengers"). In the prior appeal, the Court drew inferences in favor of Defendants with respect to both the government's purported interests and the utility (or supposed lack thereof) of the banned magazines in self-defense, both central issues in the Court's analysis. *Id.* at 120 (drawing inferences related to reloading time and the theoretical ability of a victim of a gun crime to escape during reloading in favor of Defendants' arguments despite no evidence), 122 (stating that "the record does not show that LCMs are well-suited or safe for self-defense" while simultaneously citing to record evidence that shows that the banned magazines are safe and effective for self-defense, but dismissing it in a footnote and without any analysis); *see also id.* at 131-132 (Bibas, J., dissenting) (describing in detail the inferences the prior panel drew in favor of Defendants).

This appeal requires an entirely different analysis. This Court must now draw all factual inferences in Plaintiffs' favor and review de novo the district court's entry of summary judgment. *See, e.g.*, *Foehl*, 238 F.3d at 477. The Court cannot substitute its earlier deferential decision for the plenary review that is now required. *See ACLU*, 534 F.3d at 192.

The earlier panel decision should also be disregarded to prevent clear error and manifest injustice. *See In re City of Philadelphia Litig.*, 158 F.3d 711, 720–21

14

(3d Cir. 1998). In *Philadelphia Litigation*, the Court faced a similar situation and determined that its task in the second appeal was "to evaluate th[e] prior determination solely for clear error." *Id*. at 720. The Court evaluated the merits "to the degree necessary to determine whether the prior panel's decision was clearly wrong." *Id*. at 721.

As explained *infra*, at 17–21, the earlier panel in this case was clearly wrong to the extent it upheld a law that infringes upon a fundamental constitutional right. The earlier panel's decision will work a manifest injustice by allowing New Jersey to enforce an unconstitutional ban and deprive law-abiding, responsible citizens of their right to keep and bear arms typically used for lawful purposes like self-defense.[2]

For these reasons, the Court is not bound by the earlier panel's decision in this case but should consider anew the substantive briefing and evaluate de novo the district court's entry of summary judgment in favor of Defendants.

---

[2] A party is not required to petition the United States Supreme Court for certiorari review following the court of appeals' decision on a preliminary injunction. *See Ash v. Baker*, 392 F. Supp. 368, 369 (E.D. Pa. 1975) ("The prior litigation resulted in a denial of a preliminary injunction, affirmation of said denial on appeal, grant of a motion for summary judgment . . . , reversal of summary judgment on appeal, and grant of certiorari by the Supreme Court."). If this Court refuses to hear this appeal de novo on the merits, it would preempt Supreme Court procedure by effectively requiring parties to petition the Supreme Court for certiorari review following the grant or denial of a preliminary injunction.

**II.  New Jersey's magazine ban violates the Second, Fifth, and Fourteenth Amendments to the United States Constitution.**

New Jersey's magazine ban should be struck down because it violates three separate and independent constitutional provisions. The ban thereby infringes the fundamental rights of all law-abiding, responsible New Jersey citizens and should be struck down.

**A. New Jersey's magazine ban violates the Second Amendment because it bans the acquisition and possession of constitutionally protected arms by law-abiding, responsible citizens.**

**1. New Jersey's magazine ban violates the Second Amendment under Supreme Court precedent because it is inconsistent with the Second Amendment's text, history, and tradition.**

The Supreme Court has reviewed three Second Amendment challenges since 2008 and—on each occasion—applied the text, history, and tradition standard to conclude that the Second Amendment protects the right of law-abiding, responsible citizens to choose, acquire, and possess bearable arms that are typically possessed for lawful purposes. *Heller*, 554 U.S. at 636; *McDonald v. City of Chicago*, 561 U.S. 742, 790–91 (2010); *Caetano*, 136 S. Ct. at 1027–28.[3] This trio of cases

---

[3] Counsel anticipates that the Supreme Court will reinforce this standard of review for a fourth time in the pending *New York Pistol & Rifle Association v. City of New York* case. In any event, this Court would be prudent to stay this case until *New York Pistol & Rifle Association* is decided to avoid issuing a decision inconsistent with imminent Supreme Court precedent.

demonstrates that a ban of firearms typically possessed for lawful purposes, like the banned magazines, is a policy choice that is "off the table." *Heller*, 554 U.S. at 636.

In *Heller*, the Supreme Court struck down a ban on the possession of handguns and operable long guns, which included within its sweep many popular semiautomatic firearms. 554 U.S. at 574, 629–36. In doing so, the Court extensively analyzed the Second Amendment's text, history, and tradition to conclude "that the Second Amendment confer[s] an individual right to keep and bear arms," *id*. at 595, which "extends, prima facie, to all instruments that constitute bearable arms," *id*. at 582, and categorically protects the possession of firearms that are "typically possessed by law-abiding citizens for lawful purposes," *id*. at 625, 627. The Court determined that the District of Columbia's firearm ban was inconsistent with the text, history, and tradition of the Second Amendment because it prohibited "an entire class of arms" typically possessed by law-abiding, responsible citizens for lawful purposes, including self-defense. *Id*. at 628–29. The Court reached its conclusion notwithstanding evidence that handgun violence presents a serious problem in the United States, *id*. at 634–35, and that other firearms may be available to the plaintiffs, *id*. at 629.

Because a ban on protected arms conflicts with the Second Amendment's text, history, and tradition, it is per se unconstitutional. *Id*. at 629. *Heller* expressly rejected interest balancing as a means to resolve Second Amendment challenges. *Id*.

at 634–35. "Constitutional rights [like the Second Amendment right] are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or . . . future judges think that scope [is] too broad." *Id*. In other words, "[t]he very enumeration of the right takes out of the hands of the government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. at 634 (emphasis in original). The Second Amendment "is the very product of an interest balancing by the people" at the time it was enacted, *id*. at 635 (emphasis omitted), and it "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* Under *Heller*, a ban on bearable arms that are typically possessed for lawful purposes is an impermissible policy choice that must be struck down. *Id*. at 636.

Two years later, the Court held that the Second Amendment applies to the States by incorporation through the Fourteenth Amendment Due Process Clause because "the right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill., 561 U.S. 742,* 778 (2010). *McDonald* confirmed that *Heller*'s text, history, and tradition standard is the only proper standard for evaluating the constitutionality of firearm bans. *Id*. at 767–68. The Court again rejected interest balancing as the appropriate paradigm for evaluating Second Amendment challenges. *Id*. at 785. In doing so, the

Court struck down two municipal handgun bans, confirming that any ban on bearable arms that are typically possessed for lawful purposes is per se unconstitutional. *See id*. at 791.

Six years later, the Court again confirmed *Heller*'s standard and holding. In *Caetano*, the Massachusetts Supreme Judicial Court had rejected *Heller*'s standard to uphold Massachusetts' ban on the possession of stun guns. 136 S. Ct. at 1027–28. For the third time in as many cases, the Supreme Court used the text, history, and tradition standard and reiterated that this standard governs cases involving a total ban of bearable arms. *See id*. at 1028. Again, the Court did not apply or approve of any form of interest balancing. The Massachusetts Supreme Judicial Court later followed *Caetano*'s instruction and faithfully applied *Heller*'s standard to conclude that the "absolute prohibition . . . against the civilian possession of stun guns is in violation of the Second Amendment." *Ramirez v. Commonwealth*, 479 Mass. 331, 343, 94 N.E.3d 809, 819 (2018). The court recognized that "the possession of stun guns may be regulated, but not absolutely banned" because any such ban "is inconsistent with the Second Amendment and is therefore unconstitutional." *Id*. at 338, 815.

*McDonald* and *Caetano* are significant for two reasons. First, the Court affirmed and reaffirmed *Heller*'s text, history, and tradition standard as the only standard for evaluating the constitutionality of bans like New Jersey's. *See*

*McDonald*, 561 U.S. at 767–68; *Caetano*, 136 S. Ct. at 1028. Second, the Court affirmed and reaffirmed the principle that bans of bearable arms typically possessed for lawful purposes like self-defense are per se unconstitutional—a means-end scrutiny analysis is neither necessary nor proper.

This Court should follow Supreme Court precedent by applying the text, history, and tradition standard set forth and applied in *Heller*, *McDonald*, and *Caetano*. Under this standard, New Jersey's ban on magazines capable of holding more than ten rounds of ammunition is unconstitutional because these magazines are typically possessed for lawful purposes like self-defense. New Jersey's ban is inconsistent with the text, history, and tradition of the Second Amendment because there is no longstanding tradition of regulating these protected arms. *See infra*, at 10. This ends the inquiry. New Jersey's ban is inconsistent with the Second Amendment's text, history, and tradition and must be struck down.[4]

---

[4] It is undisputed that magazines are "arms" within the meaning of the Second Amendment. *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116 ("[T]he question is whether a magazine is an arm under the Second Amendment. The answer is yes."). "[W]ithout bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

**2. Alternatively, New Jersey's magazine ban violates the Second Amendment under this Court's two-step framework because it fails constitutional muster under any of the standards of scrutiny applied to enumerated constitutional rights.**

Though inconsistent with *Heller*'s clear standard, this Court has applied a "two-step framework" to evaluate laws that burden conduct protected by the Second Amendment. *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116. Under this framework, the Court first determines whether the regulation at issue "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). To make this determination, the Court considers whether the prohibited items are "typically possessed by law-abiding citizens for lawful purposes." *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116.

As previously noted, the banned magazines are typically possessed by law-abiding citizens for lawful purposes. *See infra*, at 8–10; *see also Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116. These magazines are owned by millions and are useful for lawful purposes such as "hunting, pest-control, and [] self-defense." *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116. The banned magazines fall within the Second Amendment's scope.

At the second step, the Court "evaluate[s] the law under some form of means-end scrutiny." *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116. "If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id*. Although

the Supreme Court is clear that a ban of protected arms, like the banned magazines, "fail[s] constitutional muster" "[u]nder any of the standards of scrutiny . . . applied to enumerated constitutional rights," *see Heller*, 554 U.S. at 628, strict scrutiny is the only standard appropriate to analyze a magazine ban, *Duncan*, 366 F. Supp. 3d at 1158. Laws that "impinge[] upon a fundamental right explicitly or implicitly protected by the Constitution" require "strict judicial scrutiny." *San Antonio Ind. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). The right to keep and bear arms is indisputably fundamental. *McDonald*, 561 U.S. at 768, 778 (the right to keep and bear arms is enumerated in the constitutional text and was counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights"). New Jersey's ban is unconstitutional under strict scrutiny because a ban is not the narrowest means possible to achieve whatever interest the State is trying to promote.

Although *Heller* rejected intermediate scrutiny as an appropriate level of scrutiny to evaluate a ban on protected arms, New Jersey's ban also fails under this level of scrutiny.[5] Intermediate scrutiny requires that a law impacting a fundamental right be narrowly tailored to serve a substantial government interest. *McCullen v.*

---

[5] In *Heller*'s dissent, Justice Breyer proposed an interest balancing test premised upon a case applying intermediate scrutiny. *See Heller*, 554 U.S. at 690 (Breyer, J., dissenting) (citing *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195–96 (1997)). The majority rejected Justice Breyer's proposed test and when it did so, it rejected intermediate scrutiny as a standard for reviewing a ban of protected arms.

*Coakley*, 573 U.S. 464, 486 (2014); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 662 (1994). The State must demonstrate that the ban does not "burden substantially more [protected conduct] than is necessary to further that interest." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 213–214 (1997). "The burden of justification is demanding and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). The state cannot "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2005) (plurality).

New Jersey's ban is not sufficiently tailored to further the state's interest in public safety because an absolute ban on the possession of bearable arms is not tailored, much less "narrowly tailored." *See McCullen*, 573 U.S. at 486. By its terms, New Jersey's ban addresses far more than the criminal misuse of firearms; it reaches into the homes of law-abiding, responsible citizens who wish to protect themselves and their homes. *Heller* rejected the use of firearm violence to justify a ban on firearms that are typically possessed for lawful purposes. *See* 554 U.S. at 636. The government may not regulate the secondary effects of constitutionally protected conduct by forbidding the conduct itself. *E.g.*, *Edenfield v. Fane*, 507 U.S. 761, 771–77 (1993) (holding that a state cannot impose a ban on solicitations by public accountants on the ground that solicitations "create[] the dangers of fraud, overreaching, or compromised independence"); *see also Ashcroft v. Free Speech*

*Coal.*, 535 U.S. 234, 245 (2002) (holding that "[t]he prospect of crime . . . does not justify laws suppressing protected speech").

In any event, New Jersey's ban is not substantially related to furthering the state's interest in public safety because New Jersey cannot prove that its "restriction will in fact alleviate" its public safety concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). The record is devoid of a causal relationship between New Jersey's interest and the ban. This lack of evidence cannot justify New Jersey's massive intrusion on the rights of law-abiding, responsible citizens.

### B. New Jersey's magazine ban violates the Fifth Amendment Takings Clause because it is an unconstitutional taking of private property without just compensation.

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." "While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes [a] condition[] on the exercise of such authority: . . . 'just compensation' must be paid to the owner." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 231–32 (2003).

It is undisputed that magazines are personal property and therefore within the confines of the Takings Clause. *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2425–26 (2015) ("Nothing in the text or history of the Takings Clause, or our precedents, suggests that the rule is any different when it comes to appropriation of personal property."). Personal property, like ammunition magazines, can be "taken" within

the meaning of the Fifth Amendment in one of two ways. A "physical taking" occurs when the government appropriates or otherwise physically dispossesses an owner of his property. *Lingle v. Chevron USA, Inc.*, 544 U.S. 528, 537 (2005). A "regulatory taking" occurs when the government regulates the use of that property in a manner that "is tantamount to a direct appropriation or ouster." *Id*.; *see also Horne*, 135 S. Ct. at 2427.

Act A2761 is a physical taking because it dispossesses New Jersey citizens of their property. *See Tahoe-Sierra Pres. Council, Inc. v. Tahor Reg'l Planning Agency*, 535 U.S. 302, 324 n.19 (2002). Citizens have three options to avoid criminal penalties, the first of which is to surrender their ammunition magazines to the government. *See* N.J.S.A. § 2C:39-19(c). This "direct government appropriation . . . of private property" is a "paradigmatic taking requiring just compensation." *Lingle*, 544 U.S. at 537; *see also Horne*, 135 S. Ct. 2428.

Citizens unwilling to surrender their magazines may transfer them to "any person or firm lawfully entitled to own or possess that . . . magazine." N.J.S.A. § 2C:39-19(a). This is also a taking because the government is dispossessing a property owner of his property even though the property goes to a third party. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982). A taking occurred in *Kelo v. City of New London*, for example, even though owners

of the condemned parcels had the option of selling to a private entity. 545 U.S. 469, 475 (2005).

Citizens unwilling to surrender or transfer their magazines may "[r]ender the . . . magazine[s] inoperable" or permanently alter them to accept ten rounds or fewer. N.J.S.A. § 2C:39-19(b). This is also a taking; the government cannot escape its Fifth Amendment obligation to provide just compensation when it requires owners to modify their property. In *Horne*, for example, raisin growers could have "plant[ed] different crops" or "[sold] their raisin-variety grapes as table grapes or for use in juice or wine." 135 S. Ct. at 2430 (quotation marks omitted). And, in *Loretto*, the owner could have converted her building into something other than an apartment complex. 458 U.S. at 439 n.17. Nonetheless, these were takings, and New Jersey's ban is a taking, too.

Act A2761 fares no better when analyzed as a regulatory taking, which occurs when the government requires an individual to sell, destroy, or alter their property, *Yancey v. United States*, 915 F.2d 1534, 1540 (Fed. Cir. 1990), or when the government interferes with a property owner's reasonable, investment-backed expectations, *Murr v. Wisconsin*, 137 S. Ct. 1933, 1945 (2017). Property owners "do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 135 S. Ct. at 2427; *see also Duncan*, 265 F. Supp. 3d at 1138. Nor do they expect to be forced to sell, destroy, or alter property. *Yancey*, 915 F.2d at 1540.

Here, there can be no doubt that owners of the now-banned magazines have been required to sell, alter, or destroy their property. Owners of these magazines cannot keep their magazines unless they permanently alter them and decrease their utility by reducing ammunition capacity from the original, standard amount to an arbitrary number chosen by the government. This is a paradigmatic regulatory taking that requires compensation. *Id.*; *see also Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1138 (S.D. Cal. 2017).

Because New Jersey's magazine ban is a taking, the State "has a categorical duty to compensate the former owner." *Tahoe-Sierra*, 535 U.S. at 322. New Jersey fails to do so. Instead, New Jersey's ban strips law-abiding, responsible citizens of their private property without just compensation. The ban is unconstitutional, and the district court's judgment should be reversed.

### C. New Jersey's magazine ban violates the Fourteenth Amendment Equal Protection Clause because it draws impermissible distinctions between similarly situated people.

The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the law." This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Because similarly situated people must be treated equally, a state can violate the Equal Protection Clause by drawing impermissible distinctions, even if the state

27

would otherwise have the power to enact the statute at issue. In other words, even if Act A2761 were constitutional under the Second and Fifth Amendments (and it is not), it must nonetheless survive constitutional scrutiny under the Equal Protection Clause.

"Classifications . . . affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citations omitted). "[T]he right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778, and magazines capable of holding more than ten rounds are fully protected by the Second Amendment, *see supra*, at 17–21. Because Act A2761 "establishes . . . classification[s] that implicate[] fundamental rights[,] . . . [it] must meet strict scrutiny analysis," *Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099, 1114 (3d Cir. 1997), and it must be "narrowly tailored to serve a compelling state interest," *Pemberthy v. Beyer*, 19 F.3d 857, 870 n.18 (3d Cir. 1994) (quotation marks omitted).

But the classifications drawn by Act A2761 are unconstitutional even under the more lenient intermediate-scrutiny test. Under intermediate scrutiny, Defendants must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (alteration in original) (quotation marks omitted).

28

"The burden of justification is demanding," "rests entirely on the State," and must be "exceedingly persuasive." *Id*.

Act A2761 exempts retired law-enforcement officers from the magazine ban. In doing so, it distinguishes between retired law-enforcement officers (who are exempt from the ban) and law-abiding, responsible citizens of New Jersey, including retired members of the armed forces (who are not). These groups are similarly situated in all relevant respects other than the classification at issue, *see Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 394 (3d Cir. 2010), but are treated differently by Defendants.

This distinction cannot survive review because it is not "substantially related to the achievement of" the State's interest in public safety—let alone narrowly tailored to achieve that interest. *See Virginia*, 518 U.S. at 533. Banning magazines capable of holding more than ten rounds does not advance the State's interest in public safety; rather, it detracts from that interest by giving would-be criminals an advantage over their prospective victims. Permitting some, but not all, law-abiding, responsible citizens to possess these magazines does not address the purported interest in public safety. As the Ninth Circuit held when reviewing a similar equal-protection challenge under the less demanding rational-basis review, exempting retired police officers from a general firearm prohibition "bears no reasonable relationship to the stated legislative purpose" of the prohibition. *Silveira v. Lockyer*,

312 F.3d 1052, 1091 (9th Cir. 2002) (subsequent history omitted). "Rather, the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." *Id*. For that reason, the Ninth Circuit held that the exemption fails even rational-basis review. *See id*.

The distinction between veterans of the police force and law-abiding, responsible citizens cannot be justified. Veterans of the police force and law-abiding, responsible citizens are similarly situated for all relevant purposes with respect to the possession of the banned magazines. Both groups are made up of individuals with a wide range of training and expertise on the banned magazines. The Act does not distinguish between those with and without training on the banned magazines, and it does not require retired law-enforcement officers to have any training on the banned magazines before they are exempted from the possessory ban. *See* Act A2761 § 2, *codified at* N.J.S.A. § 2C:39-17. *Id*. Thus, the universe of retired law-enforcement officers includes those with extensive training on the banned magazines and those without any such training. Law-abiding, responsible citizens likewise may or may not have extensive training or expertise on the banned magazines. By exempting all retired law-enforcement officers, the Act has drawn impermissible distinctions between similarly situated groups, in violation of the Constitution.

The ban's exception for retired police officers fails the equal-protection analysis and must be invalidated on its face. The judgment of the district court should be reversed.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that, after this Court stays this appeal pending the Supreme Court's decision in *New York State Pistol & Rifle Association v. City of New York*, this Court reverse the judgment of the district court and declare that New Jersey's ban on ammunition magazines capable of holding more than ten rounds facially violates the Second, Fifth, and Fourteenth Amendments to the United States Constitution. Plaintiffs also request a permanent injunction preventing Defendants, their employees, and their agents from enforcing New Jersey's magazine ban and any implementing regulations.

Dated: January 27, 2020                    Respectfully submitted,

*/s/ John Parker Sweeney*

John Parker Sweeney
*Attorney for Plaintiffs-Appellants*
John Parker Sweeney
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT CUMMINGS
LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 393-7150
jsweeney@bradley.com

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, N.J. 07450
Telephone: (201) 967-8040
dschmutter@hartmanwinnicki.com

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because it contains 7,680 words.

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has

been prepared in a proportionally spaced typeface using Microsoft Word in Times

New Roman 14-point font.

Dated: January 27, 2020                    Respectfully submitted,

                                           */s/ John Parker Sweeney*
                                           John Parker Sweeney
                                           *Attorney for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2020, I filed the foregoing with the Clerk

of the Court via CM/ECF, which will serve the following counsel of record:

Jeremy Feigenbaum
Stuart M. Feinblatt
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
jeremy.feigenbaum@law.njoag.gov
stuart.feinblatt@law.njoag.gov

Bryan E. Lucas
Evan A. Showell
Office of Attorney General of Jew Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ 07102
bryan.lucas@law.njoag.gov
evan.showell@law.njoag.gov

George C. Jones
John H. Suminski
McElroy Deutsch Mulvaney
& Carpenter
1300 Mount Kimble Ave.
P.O. Box 2075
Morristown, NJ 07962
gjones@mdmc-law.com
jsuminski@mdmc-law.com

Carmine Richard Alampi
Jennifer Alampi
Alampi & Demarrais
One University Plaza
Suite 404
Hackensack, NJ 07601
calampi@alampi-law.com
jalampi@alampi-law.com

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Attorney for Plaintiffs-Appellants*

# CERTIFICATE OF VIRUS SCAN

I certify that the Portable Document Format version of the attached document has been scanned for viruses using Trend Micro Security Agent, and according to that program, the document is free of viruses.

Dated: January 27, 2020

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF BAR MEMBERSHIP, PRIVACY REDACTIONS, AND IDENTICAL ELECTRONIC AND HARD COPY VERSIONS

I hereby certify that the signatory to this brief, John Parker Sweeney, is a member of the bar of this Court. I further certify that no privacy redactions were necessary for this filing. Finally, I certify that the text of the electronic brief is identical to the text in the paper copies.

Dated: January 27, 2020                    Respectfully submitted,

                                           */s/ John Parker Sweeney*
                                           John Parker Sweeney
                                           *Attorney for Plaintiffs-Appellants*

# ADDENDUM TO BRIEF OF APPELLANTS
## TABLE OF CONTENTS

N.J.S.A.

§ 2C:39-1 ................................................................. A1

§ 2C:39-3 ................................................................. A8

§2C:39-5 ................................................................. A12

§ 2C:39-17 ............................................................... A15

§ 2C:39-19 ............................................................... A16

§ 2C:43-3 ................................................................. A17

§ 2C:43-6 ................................................................. A19

A2761 ...................................................................... A22

New Jersey Statutes Annotated
    Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
        Subtitle 2. Definition of Specific Offenses
            Part 5. Offenses Against Public Order, Health and Decency
                Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

N.J.S.A. 2C:39-1

2C:39-1. Definitions

Effective: November 8, 2018 to January 31, 2020
Currentness

<Text of section effective until Feb. 1, 2020. See, also, section 2C:39-1 effective Feb. 1, 2020.>

Definitions. The following definitions apply to this chapter and to chapter 58:

a. "Antique firearm" means any rifle or shotgun and "antique cannon" means a destructive device defined in paragraph (3) of subsection c. of this section, if the rifle, shotgun or destructive device, as the case may be, is incapable of being fired or discharged, or which does not fire fixed ammunition, regardless of date of manufacture, or was manufactured before 1898 for which cartridge ammunition is not commercially available, and is possessed as a curiosity or ornament or for its historical significance or value.

b. "Deface" means to remove, deface, cover, alter or destroy the name of the maker, model designation, manufacturer's serial number or any other distinguishing identification mark or number on any firearm.

c. "Destructive device" means any device, instrument or object designed to explode or produce uncontrolled combustion, including (1) any explosive or incendiary bomb, mine or grenade; (2) any rocket having a propellant charge of more than four ounces or any missile having an explosive or incendiary charge of more than one-quarter of an ounce; (3) any weapon capable of firing a projectile of a caliber greater than 60 caliber, except a shotgun or shotgun ammunition generally recognized as suitable for sporting purposes; (4) any Molotov cocktail or other device consisting of a breakable container containing flammable liquid and having a wick or similar device capable of being ignited. The term does not include any device manufactured for the purpose of illumination, distress signaling, line-throwing, safety or similar purposes.

d. "Dispose of" means to give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer, or otherwise transfer possession.

e. "Explosive" means any chemical compound or mixture that is commonly used or is possessed for the purpose of producing an explosion and which contains any oxidizing and combustible materials or other ingredients in such proportions, quantities or packing that an ignition by fire, by friction, by concussion or by detonation of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects. The term shall not include small arms ammunition, or explosives in the form prescribed by the official United States Pharmacopoeia.

f. "Firearm" means any handgun, rifle, shotgun, machine gun, automatic or semi-automatic rifle, or any gun, device or instrument in the nature of a weapon from which may be fired or ejected any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances. It shall also include, without limitation, any firearm which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person.

g. "Firearm silencer" means any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearm to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearm.

h. "Gravity knife" means any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force.

i. "Machine gun" means any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom. A machine gun also shall include, without limitation, any firearm with a trigger crank attached.

j. "Manufacturer" means any person who receives or obtains raw materials or parts and processes them into firearms or finished parts of firearms, except a person who exclusively processes grips, stocks and other nonmetal parts of firearms. The term does not include a person who repairs existing firearms or receives new and used raw materials or parts solely for the repair of existing firearms.

k. "Handgun" means any pistol, revolver or other firearm originally designed or manufactured to be fired by the use of a single hand.

*l.* "Retail dealer" means any person including a gunsmith, except a manufacturer or a wholesale dealer, who sells, transfers or assigns for a fee or profit any firearm or parts of firearms or ammunition which he has purchased or obtained with the intention, or for the purpose, of reselling or reassigning to persons who are reasonably understood to be the ultimate consumers, and includes any person who is engaged in the business of repairing firearms or who sells any firearm to satisfy a debt secured by the pledge of a firearm.

m. "Rifle" means any firearm designed to be fired from the shoulder and using the energy of the explosive in a fixed metallic cartridge to fire a single projectile through a rifled bore for each single pull of the trigger.

n. "Shotgun" means any firearm designed to be fired from the shoulder and using the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shots or a single projectile for each pull of the trigger, or any firearm designed to be fired from the shoulder which does not fire fixed ammunition.

*o.* "Sawed-off shotgun" means any shotgun having a barrel or barrels of less than 18 inches in length measured from the breech to the muzzle, or a rifle having a barrel or barrels of less than 16 inches in length measured from the breech to the muzzle,

or any firearm made from a rifle or a shotgun, whether by alteration, or otherwise, if such firearm as modified has an overall length of less than 26 inches.

p. "Switchblade knife" means any knife or similar device which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife.

q. "Superintendent" means the Superintendent of the State Police.

r. "Weapon" means anything readily capable of lethal use or of inflicting serious bodily injury. The term includes, but is not limited to, all (1) firearms, even though not loaded or lacking a clip or other component to render them immediately operable; (2) components which can be readily assembled into a weapon; (3) gravity knives, switchblade knives, daggers, dirks, stilettos, or other dangerous knives, billies, blackjacks, bludgeons, metal knuckles, sandclubs, slingshots, cesti or similar leather bands studded with metal filings or razor blades imbedded in wood; and (4) stun guns; and any weapon or other device which projects, releases, or emits tear gas or any other substance intended to produce temporary physical discomfort or permanent injury through being vaporized or otherwise dispensed in the air.

s. "Wholesale dealer" means any person, except a manufacturer, who sells, transfers, or assigns firearms, or parts of firearms, to persons who are reasonably understood not to be the ultimate consumers, and includes persons who receive finished parts of firearms and assemble them into completed or partially completed firearms, in furtherance of such purpose, except that it shall not include those persons dealing exclusively in grips, stocks and other nonmetal parts of firearms.

t. "Stun gun" means any weapon or other device which emits an electrical charge or current intended to temporarily or permanently disable a person.

u. "Ballistic knife" means any weapon or other device capable of lethal use and which can propel a knife blade.

v. "Imitation firearm" means an object or device reasonably capable of being mistaken for a firearm.

w. "Assault firearm" means:

(1) The following firearms:

Algimec AGM1 type

Any shotgun with a revolving cylinder such as the "Street Sweeper" or "Striker 12"

Armalite AR-180 type

Australian Automatic Arms SAR

Avtomat Kalashnikov type semi-automatic firearms

Beretta AR-70 and BM59 semi-automatic firearms

Bushmaster Assault Rifle

Calico M-900 Assault carbine and M-900

CETME G3

Chartered Industries of Singapore SR-88 type

Colt AR-15 and CAR-15 series

Daewoo K-1, K-2, Max 1 and Max 2, AR 100 types

Demro TAC-1 carbine type

Encom MP-9 and MP-45 carbine types

FAMAS MAS223 types

FN-FAL, FN-LAR, or FN-FNC type semi-automatic firearms

Franchi SPAS 12 and LAW 12 shotguns

G3SA type

Galil type Heckler and Koch HK91, HK93, HK94, MP5, PSG-1

Intratec TEC 9 and 22 semi-automatic firearms

M1 carbine type

M14S type

MAC 10, MAC 11, MAC 11-9mm carbine type firearms

PJK M-68 carbine type

Plainfield Machine Company Carbine

Ruger K-Mini-14/5F and Mini-14/5RF

SIG AMT, SIG 550SP, SIG 551SP, SIG PE-57 types

SKS with detachable magazine type

Spectre Auto carbine type

Springfield Armory BM59 and SAR-48 type

Sterling MK-6, MK-7 and SAR types

Steyr A.U.G. semi-automatic firearms

USAS 12 semi-automatic type shotgun

Uzi type semi-automatic firearms

Valmet M62, M71S, M76, or M78 type semi-automatic firearms

Weaver Arm Nighthawk.

(2) Any firearm manufactured under any designation which is substantially identical to any of the firearms listed above.

(3) A semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock.

(4) A semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds. "Assault firearm" shall not include a semi-automatic rifle which has an attached tubular device and which is capable of operating only with .22 caliber rimfire ammunition.

(5) A part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person.

(6) A firearm with a bump stock attached.

x. "Semi-automatic" means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet.

y. "Large capacity ammunition magazine" means a box, drum, tube or other container which is capable of holding more than 10 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm. The term shall not include an attached tubular device which is capable of holding only .22 caliber rimfire ammunition.

z. "Pistol grip" means a well-defined handle, similar to that found on a handgun, that protrudes conspicuously beneath the action of the weapon, and which permits the shotgun to be held and fired with one hand.

aa. "Antique handgun" means a handgun manufactured before 1898, or a replica thereof, which is recognized as being historical in nature or of historical significance and either (1) utilizes a match, friction, flint, or percussion ignition, or which utilizes a pin-fire cartridge in which the pin is part of the cartridge or (2) does not fire fixed ammunition or for which cartridge ammunition is not commercially available.

bb. "Trigger lock" means a commercially available device approved by the Superintendent of State Police which is operated with a key or combination lock that prevents a firearm from being discharged while the device is attached to the firearm. It may

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

include, but need not be limited to, devices that obstruct the barrel or cylinder of the firearm, as well as devices that immobilize the trigger.

cc. "Trigger locking device" means a device that, if installed on a firearm and secured by means of a key or mechanically, electronically or electromechanically operated combination lock, prevents the firearm from being discharged without first deactivating or removing the device by means of a key or mechanically, electronically or electromechanically operated combination lock.

dd. "Personalized handgun" means a handgun which incorporates within its design, and as part of its original manufacture, technology which automatically limits its operational use and which cannot be readily deactivated, so that it may only be fired by an authorized or recognized user. The technology limiting the handgun's operational use may include, but not be limited to: radio frequency tagging, touch memory, remote control, fingerprint, magnetic encoding and other automatic user identification systems utilizing biometric, mechanical or electronic systems. No make or model of a handgun shall be deemed to be a "personalized handgun" unless the Attorney General has determined, through testing or other reasonable means, that the handgun meets any reliability standards that the manufacturer may require for its commercially available handguns that are not personalized or, if the manufacturer has no such reliability standards, the handgun meets the reliability standards generally used in the industry for commercially available handguns.

ee. "Bump stock" means any device or instrument for a firearm that increases the rate of fire achievable with the firearm by using energy from the recoil of the firearm to generate a reciprocating action that facilitates repeated activation of the trigger.

ff. "Trigger crank" means any device or instrument to be attached to a firearm that repeatedly activates the trigger of the firearm through the use of a lever or other part that is turned in a circular motion; provided, however, the term shall not include any weapon initially designed and manufactured to fire through the use of a crank or lever.

gg. "Armor piercing ammunition" means: (1) a projectile or projectile core which may be used in a handgun and is constructed entirely, excluding the presence of traces of other substances, from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or (2) a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile. "Armor piercing ammunition" shall not include shotgun shot required by federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the United States Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the United States Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil gas well perforating device.

hh. "Covert firearm" means any firearm that is constructed in a shape or configuration such that it does not resemble a handgun, rifle, shotgun, or machine gun including, but not limited to, a firearm that resembles a key-chain, pen, cigarette lighter, cigarette package, cellphone, smart phone, wallet, or cane.

ii. "Undetectable firearm" means a firearm that: (1) after removal of all parts other than major components, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or (2) includes a major component which, if the firearm were subjected to inspection by the types of detection devices commonly used at airports for security screening, would not generate an image that accurately depicts the shape of the component. "Undetectable firearm" shall not be construed to include a firearm subject to the provisions of paragraphs (3) through (6) of subsection (p) of 18 U.S.C. s.922.

jj. "Major component" means the slide or cylinder or the frame or receiver of a firearm and, in the case of a rifle or shotgun, also includes the barrel.

kk. "Security Exemplar" means the Security Exemplar fabricated in accordance with subparagraph (C) of paragraph (2) of subsection (p) of 18 U.S.C. s.922.

**Credits**
L.1978, c. 95, § 2C:39-1, eff. Sept. 1, 1979. Amended by L.1981, c. 363, § 1, eff. Dec. 30, 1981; L.1983, c. 479, § 1, eff. Jan. 12, 1984; L.1985, c. 360, § 1, eff. Nov. 12, 1985; L.1987, c. 228, § 1, eff. July 30, 1987; L.1989, c. 120, § 1, eff. Aug. 1, 1989; L.1990, c. 32, § 1, eff. May 30, 1990; L.1999, c. 233, § 1, eff. Jan. 1, 2000; L.1999, c. 255, § 1, eff. Oct. 15, 1999; L.2002, c. 130, § 5, eff. Dec. 23, 2002; L.2017, c. 323, § 1, eff. Jan. 16, 2018; L.2018, c. 38, § 1, eff. June 13, 2018; L.2018, c. 39, § 1, eff. June 13, 2018; L.2018, c. 138, § 1, eff. Nov. 8, 2018.

N. J. S. A. 2C:39-1, NJ ST 2C:39-1
Current with laws through L.2019, c. 268 and J.R. No. 22

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    A-007    7

New Jersey Statutes Annotated
    Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
        Subtitle 2. Definition of Specific Offenses
            Part 5. Offenses Against Public Order, Health and Decency
                Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

N.J.S.A. 2C:39-3

2C:39-3. Prohibited weapons and devices

Effective: July 16, 2019
Currentness

Prohibited Weapons and Devices.

a. Destructive devices. Any person who knowingly has in his possession any destructive device is guilty of a crime of the third degree.

b. Sawed-off shotguns. Any person who knowingly has in his possession any sawed-off shotgun is guilty of a crime of the third degree.

c. Silencers. Any person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree.

d. Defaced firearms. Any person who knowingly has in his possession any firearm which has been defaced, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree.

e. Certain weapons. Any person who knowingly has in his possession any gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckle, sandclub, slingshot, cestus or similar leather band studded with metal filings or razor blades imbedded in wood, ballistic knife, without any explainable lawful purpose, is guilty of a crime of the fourth degree.

f. Dum-dum or armor piercing ammunition. (1) Any person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet, or (2) any person, other than a collector of firearms or ammunition as curios or relics as defined in Title 18, United States Code, section 921 (a) (13) and has in his possession a valid Collector of Curios and Relics License issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who knowingly has in his possession any armor piercing ammunition, as defined in subsection gg. of N.J.S.2C:39-1, is guilty of a crime of the fourth degree. For purposes of this section, a collector may possess not more than three examples of each distinctive variation of the ammunition described above. A distinctive variation includes a different head stamp, composition, design, or color.

g. Exceptions. (1)(a) Nothing in subsection a., b., c., d., e., f., j. or k. of this section shall apply to any member of the Armed Forces of the United States or the National Guard, or except as otherwise provided, to any law enforcement officer while actually

on duty or traveling to or from an authorized place of duty, provided that his possession of the prohibited weapon or device has been duly authorized under the applicable laws, regulations or military or law enforcement orders.

(b) Nothing in subsection j. of this section shall apply to a law enforcement officer who possesses and carries while off-duty a large capacity ammunition magazine capable of holding not more than 17 rounds of ammunition that can be fed continuously and directly into a semi-automatic firearm.

(c) Notwithstanding subparagraph (b) of this paragraph, subsection j. of this section shall not apply to a law enforcement officer who possesses and carries while off-duty a large capacity ammunition magazine capable of holding more than 17 rounds of ammunition that can be fed continuously and directly into a semi-automatic firearm provided the large capacity ammunition magazine is used with a service firearm issued to the officer by the officer's employer for use in the officer's official duties.

(d) Nothing in subsection h. of this section shall apply to any law enforcement officer who is exempted from the provisions of that subsection by the Attorney General. Nothing in this section shall apply to the possession of any weapon or device by a law enforcement officer who has confiscated, seized or otherwise taken possession of said weapon or device as evidence of the commission of a crime or because he believed it to be possessed illegally by the person from whom it was taken, provided that said law enforcement officer promptly notifies his superiors of his possession of such prohibited weapon or device.

(2)(a) Nothing in paragraph (1) of subsection f. of this section shall be construed to prevent a person from keeping such ammunition at his dwelling, premises or other land owned or possessed by him, or from carrying such ammunition from the place of purchase to said dwelling or land, nor shall paragraph (1) of subsection f. of this section be construed to prevent any licensed retail or wholesale firearms dealer from possessing such ammunition at its licensed premises, provided that the seller of any such ammunition shall maintain a record of the name, age and place of residence of any purchaser who is not a licensed dealer, together with the date of sale and quantity of ammunition sold.

(b) Nothing in paragraph (1) of subsection f. of this section shall be construed to prevent a designated employee or designated licensed agent for a nuclear power plant under the license of the Nuclear Regulatory Commission from possessing hollow nose ammunition while in the actual performance of his official duties, if the federal licensee certifies that the designated employee or designated licensed agent is assigned to perform site protection, guard, armed response or armed escort duties and is appropriately trained and qualified, as prescribed by federal regulation, to perform those duties.

(3) Nothing in paragraph (2) of subsection f. or in subsection j. of this section shall be construed to prevent any licensed retail or wholesale firearms dealer from possessing that ammunition or large capacity ammunition magazine at its licensed premises for sale or disposition to another licensed dealer, the Armed Forces of the United States or the National Guard, or to a law enforcement agency, provided that the seller maintains a record of any sale or disposition to a law enforcement agency. The record shall include the name of the purchasing agency, together with written authorization of the chief of police or highest ranking official of the agency, the name and rank of the purchasing law enforcement officer, if applicable, and the date, time and amount of ammunition sold or otherwise disposed. A copy of this record shall be forwarded by the seller to the Superintendent of the Division of State Police within 48 hours of the sale or disposition.

(4) Nothing in subsection a. of this section shall be construed to apply to antique cannons as exempted in subsection d. of N.J.S.2C:39-6.

(5) Nothing in subsection c. of this section shall be construed to apply to any person who is specifically identified in a special deer management permit issued by the Division of Fish and Wildlife to utilize a firearm silencer as part of an alternative deer control method implemented in accordance with a special deer management permit issued pursuant to section 4 of P.L.2000, c. 46 (C.23:4-42.6), while the person is in the actual performance of the permitted alternative deer control method and while going to and from the place where the permitted alternative deer control method is being utilized. This exception shall not, however, otherwise apply to any person to authorize the purchase or possession of a firearm silencer.

h. Stun guns. Any person who knowingly has in his possession any stun gun is guilty of a crime of the fourth degree.

i. Nothing in subsection e. of this section shall be construed to prevent any guard in the employ of a private security company, who is licensed to carry a firearm, from the possession of a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course approved by the Police Training Commission in the use of a nightstick.

j. Any person who knowingly has in his possession a large capacity ammunition magazine is guilty of a crime of the fourth degree unless the person has registered:

(1) an assault firearm pursuant to section 11 of P.L.1990, c. 32 (C.2C:58-12) and the magazine is maintained and used in connection with participation in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United States Department of the Army; or

(2) a firearm with a fixed magazine capacity or detachable magazine capable of holding up to 15 rounds pursuant to section 7 of P.L.2018, c. 39 (C.2C:39-20).

k. Handcuffs. Any person who knowingly has in his possession handcuffs as defined in P.L.1991, c. 437 (C.2C:39-9.2), under circumstances not manifestly appropriate for such lawful uses as handcuffs may have, is guilty of a disorderly persons offense. A law enforcement officer shall confiscate handcuffs possessed in violation of the law.

*l.* Bump stock or trigger crank. Any person who knowingly possesses a bump stock as defined in subsection ee. of N.J.S.2C:39-1 or a trigger crank as defined in subsection ff. of N.J.S.2C:39-1, regardless of whether the person is in possession of a firearm, is guilty of a crime of the third degree.

Notwithstanding the provisions of N.J.S.2C:1-8 or any other provision of law, a conviction arising out of this subsection shall not merge with a conviction for possessing an assault firearm in violation of subsection f. of N.J.S.2C:39-5 or a machine gun in violation of subsection a. of N.J.S.2C:39-5 and a separate sentence shall be imposed upon each conviction. Notwithstanding the provisions of N.J.S.2C:44-5 or any other provisions of law, the sentence imposed pursuant to this subsection shall be served consecutively to that imposed for unlawfully possessing an assault firearm in violation of subsection f. of N.J.S.2C:39-5.

m. Covert or undetectable firearms. Any person who knowingly possesses any covert firearm as defined in subsection hh. of N.J.S.2C:39-1, an undetectable firearm as defined in subsection ii. of N.J.S.2C:39-1, or a firearm enclosed in a container or covering that is designed or modified to allow the firearm to be fired while so enclosed and that disguises or obscures the shape of the firearm such that it does not resemble a handgun, rifle, shotgun, or machine gun is guilty of a crime of the third degree.

n. Firearms without a serial number. Any person who knowingly possesses a firearm manufactured or otherwise assembled using a firearm frame or firearm receiver as defined in subsection k. of N.J.S.2C:39-9 which is not imprinted with a serial number registered with a federally licensed manufacturer including, but not limited to, a firearm manufactured or otherwise assembled from parts purchased or otherwise obtained in violation of subsection k. of N.J.S.2C:39-9, is guilty of a crime of the third degree.

**Credits**

L.1978, c. 95, § 2C:39-3, eff. Sept. 1, 1979. Amended by L.1979, c. 179, § 2, eff. Sept. 1, 1979; L.1983, c. 58, § 1, eff. Feb. 7, 1983; L.1983, c. 479, § 2, eff. Jan. 12, 1984; L.1985, c. 360, § 2, eff. Nov. 12, 1985; L.1987, c. 228, § 2, eff. July 30, 1987; L.1989, c. 11, § 1, eff. Feb. 1, 1989; L.1990, c. 32, § 10, eff. May 30, 1990; L.1991, c. 437, § 1, eff. Jan. 18, 1992; L.1999, c. 233, § 2, eff. Jan. 1, 2000; L.2000, c. 46, § 5, eff. June 30, 2000; L.2003, c. 168, § 1, eff. Sept. 3, 2003; L.2017, c. 323, § 2, eff. Jan. 16, 2018; L.2018, c. 38, § 2, eff. June 13, 2018; L.2018, c. 39, § 2, eff. June 13, 2018; L.2018, c. 138, § 2, eff. Nov. 8, 2018; L.2018, c. 161, § 1, eff. Dec. 19, 2018; L.2019, c. 165, § 2, eff. July 16, 2019.

N. J. S. A. 2C:39-3, NJ ST 2C:39-3

Current with laws through L.2019, c. 268 and J.R. No. 22

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

A-011

New Jersey Statutes Annotated
    Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
        Subtitle 2. Definition of Specific Offenses
            Part 5. Offenses Against Public Order, Health and Decency
                Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

N.J.S.A. 2C:39-5

2C:39-5. Unlawful possession of weapons

Effective: August 8, 2013
Currentness

Unlawful possession of weapons. a. Machine guns. Any person who knowingly has in his possession a machine gun or any instrument or device adaptable for use as a machine gun, without being licensed to do so as provided in N.J.S.2C:58-5, is guilty of a crime of the second degree.

b. Handguns. (1) Any person who knowingly has in his possession any handgun, including any antique handgun, without first having obtained a permit to carry the same as provided in N.J.S.2C:58-4, is guilty of a crime of the second degree. (2) If the handgun is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person it is a crime of the third degree.

c. Rifles and shotguns. (1) Any person who knowingly has in his possession any rifle or shotgun without having first obtained a firearms purchaser identification card in accordance with the provisions of N.J.S.2C:58-3, is guilty of a crime of the third degree.

(2) Unless otherwise permitted by law, any person who knowingly has in his possession any loaded rifle or shotgun is guilty of a crime of the third degree.

d. Other weapons. Any person who knowingly has in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have is guilty of a crime of the fourth degree.

e. Firearms or other weapons in educational institutions.

(1) Any person who knowingly has in his possession any firearm in or upon any part of the buildings or grounds of any school, college, university or other educational institution, without the written authorization of the governing officer of the institution, is guilty of a crime of the third degree, irrespective of whether he possesses a valid permit to carry the firearm or a valid firearms purchaser identification card.

(2) Any person who knowingly possesses any weapon enumerated in paragraphs (3) and (4) of subsection r. of N.J.S.2C:39-1 or any components which can readily be assembled into a firearm or other weapon enumerated in subsection r. of N.J.S.2C:39-1 or

any other weapon under circumstances not manifestly appropriate for such lawful use as it may have, while in or upon any part of the buildings or grounds of any school, college, university or other educational institution without the written authorization of the governing officer of the institution is guilty of a crime of the fourth degree.

(3) Any person who knowingly has in his possession any imitation firearm in or upon any part of the buildings or grounds of any school, college, university or other educational institution, without the written authorization of the governing officer of the institution, or while on any school bus is a disorderly person, irrespective of whether he possesses a valid permit to carry a firearm or a valid firearms purchaser identification card.

f. Assault firearms. Any person who knowingly has in his possession an assault firearm is guilty of a crime of the second degree except if the assault firearm is licensed pursuant to N.J.S.2C:58-5; registered pursuant to section 11 of P.L.1990, c. 32 (C.2C:58-12); or rendered inoperable pursuant to section 12 of P.L.1990, c. 32 (C.2C:58-13).

g. (1) The temporary possession of a handgun, rifle or shotgun by a person receiving, possessing, carrying or using the handgun, rifle, or shotgun under the provisions of section 1 of P.L.1992, c. 74 (C.2C:58-3.1) shall not be considered unlawful possession under the provisions of subsection b. or c. of this section.

(2) The temporary possession of a firearm by a person receiving, possessing, carrying or using the firearm under the provisions of section 1 of P.L.1997, c. 375 (C.2C:58-3.2) shall not be considered unlawful possession under the provisions of this section.

h. A person who is convicted of a crime under subsection a., b., f. or j. of this section shall be ineligible for participation in any program of intensive supervision; provided, however, that this provision shall not apply to a crime under subsection b. involving only a handgun which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person.

i. A person convicted of violating subsection a., b. or f. of this section shall be sentenced by the court to a term of imprisonment, which shall include the imposition of a minimum term during which the defendant shall be ineligible for parole, if the court finds that the aggravating circumstance set forth in paragraph (5) of subsection a. of N.J.S.2C:44-1 applies. The minimum term of parole ineligibility shall be fixed at five years. The sentencing court shall make a finding on the record as to whether the aggravating circumstance set forth in paragraph (5) of subsection a. of N.J.S.2C:44-1 applies, and the court shall presume that there is a substantial likelihood that the defendant is involved in organized criminal activity if there is a substantial likelihood that the defendant is a member of an organization or group that engages in criminal activity. The prosecution at the sentencing hearing shall have the initial burden of producing evidence or information concerning the defendant's membership in such an organization or group.

j. A violation of subsection a., b., c. or f. of this section by a person who has a prior conviction of any of the crimes enumerated in subsection d. of section 2 of P.L.1997, c. 117 (C.2C:43-7.2) is a first degree crime.

**Credits**
L.1978, c. 95, § 2C:39-5, eff. Sept. 1, 1979. Amended by L.1979, c. 179, § 4, eff. Sept. 1, 1979; L.1990, c. 32, § 2, eff. May 30, 1990; L.1992, c. 74, § 2, eff. July 31, 1992; L.1992, c. 94, § 1, eff. Sept. 9, 1992; L.1995, c. 389, § 1, eff. Jan. 10, 1996;

L.1997, c. 375, § 2, eff. Jan. 19, 1998; L.2007, c. 284, § 1, eff. Jan. 13, 2008; L.2009, c. 13, § 1, eff. Feb. 2, 2009; L.2013, c. 113, § 1, eff. Aug. 8, 2013.

N. J. S. A. 2C:39-5, NJ ST 2C:39-5
Current with laws through L.2019, c. 268 and J.R. No. 22

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

N.J.S.A. 2C:39-17

2C:39-17. Possession and carry of large capacity ammunition magazine by
retired law enforcement officer authorized to possess and carry handgun

Effective: June 13, 2018
Currentness

Notwithstanding the provisions of subsection j. of N.J.S.2C:39-3, a retired law enforcement officer who is authorized to possess and carry a handgun pursuant to subsection l. of N.J.S.2C:39-6 may possess and carry a large capacity ammunition magazine which is capable of holding up to 15 rounds of ammunition that can be fed continuously and directly into a semi-automatic handgun.

**Credits**
L.2018, c. 39, § 3, eff. June 13, 2018.

N. J. S. A. 2C:39-17, NJ ST 2C:39-17
Current with laws through L.2019, c. 268 and J.R. No. 22

---

**End of Document**                                        © 2020 Thomson Reuters. No claim to original U.S. Government Works.

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

N.J.S.A. 2C:39-19

2C:39-19. Current owners of automatic rifles; retention of possession; regulations

Effective: June 13, 2018
Currentness

Except as provided in section 7 of P.L.2018, c. 39 (C.2C:39-20), a person who legally owns a semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds or a large capacity ammunition magazine as defined under subsection y. of N.J.S.2C:39-1 which is capable of holding more than 10 rounds of ammunition on the effective date of P.L.2018, c. 39 (C.2C:39-17 et al.) may retain possession of that rifle or magazine for a period not to exceed 180 days after the effective date of this act. During this time period, the owner of the semi-automatic rifle or magazine shall:

a. Transfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine;

b. Render the semi-automatic rifle or magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less; or

c. Voluntarily surrender the semi-automatic rifle or magazine pursuant to the provisions of N.J.S.2C:39-12.

**Credits**
L.2018, c. 39, § 5, eff. June 13, 2018.

N. J. S. A. 2C:39-19, NJ ST 2C:39-19
Current with laws through L.2019, c. 268 and J.R. No. 22

---

**End of Document**　　　　　　　　　　　　　　　© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

New Jersey Statutes Annotated
    Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
        Subtitle 3. Sentencing
            Chapter 43. Authorized Disposition of Offenders (Refs & Annos)

N.J.S.A. 2C:43-3

2C:43-3. Fines and restitution

Currentness

Fines and Restitutions. A person who has been convicted of an offense may be sentenced to pay a fine, to make restitution, or both, such fine not to exceed:

a. (1) $200,000.00 when the conviction is of a crime of the first degree;

(2) $150,000.00 when the conviction is of a crime of the second degree;

b. (1) $15,000.00 when the conviction is of a crime of the third degree;

(2) $10,000.00 when the conviction is of a crime of the fourth degree;

c. $1,000.00, when the conviction is of a disorderly persons offense;

d. $500.00, when the conviction is of a petty disorderly persons offense;

e. Any higher amount equal to double the pecuniary gain to the offender or loss to the victim caused by the conduct constituting the offense by the offender. In such case the court shall make a finding as to the amount of the gain or loss, and if the record does not contain sufficient evidence to support such a finding the court may conduct a hearing upon the issue. For purposes of this section the term "gain" means the amount of money or the value of property derived by the offender and "loss" means the amount of value separated from the victim or the amount of any payment owed to the victim and avoided or evaded and includes any reasonable and necessary expense incurred by the owner in recovering or replacing lost, stolen or damaged property, or recovering any payment avoided or evaded, and, with respect to property of a research facility, includes the cost of repeating an interrupted or invalidated experiment or loss of profits. The term "victim" shall mean a person who suffers a personal physical or psychological injury or death or incurs loss of or injury to personal or real property as a result of a crime committed against that person, or in the case of a homicide, the nearest relative of the victim. The terms "gain" and "loss" shall also mean, where appropriate, the amount of any tax, fee, penalty and interest avoided, evaded, or otherwise unpaid or improperly retained or disposed of;

f. Any higher amount specifically authorized by another section of this code or any other statute;

g. Up to twice the amounts authorized in subsection a., b., c. or d. of this section, in the case of a second or subsequent conviction of any tax offense defined in Title 54 of the Revised Statutes or Title 54A of the New Jersey Statutes, as amended and supplemented, or of any offense defined in chapter 20 or 21 of this code;

h. In the case of violations of chapter 35, any higher amount equal to three times the street value of the controlled dangerous substance or controlled substance analog. The street value for purposes of this section shall be determined pursuant to subsection e. of N.J.S.2C:44-2.

The restitution ordered paid to the victim shall not exceed the victim's loss, except that in any case involving the failure to pay any State tax, the amount of restitution to the State shall be the full amount of the tax avoided or evaded, including full civil penalties and interest as provided by law. In any case where the victim of the offense is any department or division of State government, the court shall order restitution to the victim. Any restitution imposed on a person shall be in addition to any fine which may be imposed pursuant to this section.

**Credits**

L.1978, c. 95, § 2C:43-3, Sept. 1, 1979. Amended by L.1979, c. 178, § 83, eff. Sept. 1, 1979; L.1981, c. 290, § 37, eff. Sept. 24, 1981; L.1987, c. 76, § 34, eff. Dec. 9, 1987; L.1987, c. 106, § 10, eff. June 22, 1987, operative July 9, 1987; L.1991, c. 329, § 2, eff. Dec. 23, 1991; L.1995, c. 20, § 6, eff. Jan. 25, 1995; L.1995, c. 417, § 2, eff. Jan. 10, 1996; L.1997, c. 181, § 12, eff. Aug. 1, 1997.

N. J. S. A. 2C:43-3, NJ ST 2C:43-3
Current with laws through L.2019, c. 268 and J.R. No. 22

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 3. Sentencing
      Chapter 43. Authorized Disposition of Offenders (Refs & Annos)

N.J.S.A. 2C:43-6

2C:43-6. Sentence of imprisonment for crime; ordinary terms; mandatory terms

Effective: August 8, 2013

Currentness

a. Except as otherwise provided, a person who has been convicted of a crime may be sentenced to imprisonment, as follows:

(1) In the case of a crime of the first degree, for a specific term of years which shall be fixed by the court and shall be between 10 years and 20 years;

(2) In the case of a crime of the second degree, for a specific term of years which shall be fixed by the court and shall be between five years and 10 years;

(3) In the case of a crime of the third degree, for a specific term of years which shall be fixed by the court and shall be between three years and five years;

(4) In the case of a crime of the fourth degree, for a specific term which shall be fixed by the court and shall not exceed 18 months.

b. As part of a sentence for any crime, where the court is clearly convinced that the aggravating factors substantially outweigh the mitigating factors, as set forth in subsections a. and b. of 2C:44-1, or the court finds that the aggravating factor set forth in paragraph (5) of subsection a. of N.J.S.2C:44-1 applies, the court may fix a minimum term not to exceed one-half of the term set pursuant to subsection a., or one-half of the term set pursuant to a maximum period of incarceration for a crime set forth in any statute other than this code, during which the defendant shall not be eligible for parole; provided that no defendant shall be eligible for parole at a date earlier than otherwise provided by the law governing parole.

c. A person who has been convicted under subsection b. or d. of N.J.S.2C:39-3, subsection a. of N.J.S.2C:39-4, subsection a. of section 1 of P.L.1998, c. 26 (C.2C:39-4.1), subsection a., b., c., or f. of N.J.S.2C:39-5, subsection a. or paragraph (2) or (3) of subsection b. of section 6 of P.L.1979, c. 179 (C.2C:39-7), or subsection a., b., e. or g. of N.J.S.2C:39-9, or of a crime under any of the following sections: 2C:11-3, 2C:11-4, 2C:12-1b., 2C:13-1, 2C:14-2a., 2C:14-3a., 2C:15-1, 2C:18-2, 2C:29-5, who, while in the course of committing or attempting to commit the crime, including the immediate flight therefrom, used or was in possession of a firearm as defined in 2C:39-1f., shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at one-half of the sentence imposed by the court or 42 months, whichever is greater, or 18 months in the case of a fourth degree crime, during which the defendant shall be ineligible for parole.

The minimum terms established by this section shall not prevent the court from imposing presumptive terms of imprisonment pursuant to 2C:44-1f. (1) except in cases of crimes of the fourth degree.

A person who has been convicted of an offense enumerated by this subsection and who used or possessed a firearm during its commission, attempted commission or flight therefrom and who has been previously convicted of an offense involving the use or possession of a firearm as defined in 2C:44-3d., shall be sentenced by the court to an extended term as authorized by 2C:43-7c., notwithstanding that extended terms are ordinarily discretionary with the court.

d. (1) The court shall not impose a mandatory sentence pursuant to subsection c. of this section, 2C:43-7c. or 2C:44-3d., unless the ground therefor has been established at a hearing. At the hearing, which may occur at the time of sentencing, the prosecutor shall establish by a preponderance of the evidence that the weapon used or possessed was a firearm. In making its finding, the court shall take judicial notice of any evidence, testimony or information adduced at the trial, plea hearing, or other court proceedings and shall also consider the presentence report and any other relevant information.

(2) The court shall not impose a mandatory sentence pursuant to subsection c. of this section for a violation of paragraph (2) of subsection b. of N.J.S.2C:39-5; a violation of paragraph (2) of subsection c. of N.J.S.2C:39-5, if that rifle or shotgun is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person; or a violation of paragraph (1) of subsection c. of N.J.S.2C:39-5.

e. A person convicted of a third or subsequent offense involving State taxes under N.J.S.2C:20-9, N.J.S.2C:21-15, any other provision of this code, or under any of the provisions of Title 54 of the Revised Statutes, or Title 54A of the New Jersey Statutes, as amended and supplemented, shall be sentenced to a term of imprisonment by the court. This shall not preclude an application for and imposition of an extended term of imprisonment under N.J.S.2C:44-3 if the provisions of that section are applicable to the offender.

f. A person convicted of manufacturing, distributing, dispensing or possessing with intent to distribute any dangerous substance or controlled substance analog under N.J.S.2C:35-5, of maintaining or operating a controlled dangerous substance production facility under N.J.S.2C:35-4, of employing a juvenile in a drug distribution scheme under N.J.S.2C:35-6, leader of a narcotics trafficking network under N.J.S.2C:35-3, or of distributing, dispensing or possessing with intent to distribute on or near school property or buses under section 1 of P.L.1987, c. 101 (C.2C:35-7), who has been previously convicted of manufacturing, distributing, dispensing or possessing with intent to distribute a controlled dangerous substance or controlled substance analog, shall upon application of the prosecuting attorney be sentenced by the court to an extended term as authorized by subsection c. of N.J.S.2C:43-7, notwithstanding that extended terms are ordinarily discretionary with the court. The term of imprisonment shall, except as may be provided in N.J.S.2C:35-12, include the imposition of a minimum term. The minimum term shall be fixed at, or between, one-third and one-half of the sentence imposed by the court or three years, whichever is greater, not less than seven years if the person is convicted of a violation of N.J.S.2C:35-6, or 18 months in the case of a fourth degree crime, during which the defendant shall be ineligible for parole.

The court shall not impose an extended term pursuant to this subsection unless the ground therefor has been established at a hearing. At the hearing, which may occur at the time of sentencing, the prosecutor shall establish the ground therefor by a preponderance of the evidence. In making its finding, the court shall take judicial notice of any evidence, testimony or information adduced at the trial, plea hearing, or other court proceedings and shall also consider the presentence report and any other relevant information.

For the purpose of this subsection, a previous conviction exists where the actor has at any time been convicted under chapter 35 of this title or Title 24 of the Revised Statutes or under any similar statute of the United States, this State, or any other state for an offense that is substantially equivalent to N.J.S.2C:35-3, N.J.S.2C:35-4, N.J.S.2C:35-5, N.J.S.2C:35-6 or section 1 of P.L.1987, c. 101 (C.2C:35-7).

g. Any person who has been convicted under subsection a. of N.J.S.2C:39-4 or of a crime under any of the following sections: N.J.S.2C:11-3, N.J.S.2C:11-4, N.J.S.2C:12-1b., N.J.S.2C:13-1, N.J.S.2C:14-2a., N.J.S.2C:14-3a., N.J.S.2C:15-1, N.J.S.2C:18-2, N.J.S.2C:29-5, N.J.S.2C:35-5 who, while in the course of committing or attempting to commit the crime, including the immediate flight therefrom, used or was in possession of a machine gun or assault firearm shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at 10 years for a crime of the first or second degree, five years for a crime of the third degree, or 18 months in the case of a fourth degree crime, during which the defendant shall be ineligible for parole.

The minimum terms established by this section shall not prevent the court from imposing presumptive terms of imprisonment pursuant to paragraph (1) of subsection f. of N.J.S.2C:44-1 for crimes of the first degree.

A person who has been convicted of an offense enumerated in this subsection and who used or possessed a machine gun or assault firearm during its commission, attempted commission or flight therefrom and who has been previously convicted of an offense involving the use or possession of any firearm as defined in subsection d. of N.J.S.2C:44-3, shall be sentenced by the court to an extended term as authorized by subsection d. of N.J.S.2C:43-7, notwithstanding that extended terms are ordinarily discretionary with the court.

h. The court shall not impose a mandatory sentence pursuant to subsection g. of this section, subsection d. of N.J.S.2C:43-7 or N.J.S.2C:44-3, unless the ground therefor has been established at a hearing. At the hearing, which may occur at the time of sentencing, the prosecutor shall establish by a preponderance of the evidence that the weapon used or possessed was a machine gun or assault firearm. In making its finding, the court shall take judicial notice of any evidence, testimony or information adduced at the trial, plea hearing, or other court proceedings and shall also consider the presentence report and any other relevant information.

i. A person who has been convicted under paragraph (6) of subsection b. of 2C:12-1 of causing bodily injury while eluding shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at, or between one-third and one-half of the sentence imposed by the court. The minimum term established by this subsection shall not prevent the court from imposing a presumptive term of imprisonment pursuant to paragraph (1) of subsection f. of 2C:44-1.

**Credits**

L.1978, c. 95, § 2C:43-6, eff. Sept. 1, 1979. Amended by L.1979, c. 178, § 85, eff. Sept. 1, 1979; L.1981, c. 31, § 1, eff. Feb. 12, 1981; L.1981, c. 290, § 38, eff. Sept. 24, 1981; L.1981, c. 569, § 1, eff. Jan. 18, 1982; L.1982, c. 119, § 1, eff. Aug. 31, 1982; L.1987, c. 76, § 35, eff. Dec. 9, 1987; L.1987, c. 106, § 12, eff. June 22, 1987, operative July 9, 1987; L.1988, c. 44, § 13, eff. June 28, 1988; L.1990, c. 32, § 6, eff. May 30, 1990; L.1993, c. 219, § 6, eff. Aug. 2, 1993; L.2007, c. 341, § 5, eff. Jan. 13, 2008; L.2013, c. 113, § 2, eff. Aug. 8, 2013.

N. J. S. A. 2C:43-6, NJ ST 2C:43-6

Current with laws through L.2019, c. 268 and J.R. No. 22

# CHAPTER 39

AN ACT concerning firearms and amending N.J.S.2C:39-1, N.J.S.2C:39-3, and N.J.S.2C:39-12, and supplementing chapter 39 of Title 2C of the New Jersey Statutes.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

1.  N.J.S.2C:39-1 is amended to read as follows:

Definitions.

Definitions.    The following definitions apply to this chapter and to chapter 58:

a.  "Antique firearm" means any rifle or shotgun and "antique cannon" means a destructive device defined in paragraph (3) of subsection c. of this section, if the rifle, shotgun or destructive device, as the case may be, is incapable of being fired or discharged, or which does not fire fixed ammunition, regardless of date of manufacture, or was manufactured before 1898 for which cartridge ammunition is not commercially available, and is possessed as a curiosity or ornament or for its historical significance or value.

b.  "Deface" means to remove, deface, cover, alter or destroy the name of the maker, model designation, manufacturer's serial number or any other distinguishing identification mark or number on any firearm.

c.  "Destructive device" means any device, instrument or object designed to explode or produce uncontrolled combustion, including (1) any explosive or incendiary bomb, mine or grenade; (2) any rocket having a propellant charge of more than four ounces or any missile having an explosive or incendiary charge of more than one-quarter of an ounce; (3) any weapon capable of firing a projectile of a caliber greater than 60 caliber, except a shotgun or shotgun ammunition generally recognized as suitable for sporting purposes; (4) any Molotov cocktail or other device consisting of a breakable container containing flammable liquid and having a wick or similar device capable of being ignited.  The term does not include any device manufactured for the purpose of illumination, distress signaling, line-throwing, safety or similar purposes.

d.  "Dispose of" means to give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer, or otherwise transfer possession.

e.  "Explosive" means any chemical compound or mixture that is commonly used or is possessed for the purpose of producing an explosion and which contains any oxidizing and combustible materials or other ingredients in such proportions, quantities or packing that an ignition by fire, by friction, by concussion or by detonation of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects. The term shall not include small arms ammunition, or explosives in the form prescribed by the official United States Pharmacopoeia.

f.  "Firearm" means any handgun, rifle, shotgun, machine gun, automatic or semi-automatic rifle, or any gun, device or instrument in the nature of a weapon from which may be fired or ejected any solid projectable ball, slug, pellet, missile or bullet, or any gas, vapor or other noxious thing, by means of a cartridge or shell or by the action of an explosive or the igniting of flammable or explosive substances.  It shall also include, without limitation, any firearm which is in the nature of an air gun, spring gun or pistol or other weapon of a similar nature in which the propelling force is a spring, elastic band, carbon dioxide, compressed or other gas or vapor, air or compressed air, or is ignited by compressed air, and ejecting a bullet or missile smaller than three-eighths of an inch in diameter, with sufficient force to injure a person.

g.   "Firearm silencer" means any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearm to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearm.

h.   "Gravity knife" means any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force.

i.   "Machine gun" means any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom.  A machine gun also shall include, without limitation, any firearm with a trigger crank attached.

j.   "Manufacturer" means any person who receives or obtains raw materials or parts and processes them into firearms or finished parts of firearms, except a person who exclusively processes grips, stocks and other nonmetal parts of firearms.  The term does not include a person who repairs existing firearms or receives new and used raw materials or parts solely for the repair of existing firearms.

k.   "Handgun" means any pistol, revolver or other firearm originally designed or manufactured to be fired by the use of a single hand.

l.   "Retail dealer" means any person including a gunsmith, except a manufacturer or a wholesale dealer, who sells, transfers or assigns for a fee or profit any firearm or parts of firearms or ammunition which he has purchased or obtained with the intention, or for the purpose, of reselling or reassigning to persons who are reasonably understood to be the ultimate consumers, and includes any person who is engaged in the business of repairing firearms or who sells any firearm to satisfy a debt secured by the pledge of a firearm.

m.   "Rifle" means any firearm designed to be fired from the shoulder and using the energy of the explosive in a fixed metallic cartridge to fire a single projectile through a rifled bore for each single pull of the trigger.

n.   "Shotgun" means any firearm designed to be fired from the shoulder and using the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shots or a single projectile for each pull of the trigger, or any firearm designed to be fired from the shoulder which does not fire fixed ammunition.

o.   "Sawed-off shotgun" means any shotgun having a barrel or barrels of less than 18 inches in length measured from the breech to the muzzle, or a rifle having a barrel or barrels of less than 16 inches in length measured from the breech to the muzzle, or any firearm made from a rifle or a shotgun, whether by alteration, or otherwise, if such firearm as modified has an overall length of less than 26 inches.

p.   "Switchblade knife" means any knife or similar device which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife.

q.   "Superintendent" means the Superintendent of the State Police.

r.   "Weapon" means anything readily capable of lethal use or of inflicting serious bodily injury.  The term includes, but is not limited to, all (1) firearms, even though not loaded or lacking a clip or other component to render them immediately operable; (2) components which can be readily assembled into a weapon; (3) gravity knives, switchblade knives, daggers, dirks, stilettos, or other dangerous knives, billies, blackjacks, bludgeons, metal knuckles, sandclubs, slingshots, cesti or similar leather bands studded with metal filings or razor blades imbedded in wood; and (4) stun guns; and any weapon or other device which projects, releases, or emits tear gas or any other substance intended to produce temporary

physical discomfort or permanent injury through being vaporized or otherwise dispensed in the air.

s.    "Wholesale dealer" means any person, except a manufacturer, who sells, transfers, or assigns firearms, or parts of firearms, to persons who are reasonably understood not to be the ultimate consumers, and includes persons who receive finished parts of firearms and assemble them into completed or partially completed firearms, in furtherance of such purpose, except that it shall not include those persons dealing exclusively in grips, stocks and other nonmetal parts of firearms.

t.    "Stun gun" means any weapon or other device which emits an electrical charge or current intended to temporarily or permanently disable a person.

u.    "Ballistic knife" means any weapon or other device capable of lethal use and which can propel a knife blade.

v.    "Imitation firearm" means an object or device reasonably capable of being mistaken for a firearm.

w.    "Assault firearm" means:

(1)  The following firearms:

Algimec AGM1 type

Any shotgun with a revolving cylinder such as the "Street Sweeper" or "Striker 12"

Armalite AR-180 type

Australian Automatic Arms SAR

Avtomat Kalashnikov type semi-automatic firearms

Beretta AR-70 and BM59 semi-automatic firearms

Bushmaster Assault Rifle

Calico M-900 Assault carbine and M-900

CETME G3

Chartered Industries of Singapore SR-88 type

Colt AR-15 and CAR-15 series

Daewoo K-1, K-2, Max 1 and Max 2, AR 100 types

Demro TAC-1 carbine type

Encom MP-9 and MP-45 carbine types

FAMAS MAS223 types

FN-FAL, FN-LAR, or FN-FNC type semi-automatic firearms

Franchi SPAS 12 and LAW 12 shotguns

G3SA type

Galil type Heckler and Koch HK91, HK93, HK94, MP5, PSG-1

Intratec TEC 9 and 22 semi-automatic firearms

M1 carbine type

M14S type

MAC 10, MAC 11, MAC 11-9mm carbine type firearms

PJK M-68 carbine type

Plainfield Machine Company Carbine

Ruger K-Mini-14/5F and Mini-14/5RF

SIG AMT, SIG 550SP, SIG 551SP, SIG PE-57 types

SKS with detachable magazine type

Spectre Auto carbine type

Springfield Armory BM59 and SAR-48 type

Sterling MK-6, MK-7 and SAR types

Steyr A.U.G. semi-automatic firearms

USAS 12 semi-automatic type shotgun

Uzi type semi-automatic firearms

Valmet M62, M71S, M76, or M78 type semi-automatic firearms

Weaver Arm Nighthawk.

(2)  Any firearm manufactured under any designation which is substantially identical to any of the firearms listed above.

(3)  A semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock.

(4)  A semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds.  "Assault firearm" shall not include a semi-automatic rifle which has an attached tubular deviceand which is capable of operating only with .22 caliber rimfire ammunition.

(5)  A part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person.

(6)  A firearm with a bump stock attached.

x.  "Semi-automatic" means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet.

y.  "Large capacity ammunition magazine" means a box, drum, tube or other container which is capable of holding more than 10 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm. The term shall not include an attached tubular device which is capable of holding only .22 caliber rimfire ammunition.

z.  "Pistol grip" means a well-defined handle, similar to that found on a handgun, that protrudes conspicuously beneath the action of the weapon, and which permits the shotgun to be held and fired with one hand.

aa.  "Antique handgun" means a handgun manufactured before 1898, or a replica thereof, which is recognized as being historical in nature or of historical significance and either (1) utilizes a match, friction, flint, or percussion ignition, or which utilizes a pin-fire cartridge in which the pin is part of the cartridge or (2) does not fire fixed ammunition or for which cartridge ammunition is not commercially available.

bb.  "Trigger lock" means a commercially available device approved by the Superintendent of State Police which is operated with a key or combination lock that prevents a firearm from being discharged while the device is attached to the firearm.  It may include, but need not be limited to, devices that obstruct the barrel or cylinder of the firearm, as well as devices that immobilize the trigger.

cc.  "Trigger locking device" means a device that, if installed on a firearm and secured by means of a key or mechanically, electronically or electromechanically operated combination lock, prevents the firearm from being discharged without first deactivating or removing the device by means of a key or mechanically, electronically or electromechanically operated combination lock.

dd.  "Personalized handgun" means a handgun which incorporates within its design, and as part of its original manufacture, technology which automatically limits its operational use and which cannot be readily deactivated, so that it may only be fired by an authorized or recognized user.  The technology limiting the handgun's operational use may include, but not be limited to:  radio frequency tagging, touch memory, remote control, fingerprint, magnetic encoding and other automatic user identification systems utilizing biometric, mechanical or electronic systems.  No make or model of a handgun shall be deemed to be a "personalized handgun" unless the Attorney General has determined, through testing or other reasonable means, that the handgun meets any reliability standards that the manufacturer may require for

its commercially available handguns that are not personalized or, if the manufacturer has no such reliability standards, the handgun meets the reliability standards generally used in the industry for commercially available handguns.

ee.  "Bump stock" means any device or instrument for a firearm that increases the rate of fire achievable with the firearm by using energy from the recoil of the firearm to generate a reciprocating action that facilitates repeated activation of the trigger.

ff.  "Trigger crank" means any device or instrument to be attached to a firearm that repeatedly activates the trigger of the firearm through the use of a lever or other part that is turned in a circular motion; provided, however, the term shall not include any weapon initially designed and manufactured to fire through the use of a crank or lever.

gg.  "Armor piercing ammunition" means: (1) a projectile or projectile core which may be used in a handgun and is constructed entirely, excluding the presence of traces of other substances, from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or (2) a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile. "Armor piercing ammunition" shall not include shotgun shot required by federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the United States Attorney General finds is primarily intended to be used for sporting purposes, or any other projectile or projectile core which the United States Attorney General finds is intended to be used for industrial purposes, including a charge used in an oil gas well perforating device.

2.  N.J.S.2C:39-3 is amended to read as follows:

Prohibited weapons and devices.

2C:39-3.  Prohibited Weapons and Devices.

a.  Destructive devices.  Any person who knowingly has in his possession any destructive device is guilty of a crime of the third degree.

b.  Sawed-off shotguns.  Any person who knowingly has in his possession any sawed-off shotgun is guilty of a crime of the third degree.

c.  Silencers.  Any person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree.

d.  Defaced firearms.  Any person who knowingly has in his possession any firearm which has been defaced, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree.

e.  Certain weapons.  Any person who knowingly has in his possession any gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckle, sandclub, slingshot, cestus or similar leather band studded with metal filings or razor blades imbedded in wood, ballistic knife, without any explainable lawful purpose, is guilty of a crime of the fourth degree.

f.  Dum-dum or armor piercing ammunition.  (1) Any person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet, or (2) any person, other than a collector of firearms or ammunition as curios or relics as defined in Title 18, United States Code, section 921 (a) (13) and has in his possession a valid Collector of Curios and Relics License issued by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who knowingly has in his possession any armor piercing ammunition as defined in subsection gg. of N.J.S.2C:39-1 is guilty of a crime of the fourth degree.  For purposes of

this section, a collector may possess not more than three examples of each distinctive variation of the ammunition described above. A distinctive variation includes a different head stamp, composition, design, or color.

g.   Exceptions.  (1)  Nothing in subsection a., b., c., d., e., f., j. or k. of this section shall apply to any member of the Armed Forces of the United States or the National Guard, or except as otherwise provided, to any law enforcement officer while actually on duty or traveling to or from an authorized place of duty, provided that his possession of the prohibited weapon or device has been duly authorized under the applicable laws, regulations or military or law enforcement orders.

Nothing in subsection h. of this section shall apply to any law enforcement officer who is exempted from the provisions of that subsection by the Attorney General.  Nothing in this section shall apply to the possession of any weapon or device by a law enforcement officer who has confiscated, seized or otherwise taken possession of said weapon or device as evidence of the commission of a crime or because he believed it to be possessed illegally by the person from whom it was taken, provided that said law enforcement officer promptly notifies his superiors of his possession of such prohibited weapon or device.

(2) a. Nothing in subsection f. (1) shall be construed to prevent a person from keeping such ammunition at his dwelling, premises or other land owned or possessed by him, or from carrying such ammunition from the place of purchase to said dwelling or land, nor shall subsection f. (1) be construed to prevent any licensed retail or wholesale firearms dealer from possessing such ammunition at its licensed premises, provided that the seller of any such ammunition shall maintain a record of the name, age and place of residence of any purchaser who is not a licensed dealer, together with the date of sale and quantity of ammunition sold.

b.   Nothing in subsection f.(1) shall be construed to prevent a designated employee or designated licensed agent for a nuclear power plant under the license of the Nuclear Regulatory Commission from possessing hollow nose ammunition while in the actual performance of his official duties, if the federal licensee certifies that the designated employee or designated licensed agent is assigned to perform site protection, guard, armed response or armed escort duties and is appropriately trained and qualified, as prescribed by federal regulation, to perform those duties.

(3) Nothing in paragraph (2) of subsection f. or in subsection j. shall be construed to prevent any licensed retail or wholesale firearms dealer from possessing that ammunition or large capacity ammunition magazine at its licensed premises for sale or disposition to another licensed dealer, the Armed Forces of the United States or the National Guard, or to a law enforcement agency, provided that the seller maintains a record of any sale or disposition to a law enforcement agency.  The record shall include the name of the purchasing agency, together with written authorization of the chief of police or highest ranking official of the agency, the name and rank of the purchasing law enforcement officer, if applicable, and the date, time and amount of ammunition sold or otherwise disposed. A copy of this record shall be forwarded by the seller to the Superintendent of the Division of State Police within 48 hours of the sale or disposition.

(4)  Nothing in subsection a. of this section shall be construed to apply to antique cannons as exempted in subsection d. of N.J.S.2C:39-6.

(5)  Nothing in subsection c. of this section shall be construed to apply to any person who is specifically identified in a special deer management permit issued by the Division of Fish and Wildlife to utilize a firearm silencer as part of an alternative deer control method implemented in accordance with a special deer management permit issued pursuant to section 4 of P.L.2000, c.46 (C.23:4-42.6), while the person is in the actual performance of the

permitted alternative deer control method and while going to and from the place where the permitted alternative deer control method is being utilized.  This exception shall not, however, otherwise apply to any person to authorize the purchase or possession of a firearm silencer.

h.   Stun guns.  Any person who knowingly has in his possession any stun gun is guilty of a crime of the fourth degree.

i.   Nothing in subsection e. of this section shall be construed to prevent any guard in the employ of a private security company, who is licensed to carry a firearm, from the possession of a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course approved by the Police Training Commission in the use of a nightstick.

j.   Any person who knowingly has in his possession a large capacity ammunition magazine is guilty of a crime of the fourth degree unless the person has registered:

(1) an assault firearm pursuant to section 11 of P.L.1990, c.32 (C.2C:58-12) and the magazine is maintained and used in connection with participation in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United States Department of the Army; or

(2) a firearm with a fixed magazine capacity or detachable magazine capable of holding up to 15 rounds pursuant to section 7 of P.L.2018, c.39 (C.2C:39-20).

k.   Handcuffs.   Any person who knowingly has in his possession handcuffs as defined in P.L.1991, c.437 (C.2C:39-9.2), under circumstances not manifestly appropriate for such lawful uses as handcuffs may have, is guilty of a disorderly persons offense.  A law enforcement officer shall confiscate handcuffs possessed in violation of the law.

l.   Bump stock or trigger crank.  Any person who knowingly possesses a bump stock as defined in subsection ee. of N.J.S.2C:39-1 or a trigger crank as defined in subsection ff. of N.J.S.2C:39-1, regardless of whether the person is in possession of a firearm, is guilty of a crime of the third degree.

Notwithstanding the provisions of N.J.S.2C:1-8 or any other provision of law, a conviction arising out of this subsection shall not merge with a conviction for possessing an assault firearm in violation of subsection f. of N.J.S.2C:39-5 or a machine gun in violation of subsection a. of N.J.S.2C:39-5 and a separate sentence shall be imposed upon each conviction. Notwithstanding the provisions of N.J.S.2C:44-5 or any other provisions of law, the sentence imposed pursuant to this subsection shall be served consecutively to that imposed for unlawfully possessing an assault firearm in violation of subsection f. of N.J.S.2C:39-5.

C.2C:39-17    Retired law enforcement officers permitted to possess, carry certain ammunition.

3.   Notwithstanding the provisions of subsection j. of N.J.S.2C:39-3, a retired law enforcement officer who is authorized to possess and carry a handgun pursuant to subsection l. of N.J.S.2C:39-6 may possess and carry a large capacity ammunition magazine which is capable of holding up to 15 rounds of ammunition that can be fed continuously and directly into a semi-automatic handgun.

C.2C:39-18  Inapplicability.

4.   The provisions of P.L.2018, c.39 (C.2C:39-17 et al.) shall not apply to the possession of a large capacity ammunition magazine solely used as a prop for a motion picture, television, or video production, provided the large capacity ammunition magazine has been

reconfigured to fire blank ammunition and remains under the control of a federal firearms license holder.

C.2C:39-19  Regulations relative to certain current owners of automatic rifles.

5.    Except as provided in section 7 of P.L.2018, c.39 (C.2C:39-20), a person who legally owns a semi-automatic rifle with a fixed magazine capacity exceeding 10 rounds or a large capacity ammunition magazine as defined under subsection y. of N.J.S.2C:39-1 which is capable of holding more than 10 rounds of ammunition on the effective date of P.L.2018, c.39 (C.2C:39-17 et al.) may retain possession of that rifle or magazine for a period not to exceed 180 days after the effective date of this act.  During this time period, the owner of the semi-automatic rifle or magazine shall:

a.    Transfer the semi-automatic rifle or magazine to any person or firm lawfully entitled to own or possess that firearm or magazine;

b.    Render the semi-automatic rifle or magazine inoperable or permanently modify a large capacity ammunition magazine to accept 10 rounds or less; or

c.    Voluntarily surrender the semi-automatic rifle or magazine pursuant to the provisions of N.J.S.2C:39-12.

6.    N.J.S.2C:39-12 is amended to read as follows:

Voluntary surrender.

2C:39-12.  No person shall be convicted of an offense under this chapter for possessing any firearms, weapons, destructive devices, large capacity ammunition magazines, silencers or explosives, if after giving written notice of his intention to do so, including the proposed date and time of surrender, he voluntarily surrendered the weapon, device, instrument or substance in question to the superintendent or to the chief of police in the municipality in which he resides, provided that the required notice is received by the superintendent or chief of police before any charges have been made or complaints filed against such person for the unlawful possession of the weapon, device, instrument or substance in question and before any investigation has been commenced by any law enforcement agency concerning the unlawful possession.  Nothing in this section shall be construed as granting immunity from prosecution for any crime or offense except that of the unlawful possession of such weapons, devices, instruments or substances surrendered as herein provided.

C.2C:39-20  Registration of certain firearms.

7.    a. A person who legally owns a firearm as set forth in paragraph (1) or (2) of this subsection prior to the effective date of P.L.2018, c.39 (C.2C:39-17 et al.) shall register that firearm within one year from the effective date:

(1)  a firearm with a fixed magazine capacity holding up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds; or

(2)  a firearm which only accepts a detachable magazine with a capacity of up to 15 rounds which is incapable of being modified to accommodate 10 or less rounds.

b.    In order to register the firearm pursuant to subsection a. of this section, the owner shall:

(1)  complete a registration statement, in the form to be prescribed by the Superintendent of the State Police; and

(2)   produce for inspection a valid firearms purchaser identification card, permit to carry a handgun, or permit to purchase a handgun.

c.   The information provided in the registration statement established pursuant to subsection b. of this section shall include, but shall not be limited to: the name and address of the registrant; the number or numbers on the registrant's firearms purchaser identification card, permit to carry a handgun, or permit to purchase a handgun; and the make, model, and serial number of the firearm being registered.  Each registration statement shall be signed by the registrant, and the signature shall constitute a representation of the accuracy of the information contained in the registration statement.

d.   An applicant shall register the firearm in the law enforcement agency of the municipality in which the applicant resides or, if the municipality does not have a municipal law enforcement agency, any State Police station.

e.   Within 60 days of the effective date of P.L.2018, c.39 (C.2C:39-17 et al.), the superintendent shall prepare the form of registration statement as described in subsection c. of this section and shall provide a suitable supply of statements to each organized full-time municipal police department and each State Police station.

f.   One copy of the completed registration statement shall be returned to the registrant, a second copy shall be sent to the superintendent, and, if the registration takes place at a municipal police department, a third copy shall be retained by that municipal police department.

g.   The heir or estate of an owner of a firearm which has been registered pursuant to this section shall within 90 days after the owner's death dispose of that firearm in accordance with section 5 of P.L.2018, c.39 (C.2C:39-19).

8.   This act shall take effect immediately.

Approved June 13, 2018.

**No. 19-3142**

# In the
# United States Court of Appeals
# for the Third Circuit

## ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.; BLAKE ELLMAN; ALEXANDER DEMBOWSKI,

*Plaintiffs-Appellants*,

**v.**

## ATTORNEY GENERAL NEW JERSEY; SUPERINTENDENT NEW JERSEY STATE POLICE; THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department; JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of New Jersey
Case No. 3:18-cv-10507
The Honorable Peter G. Sheridan

### JOINT APPENDIX VOLUME I
### JA-001 THROUGH JA-009

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, N.J. 07450
Telephone: (201) 967-8040
dschmutter@hartmanwinnicki.com

John Parker Sweeney
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 719-8216
jsweeney@bradley.com

*Counsel for Plaintiffs-Appellants*

# APPENDIX TABLE OF CONTENTS

| Document Name | Appendix Page: |
|---|---|
| VOLUME I | |
| Doc. 104: Notice of Appeal | JA-001 |
| Doc. 103: Judgment Pursuant to Fed. R. Civ. P 56(a) | JA-002 |
| Doc. 101: Memorandum and Order | JA-004 |
| VOLUME II | |
| District Court's Docket | JA-010 |
| Doc. 1: Complaint for Declaratory and Injunctive Relief | JA-028 |
| Doc. 84: Notice of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) by Defendants Gurbir S. Grewal and Patrick J. Callahan | JA-047 |
| Doc. 84-1: Certificate of Service | JA-050 |
| Doc. 84-2: Brief in Support of State Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) | JA-052 |
| Doc. 84-3: Proposed Order Granting Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) | JA-073 |
| Doc. 85: Notice of Motion to Join Co-Defendants' Motion and for Summary Judgment Pursuant to F.R.C.P. 56(a) by Defendant James B. O'Connor | JA-075 |
| Doc. 85-1: Statement in Lieu of Brief by Defendant James B. O'Connor | JA-077 |
| Doc. 85-2: Certificate of Service | JA-080 |
| Doc. 85-3: Proposed Order Granting Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) | JA-082 |
| Doc. 86: Notice of Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(a) by Defendant Thomas Williver | JA-084 |
| Doc. 86-1: Statement in Lieu of Brief in Support of Defendant Thomas Williver's Motion for Summary Judgment | JA-086 |
| Doc. 86-2: Proposed Order Granting Summary Judgment Dismissing All Claims Against Defendant Thomas Williver | JA-088 |
| Doc. 86-3: Certificate of Service | JA-090 |
| Doc. 88: Notice of Cross-Motion for Summary Judgment | JA-093 |
| Doc. 90: Plaintiffs' Brief in Support of Their Cross-Motion for Summary Judgment and Cross-Motion for a Stay | JA-095 |
| Doc. 97: Reply Brief in Support of State Defendants' Motion for Summary Judgment Pursuant to Fed. R. Civ. P 56(a) and in | JA-112 |

| | |
|---|---|
| Opposition to Plaintiffs' Cross-Motions for a Stay and for Summary Judgment | |
| Transcript of Preliminary Injunction Hearing (Aug. 13, 16, 17, 2018) (Excerpts) | JA-134 |
| PX4: Thomas J. Aveni, Officer-Involved Shootings: What We Didn't Know Has Hurt Us (2003) | JA-352 |
| PX5: Massad Ayoob, The Complete Book of Handguns (2013) | JA-360 |
| PX8: Philip J. Cook and Jens Ludwig, Guns in America (1996) | JA-364 |
| PX10: Declaration of Alexander Dembowski | JA-373 |
| PX18: Declaration of Blake Ellman | JA-379 |
| PX27: Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant (Mar. 9, 2013) | JA-499 |
| PX30: Edward W. Hill, *How Many Guns Are In the United States: Americans Own Between 262 Million and 310 Million Firearms*, URBAN PUBLICATIONS (2013) | JA-386 |
| PX33: Nicholas J. Johnson, et al., Firearms Law and the Second Amendment: Regulation, Rights, and Policy (2018) | JA-391 |
| PX37: Kleck Supplemental Declaration | JA-396 |
| PX40: Gary Kleck, Targeting Guns (1997) | JA-419 |
| PX41: Kleck, *What Do CDC's Surveys Say About the Frequency of Defensive Gun Use?*, SSRN (2018) | JA-435 |
| VOLUME III | |
| PX42: Kleck & Kates, Armed: New Perspectives on Gun Control (2001) | JA-452 |
| PX45: Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004 2004*, in REDUCING GUN VIOLENCE IN AMERICA 157 (Daniel W. Webster and Jon S. Vernick, ed. 2013) | JA-476 |
| PX48: Gun Digest 2018 (Jerry Lee and Chris Berens, eds. 2017) | JA-484 |
| PX50: Alan I. Leshner, et al., Priorities for Research to Reduce the Threat of Firearm-Related Violence 15 (2013) | JA-526 |
| PX56: Carlisle E. Moody, *Large Capacity Magazines and Homicide*, College of William and Mary Working Paper (2015) | JA-535 |
| PX58: NSSF, Modern Sporting Rifle Comprehensive Consumer Report 2013 (2013) | JA-539 |
| PX63: Kim Parker, et al., America's Complex Relationship with Guns, Pew Research Center (2017) | JA-546 |
| PX76: Department of Justice, Criminal Victimization in the United States (2010) | JA-552 |

| | |
|---|---|
| PX78: Charles F. Wellford, et al., Firearms and Violence: A Critical Review (2005) | JA-557 |
| PX83: Gallup, Guns (2018) | JA-577 |

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and ALEXANDER DEMBOWSKI, | ) ) ) | Hon. Peter G. Sheridan, U.S.D.J. Hon. Lois H. Goodman, U.S.M.J. |
| | ) | Civil Action No. 3:18-cv-10507 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| GURBIR GREWAL, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of New Jersey Division of State Police, THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department, and JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department, | ) ) ) ) ) ) ) ) ) ) ) ) | **CIVIL ACTION** **(ELECTRONICALLY FILED)** |
| | ) | |
| Defendants. | ) | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Plaintiffs, the Association of New Jersey Rifle & Pistol Clubs, Inc., Blake Ellman, and Alexander Dembowski hereby appeal to the United States Court of Appeals for the Third Circuit from the Judgment granting summary judgment in favor of Defendants and denying Plaintiffs' cross-motion for summary judgment and for a stay entered in this action on August 19, 2019, Doc. No. 103. A copy of the Order is attached hereto as Exhibit A.

Dated: September 17, 2019

Respectfully submitted,

/s/ Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, NJ 07450
(201) 967-8040
(201) 967-0590 facsimile
dschmutter@hartmanwinnicki.com

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY
124 Halsey Street
P.O. Box 45029
Newark, New Jersey 07101
Attorney for Defendants, Gurbir S. Grewal and Patrick J. Callahan

By:     Bryan Edward Lucas (ID: 108462015)
        Deputy Attorney General
        (973) 648-7811
        Bryan.Lucas@law.njoag.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## TRENTON VICINAGE

| | |
|---|---|
| ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC., BLAKE ELLMAN, and ALEXANDER DEMBOWSKI, <br><br> Plaintiffs, <br><br> v. <br><br> GURBIR GREWAL, in his official capacity as Attorney General of New Jersey, PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police, THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department, and JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department, <br><br> Defendants. | HON. PETER G. SHERIDAN, U.S.D.J. <br> HON. LOIS H. GOODMAN, U.S.M.J. <br><br> Docket No. 3:18-cv-10507-PGS-LHG <br><br> **CIVIL ACTION** <br><br> **JUDGMENT PURSUANT TO FED. R. CIV. P. 58** |

On February 13, 2019, Defendants Gurbir S. Grewal and Patrick J. Callahan moved for summary judgment before the Honorable Peter G. Sheridan, U.S.D.J. On February 14, 2019, Defendants James B. O'Connor and Thomas Williver filed separate motions for summary judgment. On March 20, 2019, Plaintiffs Association of New Jersey Rifle & Pistol Clubs, Inc., Blake Ellman, and Alexander Dembowski cross-moved for summary judgment and for a stay of proceedings. The matter was submitted, and on July 29, 2019, the court entered a "Memorandum and Order" granting summary judgment in favor of all Defendants and denying Plaintiffs' cross-motions. In accordance with the court's findings and conclusions and the provisions of Fed. R. Civ. P. 58:

IT IS ADJUDGED that:

1. Defendants Gurbir S. Grewal and Patrick J. Callahan's motion for summary judgment is GRANTED;

2. Defendant James B. O'Connor's motion for summary judgment is GRANTED;

3. Defendant Thomas Williver's motion for summary judgment is GRANTED;

4. Plaintiffs Association of New Jersey Rifle & Pistol Clubs, Inc., Blake Ellman, and Alexander Dembowski's cross-motions for summary judgment and for a stay of proceedings are DENIED; and

5. Plaintiffs are denied all relief and the action is dismissed with prejudice on the merits.

WILLIAM T. WALSH, CLERK

*Jaweia Campbell*
Deputy Clerk

DATED: __8/19/2019__

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Association of New Jersey Rifle & Pistol Clubs, Inc., *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>Gurbir Grewal, *et al.*,<br><br>    Defendants. | Civil Action No.<br>3:18-cv-10507 (PGS) (LHG)<br><br>**MEMORANDUM<br>AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on several motions: three motions for summary judgment filed by Defendants, (ECF Nos. 84, 85, 86); a cross-motion for summary judgment filed by Plaintiffs, (ECF No. 92); and a motion to stay proceedings in this action, filed by Plaintiffs, pending the outcome of a case, which is currently pending before the Supreme Court, (ECF No. 91). This action concerns the constitutionality of a New Jersey statute regulating the capacity of firearm magazines. More specifically, on June 13, 2018, New Jersey enacted a law which, with certain exceptions, makes it unlawful for any person in the state to possess any firearm magazines that are capable of holding more than ten rounds of ammunition. *See* L. 2018, c. 39 § 1.

## I.

On the same day that New Jersey enacted that law, Plaintiffs filed the present lawsuit, seeking its invalidation and sought a preliminary injunction. The Court held a three-day hearing on August 13, 16, and 17, 2018, during which it heard the testimony of various expert witnesses.

Case 3:18-cv-10507-PGS-LHG   Document 101   Filed 07/23/19   Page 2 of 90 PageID: 1765

Closing arguments were made on September 6, 2018. On September 28, 2018, the Court entered a Memorandum and Order wherein it denied Plaintiffs' motion to enjoin enforcement of the statute.

On December 5, 2018, over a dissent, the Third Circuit affirmed. *See Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Attorney General New Jersey*, 910 F.3d 106 (3d Cir. 2018). On January 9, 2019, the Third Circuit denied Plaintiffs' petition for rehearing en banc. *Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Attorney General New Jersey*, No. 18-3170 (3d Cir. Jan. 9, 2019).

## II.

As this case was proceeding, another, similar case was proceeding in a neighboring state. Specifically, a group of Plaintiffs brought an action in the Southern District of New York seeking:

> to partially invalidate 38 RCNY § 5-23, which limits transport of a handgun through the following provision: "To maintain proficiency in the use of the handgun, the licensee may transport her/his handgun(s) directly to and from an unauthorized small arms range/shooting club, unloaded, in a locked container, the ammunition to be carried separately."

*N.Y. State Rifle & Pistol Ass'n (NYSRPA) v. City of New York*, 86 F. Supp. 3d 249, 253 (S.D.N.Y. 2015). On February 5, 2015, the court entered summary judgment in favor of the City of New York.

On February 23, 2018, the Second Circuit affirmed the district court opinion. *NYSRPA v. City of New York*, 883 F.3d 45 (2d Cir. 2018). On January 22, 2019, the Supreme Court granted the plaintiffs' petition for a writ of certiorari. *NYSRPA v. City of New York*, 139 S. Ct. 939 (2019).

## LEGAL ANALYSIS

### Stay

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. American Co.*, 299 U.S. 248, 254 (1936). A court

2

considering a motion to stay proceedings "must weigh competing interests and maintain an even balance." *Id.* at 254-55. The party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay . . . will work damage to someone else." *Id.* at 255.

> A multifactor balancing test applies to the determination:

>> (1) whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party, (2) whether denial of the stay would create a clear case of hardship or inequity for the moving party; (3) whether a stay would simplify the issues and the trial of the case, and (4) whether discovery is complete and/or a trial date has been set.

*Akishev v. Kapustin*, 23 F. Supp. 3d 440, 446 (D.N.J. 2014) (citation omitted). Additional considerations also "arise depending upon the circumstances for which the movant requests a stay." *Id.* "Where a stay is sought pending resolution of purportedly related litigation, . . . courts consider whether resolution of the related litigation would substantially impact or otherwise render moot the present action." *Id.* Applying these factors, the Court finds as follows.

First, Defendants – the nonmoving parties will suffer prejudice by the issuance of a stay. Although the statute has already gone into effect, a stay would create uncertainty with regard to its constitutionality. The State would be prejudiced by enforcing a law the constitutionality of which remains in doubt. Therefore, the first factor weighs against issuing a stay.

Second, is it unclear how denying a stay would create a clear hardship or inequity for the moving party. If the Court were to rule against Plaintiffs, they would suffer no prejudice, as they have already had to comply with the requirements of the new law by divesting themselves of magazines that hold over ten rounds of ammunition. If the Court were to rule in favor of Plaintiffs, they would clearly suffer no prejudice. Therefore, the second factor weighs against issuing a stay.

3

Third, the legal issue before the Supreme Court is distinct from that before this Court. The *NYSRPA* case involves a restriction on the right to carry a firearm in public. This case involves the possession of large capacity magazines. Therefore, the Supreme Court's decision in *NYSRPA* is unlikely to simplify the legal issues presented in this case. The third factor weighs against issuing a stay.[1]

Fourth, the Court has already heard testimony in a motion for a preliminary injunction, and the Third Circuit has resolved an appeal of that ruling. Also, discovery appears to be complete, as both parties have moved for summary judgment. Therefore, the fourth factor also weighs against issuing a stay.

In determining whether to issue a stay, the Court finds that all four factors weigh against doing so. Therefore, a stay is not warranted pending the outcome of the Supreme Court's decision in *NYSRPA*.

Summary Judgment

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all

---

[1] This analysis also shows that the resolution of *NYSRPA* by the Supreme Court would neither render moot nor substantially impact the present action; another consideration noted in *Ashkev*, 23 F. Supp. 3d at 446.

4

justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

      Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, after drawing all inferences in favor of [the non-moving party] and making all credibility determinations in his favor "that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 Fed. App'x 222, 227 (3d Cir. 2007).

      The Court recognizes that a different standard applies here – at the summary judgment stage – than applied on the petition for preliminary injunction. However, the Third Circuit has issued a precedential decision that resolves all legal issues in this case and there remains no genuine disputes of material fact. More specifically, the Third Circuit explicitly held that the New Jersey law "does not" violate "the Second Amendment, the Fifth Amendment's Takings Clause, and the Fourteenth Amendment's Equal Protection Clause." Therefore, because it is binding Third Circuit

Case 3:18-cv-10507-PGS-LHG   Document 101   Filed 07/29/19   Page 6 of 6 PageID: 1769

precedent that the New Jersey law is constitutional, the Court shall grant Defendants' motions for summary judgment and deny Plaintiffs' cross-motion.

## ORDER

For the reasons stated herein and for good cause shown,

**IT IS** on this 2⁴ day of July, 2019

**ORDERED** that the motion for summary judgment filed by Defendants Patrick Callahan and Gurbir Grewal (ECF No. 84) is granted; and it is further

**ORDERED** that the motion for summary judgment filed by Defendant James O'Connor (ECF No. 85) is granted; and it is further

**ORDERED** that the motion for summary judgment filed by Defendant Thomas Williver (ECF No. 86) is granted;

**ORDERED** that Plaintiffs' cross-motion to stay (ECF No. 91) is denied; and it is further

**ORDERED** that Plaintiffs' cross-motion for summary judgment (ECF No. 92) is denied.


PETER G. SHERIDAN, U.S.D.J.

6

JA-009

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2020, I filed the foregoing with the Clerk of the Court via CM/ECF, which will serve the following counsel of record:

Jeremy Feigenbaum
Stuart M. Feinblatt
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
jeremy.feigenbaum@law.njoag.gov
stuart.feinblatt@law.njoag.gov

Bryan E. Lucas
Evan A. Showell
Office of Attorney General of Jew Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ 07102
bryan.lucas@law.njoag.gov
evan.showell@law.njoag.gov

George C. Jones
John H. Suminski
McElroy Deutsch Mulvaney
    & Carpenter
1300 Mount Kimble Ave.
P.O. Box 2075
Morristown, NJ 07962
gjones@mdmc-law.com
jsuminski@mdmc-law.com

Carmine Richard Alampi
Jennifer Alampi
Alampi & Demarrais
One University Plaza
Suite 404
Hackensack, NJ 07601
calampi@alampi-law.com
jalampi@alampi-law.com

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Attorney for Plaintiffs-Appellants*