PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3142
_____

ASSOCIATION OF NEW JERSEY RIFLE AND PISTOL
CLUBS INC;
BLAKE ELLMAN; ALEXANDER DEMBOWSKI,
                                                    Appellants


v.


ATTORNEY GENERAL NEW JERSEY;
SUPERINTENDENT NEW JERSEY STATE POLICE;
THOMAS WILLIVER, in his official capacity as
Chief of Police of the Chester Police Department;
JAMES B. O'CONNOR, in his official capacity as
Chief of Police of the Lyndhurst Police Department
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 3-18-cv-10507)
District Judge:  Hon. Peter G. Sheridan
_____

Argued
June 16, 2020

Before:  JORDAN, MATEY and ROTH, *Circuit Judges.*

(Filed: September 1, 2020)

_____

Marc A. Nardone
John P. Sweeney   [ARGUED]
Bradley Arant Boult Cummings
1615 L Street, NW – Suite 1350
Washington, DC   20036

James W. Porter, III
Bradley Arant Boult Cummings
1819 Fifth Avenue North
One Federal Place
Birmingham, AL   35203

Daniel L. Schmutter
Hartman & Winnicki
74 Passaic Street – Suite 101
Ridgewood, NJ  07650
        *Counsel for Appellants*

Joseph Fanaroff    [ARGUED]
Stuart M. Feinblatt
Office of Attorney General of New Jersey
        Division of Law
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ   08625

Jeremy Feigenbaum
Office of Attorney General of New Jersey
    Division of Criminal Justice
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ   08625

Bryan E. Lucas
Evan A. Showell
Office of Attorney General of New Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ   07102
    *Counsel for Appellees, Attorney General New Jersey,
    and Superintendent New Jersey State Police*

George C. Jones
John H. Suminski
McElroy Deutsch Mulvaney & Carpenter
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, NJ   07962
    *Counsel for Appellee, Thomas Williver*

Carmine Richard Alampi
Jennifer Alampi
Alampi & Demarrais
One University Plaza – Suite 404
Hackensack, NJ   07601
    *Counsel for Appellee, James B. O'Connor*

Joseph G.S. Greenlee
Firearms Policy Coalition
1215 K Street – 17th Floor
Sacramento, CA   95814
   *Counsel for Amicus Appellants*

———————

OPINION OF THE COURT

———————

JORDAN, *Circuit Judge*.

We are asked to determine whether a New Jersey statute that makes it illegal to possess large capacity magazines ("LCMs") – defined as magazines capable of holding more than ten rounds of ammunition – violates the Second Amendment, the Fifth Amendment's Takings Clause, or the Fourteenth Amendment's Equal Protection Clause. But we cannot answer that question, since it has already been answered. A prior panel of our court reviewed that statute, known as Assembly Bill No. 2761 and codified at N.J. Stat. Ann. § 2C:39-1 ("the Act"), on appeal from an earlier order of the District Court denying a preliminary injunction. It upheld the District Court's order and, in doing so, went beyond simply answering the question of the plaintiffs' likelihood of success on the merits. It directly addressed the merits of the constitutionality of the Act, holding that the Act did not violate the Second, Fifth, or Fourteenth Amendments.

On remand, the District Court ruled on summary judgment that it was bound by that earlier decision and so upheld the constitutionality of the Act. The plaintiffs have now appealed again, arguing that the District Court erred in treating

Case: 19-3142   Document: 114   Page: 5   Date Filed: 09/01/2020

the prior panel's opinion as binding and arguing again that the Act is unconstitutional. Because they are wrong on the first point, we do not reach the second. We will affirm.

## I.   BACKGROUND

In 2018, New Jersey enacted Assembly Bill No. 2761, a law making it illegal to possess a magazine capable of holding more than ten rounds of ammunition. N.J. Stat. Ann. § 2C:39-1(y), 2C:39-3(j). Prior to that, it had been illegal in New Jersey to possess magazines capable of holding more than 15 rounds of ammunition. Owners of LCMs had several options for complying with the new Act:

> Specifically, the legislation g[ave] LCM owners until December 10, 2018 to (1) modify their LCMs "to accept ten rounds or less," *id.* at 2C:39-19(b); (2) render firearms with LCMs or the LCM itself inoperable, *id.*; (3) register firearms with LCMs that c[ould not] be "modified to accommodate ten or less rounds," *id.* at 2C:39-20(a); (4) transfer the firearm or LCM to an individual or entity entitled to own or possess it, *id.* at 2C:39-19(a); or (5) surrender the firearm or LCM to law enforcement, *id.* at 2C:39-19(c).

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 910 F.3d 106, 111 (3d Cir. 2018) ("*Prior Panel Opinion*") (footnote omitted). The statute exempts active military

members and active and retired law enforcement officers. N.J. Stat. Ann. § 2C:39-3(g), 2C:39-17.

On the day the bill was signed into law, the plaintiffs filed this action,[1] naming certain state and local law enforcement officials as defendants. (For ease of reference, we refer to the defendants collectively as "the State.") The complaint alleges that the Act violates the Second Amendment, the Fifth Amendment's Takings Clause, and the Fourteenth Amendment's Equal Protection Clause. *Prior Panel Opinion*, 910 F.3d at 111. With their complaint, the plaintiffs also filed a motion for a preliminary injunction. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:18-cv-10507 (PGS) (LHG), 2018 WL 4688345, at *1 (D.N.J. Sept. 28, 2018) ("*Preliminary Injunction Opinion*").

The District Court held a three-day hearing on the motion, during which the parties presented conflicting expert testimony on the use of LCMs in mass shootings, including the number of casualties involved and whether the Act would save lives during a mass shooting by forcing the shooter to pause

---

[1] The plaintiffs are the Association of New Jersey Rifle and Pistol Clubs, Inc. ("ANJRPC"), Blake Ellman, and Alexander Dembowski. ANJRPC is "an eighty-year old membership organization, representing tens of thousands of members, many of whom possess large capacity magazines for self-defense." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Grewal*, No. 3:18-cv-10507 (PGS) (LHG), 2018 WL 4688345, at *2 (D.N.J. Sept. 28, 2018). Ellman and Dembowski are members of ANJRPC who possess LCMs. *Id.* The plaintiffs' standing is not in question.

and reload ammunition, thus allowing individuals time to escape or subdue the shooter. *Id.* at \*4-8. The Court also heard testimony on whether LCMs are used in self-defense. *Id.* To distinguish law enforcement officers from the general public, the State offered expert testimony that both active and retired police officers who possess firearms are required to pass a qualification course bi-annually, using a weapon equipped with a 15-round magazine. *Id.* at \*5. Ultimately, the District Court denied the preliminary injunction, remarking that "the expert testimony [wa]s of little help in its analysis." *Id.* at \*8.

In rejecting the plaintiffs' contention that the Act violated the Second Amendment, the District Court applied the two-step analytical approach we set out in *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). *Preliminary Injunction Opinion*, 2018 WL 4688345, at \*9. *Marzzarella* requires a court to ask first whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee of the right to bear arms. If it does, the second step is to evaluate that law under some form of heightened scrutiny.[2] 614 F.3d at 89. The level of scrutiny to

---

[2] There are three levels of scrutiny: rational basis review, intermediate scrutiny, and strict scrutiny. In *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016) (en banc), we explained the three levels of scrutiny by saying:

> Depending on the importance of the rights involved and the nature of the burden on them, a law's purpose may need to be only legitimate and the means to achieve it rational (called rational basis scrutiny); the purpose may need to be important and the means to achieve it substantially related (called intermediate

be applied is determined by whether the law burdens the core of the Second Amendment guarantee. *Id.* The "core … [of] the Second Amendment protects the right of law-abiding citizens to possess non-dangerous weapons for self-defense in the home." *Id.* at 92. *See also District of Columbia v. Heller*, 554 U.S. 570, 635 (2008) (explaining that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."). Laws that do burden that core receive strict scrutiny, whereas those that do not burden it receive intermediate scrutiny. *Marzzarella*, 614 F.3d at 89, 96-97.

The District Court concluded that the New Jersey Act imposes a burden on the Second Amendment because magazines, including LCMs, are integral components of guns. *Preliminary Injunction Opinion*, 2018 WL 4688345, at *9-11. Having answered the step-one question from *Marzzarella*, the Court proceeded to the second step and determined that the law should be evaluated under intermediate scrutiny because the core of the Second Amendment right to keep and bear arms is not burdened by the Act. As the Court saw it, the Act "does not prohibit the possession of the quintessential self-defense weapon, the handgun," nor does it "effectively disarm individuals or substantially affect their ability to defend

---

scrutiny); or the purpose may need to be compelling and the means to achieve it narrowly tailored, that is, the least restrictive (called strict scrutiny). The latter two tests we refer to collectively as heightened scrutiny to distinguish them from the easily met rational basis test.

836 F.3d at 341.

8

themselves." *Id.* at \*12 (internal quotation marks and citation omitted).

Then, applying intermediate scrutiny, the District Court upheld the Act. *Id.* at \*12-13. Intermediate scrutiny requires the government to prove that the objective of the government regulation is "significant, substantial, or important[,]" and that "the fit between the challenged regulation and the asserted objective [is] reasonable[.]" *Marzzarella*, 614 F.3d at 98 (internal quotation marks omitted). "The regulation need not be the least restrictive means of serving the interest, but may not burden more [conduct] than is reasonably necessary." *Id.* (citations omitted). The District Court concluded that New Jersey has a significant, substantial, and important interest in the safety of its citizens. *Preliminary Injunction Opinion*, 2018 WL 4688345, at \*12. While the Court did not make a definitive finding that the Act will significantly reduce casualties in a mass shooting by limiting the number of shots that can be fired from a single gun, it did decide that there was a reasonable fit between the Act and its stated object. It said, "the expert testimony established that there is some delay associated with reloading, which may provide an opportunity for potential victims to escape or for a bystander to intercede and somehow stop a shooter." *Id.* at \*12. Finally, the Court concluded that the Act places a minimal burden on lawful gun owners because it does not impose a restriction on the number of magazines an individual may own and instead limits only the lawful capacity of a single magazine. *Id.* at \*13.

The District Court also rejected the plaintiffs' Fifth and Fourteenth Amendment claims. It concluded that there had been no taking of property in violation of the Fifth Amendment because the Act allows for gun owners to permanently modify

9

their magazines to accept ten rounds, and, if those magazines or guns cannot be modified, they can be kept as long as the owner registers them. *Id.* at \*16. As to the plaintiffs' argument that the Act violates the Fourteenth Amendment's Equal Protection clause because it treats active and retired law enforcement officers differently than other individuals, the District Court concluded that law enforcement officers are not similarly situated to other New Jersey citizens for a number of reasons.[3]    Officers are required to pass gun safety requalification tests, which are not required of other individuals; officers have "an unusual ethos of public service … and are expected to act in the public's interest[;]" and "retired police officers face special threats that private citizens do not[.]" *Id.* at \*14 (internal quotation marks and citations omitted).

Dissatisfied with the denial of their motion for a preliminary injunction, the plaintiffs appealed, but a divided panel of our Court affirmed. *Prior Panel Opinion*, 910 F.3d at 110. The panel announced its holding in these straightforward words: "Today we address whether [the Act] violates the Second Amendment, the Fifth Amendment's Takings Clause, and the Fourteenth Amendment's Equal Protection Clause. We conclude that it does not." *Id.* While the panel explained

---

[3] The plaintiffs did not argue that the Act's exemption for active military personnel violates the Equal Protection Clause but did argue that there was disparate treatment between retired police officers and military veterans. The Court rejected that, saying, "there is no evidence to suggest that military veterans receive equivalent training [to law enforcement officers]." *Preliminary Injunction Opinion*, 2018 WL 4688345, at \*14.

that its task was to "decide whether Plaintiffs have a reasonable probability of showing that the Act violates [these constitutional rights,]" *id.* at 115, it nevertheless immediately went beyond that task, reached the merits, and determined that the Act withstands the plaintiffs' constitutional challenge.

Addressing the Second Amendment claim, the panel applied the analytical approach from *Marzzarella*, as had the District Court. *Id.* at 116-24. First, it assumed without deciding that LCMs are "typically possessed by law-abiding citizens for lawful purposes and that they are entitled to Second Amendment protection." *Id.* at 117. It then turned to the second step of *Marzzarella* and determined that intermediate scrutiny should apply because the Act does not burden the core Second Amendment guarantee, for five reasons: (1) it does not categorically ban a class of firearms but is rather a ban on a subset of magazines; (2) it is not a prohibition of a class of arms overwhelmingly chosen by Americans for self-defense in the home; (3) it does not disarm or substantially affect Americans' ability to defend themselves; (4) New Jersey residents can still possess and use magazines, just with fewer rounds; and (5) "it cannot be the case that possession of a firearm in the home for self-defense is a protected form of possession under all circumstances. By this rationale, any type of firearm possessed in the home would be protected merely because it could be used for self-defense." *Id.* at 117-18 (citations and internal quotation marks omitted).

The panel also agreed with the District Court that the Act survives intermediate scrutiny. It recognized New Jersey's significant, substantial, and important interest in protecting its citizens' safety. *Id.* at 119. And, the panel said, the Act reasonably fits the State's interest because, by reducing the

11

number of shots that can be fired from one gun, victims will be able to flee, bystanders to intervene, and numerous injuries will be avoided in a mass shooting incident. *Id.* at 119. The panel further decided that the Act did not burden more conduct than is reasonably necessary because it imposes no limit on the number of firearms, magazines, or ammunition an individual may possess, and there is no record evidence that LCMs are "well-suited or safe for self-defense." *Id.* at 122. The panel also rejected the plaintiffs' Fifth Amendment and Equal Protection Clause claims, for the same reasons as did the District Court. *Id.* at 124-26.

In ruling for the State, the panel's decision was in line with the decisions of at least four other circuits that have decided that laws regulating LCMs are constitutional. *See Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) (affirming grant of summary judgment upholding Maryland's ten round limit); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) (upholding, on review from summary judgment, New York and Connecticut's laws imposing a ten round limit); *Friedman v. City of Highland Park, Illinois*, 784 F.3d 406 (7th Cir. 2015) (affirming grant of summary judgment upholding City of Highland Park's ten round limit); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") (affirming grant of summary judgment upholding D.C.'s ten round limit).[4]

---

[4] Since the prior panel opinion was issued, the First Circuit has also concluded that Massachusetts's ten round limit is constitutional. *See Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) (affirming grant of summary judgment upholding Massachusetts ten round limit). The Ninth Circuit, however, has very recently held that California's ban on LCMs of more

The decision was not, however, unanimous. The dissenting member of the panel said that, in two ways, the majority treated the Second Amendment differently from other parts of the Bill of Rights: first, the majority weighed the merits of the case in order to pick a tier of scrutiny, and second, the majority, while purporting to use intermediate scrutiny, actually applied rational basis review. *Id.* at 126 (Bibas, J., dissenting). Among other things, the dissent was concerned that the majority failed to demand actual proof to justify the State's regulation, as heightened scrutiny demands in other contexts, and that the majority had likewise failed to put the burden of proof on the State to demonstrate that the regulation was sufficiently tailored. *Id.*

When the case was remanded to the District Court, the parties promptly filed cross-motions for summary judgment, and the State's motion won. Although the Court recognized that different standards apply at the summary judgment stage than at the preliminary injunction stage, it said that it was granting summary judgment because "the Third Circuit has issued a precedential decision that resolves all legal issues in this case and there remains no genuine disputes of material fact." (App. at 8.) The District Court noted that the prior panel opinion said the Act does not violate the Second, Fifth, or Fourteenth Amendments, so there was "binding Third Circuit precedent that the New Jersey law is constitutional[.]" (App. at 8-9.)

---

than ten rounds is unconstitutional under either strict scrutiny or intermediate scrutiny. *Duncan v. Becerra*, --- F.3d ---, No. , 2020 WL 4730668, at *25 (9th Cir. Aug. 14, 2020).

13

This timely appeal followed.

## II.   **DISCUSSION**[5]

"It is the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels." (3d Cir. I.O.P 9.1.)  The plaintiffs argue, however, that we are not under that restriction here, for two reasons.  First, they contend the outcome can differ here because this appeal arises in a different procedural posture than did the earlier one, with different standards and different inferences in play.  Second, they say that the prior panel decision was clearly wrong and should be disregarded, to prevent manifest injustice.  Neither argument succeeds.

True enough, the standards for obtaining a preliminary injunction and summary judgment are different.  Under the well-known standard for obtaining a preliminary injunction, the moving party must show "both a likelihood of success on the merits and a probability of irreparable harm. Additionally, the district court should consider the effect of the issuance of a preliminary injunction on other interested persons and the public interest." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990) (citations omitted).  On summary judgment, by contrast, the moving party must establish that "there is not a genuine dispute with respect to a material fact

---

[5] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.  "It is well established that we employ a plenary standard in reviewing orders entered on motions for summary judgment, applying the same standard as the district court."  *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014).

and thus the moving party is entitled to judgment as a matter of law." *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014). Our standards of review are also different. We will affirm a district court's order on a preliminary injunction, "unless the court abused its discretion, committed an obvious error of law, or made a serious mistake in considering the proof." *Bradley*, 910 F.2d at 1175. On the other hand, we exercise plenary review over an order on summary judgment. *Blunt*, 767 F.3d at 265.

But despite the differing standards pertaining to the differing procedural postures, a panel of our Court reviewing a decision on a preliminary injunction motion can indeed bind a subsequent panel reviewing an appeal from an order on summary judgment. As then-Judge Alito explained in *Pitt News v. Pappert*, 379 F.3d 96 (3d Cir. 2004),

> although a panel entertaining a preliminary injunction appeal generally decides only whether the district court abused its discretion in ruling on the request for relief and generally does not go into the merits any farther than is necessary to determine whether the moving party established a likelihood of success, a panel is not always required to take this narrow approach. If a preliminary injunction appeal presents a question of law and the facts are established or of no controlling relevance, the panel *may* decide the merits of the claim.

*Id.* at 105 (internal quotation marks and citations omitted). Thus, "[i]n the typical situation—where the prior panel stopped at the question of likelihood of success—the prior panel's legal

analysis must be carefully considered, but it is not binding on the later panel." *Id.* "On the other hand, if the first panel does not stop at the question of likelihood of success and instead addresses the merits, the later panel, in accordance with our Court's traditional practice, should regard itself as bound by the prior panel opinion."[6] *Id.* "We have recognized, however, that reconsideration is justified in extraordinary circumstances such as where: (1) there has been an intervening change in the law; (2) new evidence has become available; or (3) reconsideration is necessary to prevent clear error or a manifest

---

[6] There are sound reasons why a panel reviewing a ruling on a preliminary injunction should focus on the question of likelihood of success on the merits rather than reaching the merits of the claim before them. Given the already-mentioned different standards on a motion for preliminary injunction and motion for summary judgment and our different standards of review, going to the merits on a preliminary record, under hurried circumstances, can lead to premature and less informed decisions. On review at the preliminary injunction stage, a panel may conclude that the district court did not abuse its discretion or commit obvious errors of law or serious mistakes in its findings of fact. But a subsequent panel reviewing an order on summary judgment may, in its plenary review of the record, identify errors the district court committed that, while not obvious or serious, impact the analysis or outcome of a case. We therefore make it a general practice to proceed cautiously, to avoid ending a case on review from a preliminary injunction when the record could be more developed on summary judgment and we can conduct a plenary review of that record.

16

injustice." *Council of Alt. Political Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999).

Here, the prior panel's opinion immediately went beyond the question of likelihood of success and declared a holding on the merits. Again, it held very plainly that the Act does not violate the Second Amendment, the Fifth Amendment's Takings Clause, and the Fourteenth Amendment's Equal Protection Clause. *Prior Panel Opinion*, 910 F.3d at 110. In short, it addressed the ultimate merits of the dispute, as the plaintiffs rightly admit.[7] (Oral Arg. At 2:02-40, https://www2.ca3.uscourts.gov/oralargument/audio/19-3142_AssnNJRiflePistolClubsv.AttyGenNJ.mp3.) And the panel did so primarily on the basis of facts that are uncontested.[8]

---

[7] *See Prior Panel Opinion*, 910 F.3d at 122 ("[W]e hold that laws restricting magazine capacity to ten rounds of ammunition do not violate the Second Amendment."); *id.* at 125 ("In short, the Act does not result in a taking."); *id.* at 126 ("[R]etired law enforcement officers are not similarly situated to retired military personnel and ordinary citizens, and therefore their exemption from the LCM ban does not violate the Equal Protection Clause.").

[8] The case-determinative facts here centered on reloading. The District Court's conclusion that the Act survived intermediate scrutiny relied on its finding that "there is some delay associated with reloading, which may provide an opportunity for potential victims to escape or for a bystander to intercede[.]" *Preliminary Injunction Opinion*, 2018 WL 4688345, at *12. The prior panel also relied heavily on that finding. *Prior Panel Opinion*, 910 F.3d at 119-20. The

17

To avoid the conclusion that the law of the case has been set and a precedent established,[9] the plaintiffs do not argue that there has been an intervening change in the law or the discovery of new evidence, but they do point out an intervening procedural step in our Court. They note that the State asked a motions panel of our Court to summarily affirm the District Court's grant of summary judgment on remand but that the motions panel denied that request. According to the plaintiffs, that means "the motions panel necessarily rejected [the State's] argument that the prior merits panel's denial of a preliminary injunction binds the outcome of this appeal." (Reply Br. at 2.)

Not so. According to our Internal Operating Procedures, we "*may* take summary action … if it clearly appears that no substantial question is presented or that subsequent precedent or a change in circumstances warrants such action." (3d Cir. I.O.P 10.6 (emphasis added)). Thus, although we may choose to summarily affirm, a decision of a motions panel declining to affirm is not the same as a

---

plaintiffs' own witness before the District Court acknowledged that there would be some pause while a shooter reloaded. *Preliminary Injunction Opinion*, 2018 WL 4688345, at *6-7. And, on appeal, the plaintiffs have presented only legal, not factual, arguments.

[9] We have explained that "[u]nder the law of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances." *Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 165 (3d Cir. 1982). Thus, the prior panel's opinion is both the law of the case and binding precedent.

determination that there is a substantial question left in the case.  It often means nothing more than that the presentation made by motion has left that particular motions panel wondering whether there is a substantial question.

Moreover, we do not afford the same deference to decisions made by a motions panel that we afford to opinions by a merits panel.  Although "a merits panel does not lightly overturn a decision made by a motions panel during the course of the same appeal, we do not apply the law of the case doctrine as strictly in that instance as we do when a second merits panel is asked to reconsider a decision reached by the first merits panel on an earlier appeal." *Council Tree Commc'ns, Inc. v. FCC*, 503 F.3d 284, 292 (3d Cir. 2007).  That is in part because litigants can seek en banc review and review by certiorari of merits panel decisions but do not have similar opportunities with respect to a motions panel decision. *Id.* at 291-92.  Here, the order denying the motion for summary affirmance does not explain why the motion was being denied.  Thus, even if the decisions of the merits panel and the motions panel were in conflict (which they are not), the merits panel is the one owed deference.

The plaintiffs next argue that we need not follow the prior panel's decision because it is clearly wrong and would work a manifest injustice.  The burden that accompanies that contention is heavy.  The plaintiffs must "persuade us not only that our prior decision was wrong, but that it was *clearly wrong*[.]" *See In re City of Phila. Litig.*, 158 F.3d 711, 720-21 (3d Cir. 1998) (emphasis added).  Similarly, a manifest injustice occurs only when there is "direct, obvious, and observable error[.]"  *Manifest Injustice*, Black's Law Dictionary (11th ed. 2019).  "The law of the case will be

19

disregarded only when the court has a clear conviction of error[.]" *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981) (internal quotation marks and citation omitted). "Mere doubt on our part is not enough to open the point for full reconsideration*." Id.* (internal quotation marks omitted).

There is certainly room for vigorous debate about the prior decision. The thorough dissent shows that. But whether we agree with the majority's opinion or not, we cannot say that it is clearly wrong or manifestly unjust. Even if we ignore that many other circuit courts have reached the same conclusion as the prior panel, with respect to very similar laws, there is evident in the prior panel's work thoughtful consideration of the record and the relevant legal principles. Whether the prior panel ultimately got things wrong is not the question now. The question is whether it went so far astray that its decision can be called clearly wrong and manifestly unjust. The answer to that is no. We are therefore bound to respect the decision rendered by the prior panel, which ends this appeal.[10]

---

[10] The dissent concludes that the law of the case doctrine does not bar our consideration of the merits of the parties' dispute, for two reasons: first, the prior panel assumed without deciding that magazines holding more than ten rounds are protected under the Second Amendment, and, second, the prior panel was imprecise and interchangeably used the terms "magazines," "LCMs," and "large capacity magazines" to refer to magazines of different capacities and to magazines and firearms with different capabilities. In our view, neither of those considerations affects whether we are bound by the prior panel's decision. Even though the prior panel assumed without deciding that magazines holding more than ten rounds are protected under the Second Amendment, that assumption did

## III.    CONCLUSION

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of the State and its denial of the plaintiffs' cross-motion for summary judgment.

---

not leave the parties' rights unsettled. That assumption was in plaintiffs' favor, and, under that assumption, the prior panel clearly held that the Act does not violate the Second Amendment. That holding settled the parties' rights. Similarly, the prior panel's language describing magazines, even if not as precise as our dissenting colleague would like, does not, in our opinion, create anything that we can call clear error or manifest injustice and thus that would permit us to disregard the prior panel's case dispositive holdings and reach the merits afresh.

MATEY, *Circuit Judge,* dissenting.

The majority concludes that a prudential principle bars our consideration of the meaning of the Constitution. But "[t]he interpretation of the laws is the proper and peculiar province of the courts," The Federalist No. 78, at 525 (Alexander Hamilton) (J. Cooke ed., 1961), and a judicially created tool for case management does not, in my opinion, supersede the expectation that the judiciary will decide cases and controversies arising under the Constitution. No doubt, there are rational reasons behind the "law-of-the-case doctrine." Allowing courts to repeatedly consider questions already decided would undermine the stability and predictability of the law. In contrast, where issues remain undecided, or the assumptions underlying those decisions are unclear, then the opposite conclusion holds. And in such cases, the twin aims of finality—constancy and certainty—do not support limiting the judicial power granted in the Constitution and extended by Congress.

This case, in my view, is an example of the latter category for two reasons. First, in *Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General of New Jersey*, 910 F.3d 106 (3d Cir. 2018) ("*NJ Rifle I*"),[1] the panel did not decide whether all "magazines" enjoy the guarantee of the Second Amendment under *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010); and second, the decision did not define what constitutes a "large capacity magazine." Because both issues are central to the resolution of this case, I would decline to apply the law-of-the-case doctrine and would consider the issues raised by the appellant. Doing so, I would reverse the

---

[1] For convenience, I sometimes refer to the *NJ Rifle I* panel as "the prior panel."

1

order of the District Court and remand this matter to permit the State to provide evidence that N.J. Stat. Ann. § 2C:39-1(y) ("New Jersey Magazine Act" or "the Act") is narrowly tailored to advance the State's interests.

Finally, given the difficulty applying our existing framework in cases implicating the Second Amendment— illustrated by the deeply reasoned, but still deeply divergent opinions in *NJ Rifle I*—I believe we should reconsider our decision in *Marzzarella* in favor of a standard that draws on the text, history, and original meaning of the constitutional guarantee of "the right of the people to keep and bear Arms." U.S. Const. amend. II.

## I. LAW-OF-THE-CASE DOCTRINE

### A.    Background

Under the law-of-the-case doctrine, "one panel of an appellate court generally will not reconsider questions that another panel has decided on a prior appeal in the same case." *In re City of Phila. Litig.*, 158 F.3d 711, 717 (3d Cir. 1998). The doctrine does not appear in statute. Instead, it is a prudential limitation that "directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Int. Rsch. Grp. of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). But "[t]he law of the case doctrine does not limit a federal court's power; rather, it directs its exercise of discretion." *Id.* It is, in short, a judicially created self-direction on when to choose to limit further judicial review. And the reasoning is simple: declining to reconsider issues in the same case "promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*,

486 U.S. 800, 816 (1988) (internal quotation marks and citation omitted). So a "settled" issue is the key and, in this case, I do not find the rights of the parties settled.

**B.    The *NJ Rifle I* Decision**

*NJ Rifle I* concluded that "laws restricting magazine capacity to ten rounds of ammunition do not violate the Second Amendment." *NJ Rifle I*, 910 F.3d at 122. That conclusion rests on assumptions about the scope of the constitutional right to keep and bear arms, and the technical operation of self-loading firearms.

       1.    *NJ Rifle I* Did Not Decide That Magazines Holding More Than Ten Rounds Are Arms Protected under the Second Amendment

I start by asking what constitutional question *NJ Rifle I* answered. We know the Second Amendment confers "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595, 598, 622 (2008). We have also read *Heller* to require "a two-pronged approach to Second Amendment challenges." *Marzzarella*, 614 F.3d at 89. "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.*  "If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id.*

I do not read *NJ Rifle I* to have fully applied this framework. To begin, the majority opinion held that "a magazine is an arm under the Second Amendment." *NJ Rifle I*, 910 F.3d at 116. But it did not view "magazines" as the relevant

3

"arm" regulated by New Jersey in the Act. Quite differently, the opinion focused on what it viewed as a *narrower* category of magazines called "Large Capacity Magazines" or "LCMs." *Id*. at 116–17. And then, the opinion "assume[d] *without deciding* that LCMs . . . are entitled to Second Amendment protection." *Id.* at 117 (emphasis added). So are "LCMs" an "arm" under the Second Amendment? It is doubtful New Jersey thinks so. Indeed, when pressed at oral argument, the State declined to characterize *NJ Rifle I* as holding that such magazines enjoy constitutional protection.[2] That waffling is no small matter. It would of course be significant that some twenty-two million individuals residing in our Circuit are left to wonder whether they have, since the Founding, surrendered a fundamental right. But that unanswered question takes sharper focus when coupled with a second: what, exactly, is a "Large Capacity Magazine?"

> 2. *NJ Rifle I*'s Alternating Technical Definitions

Narrowing the issue presented from "magazines" to a specific kind of magazine appears, in my reading, to have obscured the reasoning in *NJ Rifle I.* Consider a few examples in which the terms "magazines," "LCMs," and "large capacity magazines" interchangeably refer to 1) magazines within the New Jersey Magazine Act because they can hold more than ten rounds of ammunition, *id.* at 110; 2) magazines subject to laws in other states limiting the amount of rounds of ammunition, *id*. at 110 n.1; 3) firearms with "combat-functional ends" capable of "rapidly" discharging ammunition, *id*. at 117 n.16; and 4) magazines used in fully-automatic firearms, *id*. at 119

---

[2]  (Oral Arg. Tr. at 28:13, https://www2.ca3.uscourts.gov/oralargument/audio/19-3142_AssnNJRiflePistolClubsv.AttyGenNJ.mp3.)

(citing *NJ Rifle I* App. at 1057, 1118–26). Each of these four concepts is different, yet they blend together throughout *NJ Rifle I*. For instance, early on the decision defines the term "LCM" to be coterminous with the object regulated by the New Jersey Magazine Act: magazines for semi-automatic firearms able to hold more than ten rounds of ammunition. *Id.* at 110 (citing N.J. Stat. Ann. § 2C:39-1(y)). A few pages later, the opinion states that "LCMs are used in mass shootings," citing portions of the record that describe a host of different *types* of firearms—repeaters, semi-automatic, and automatic—and various *sizes* of magazines used in both automatic and semi-automatic firearms. *See id*. at 119 (citing *NJ Rifle I* App. at 1057 (defining "LCM firearms" to include "assault weapons" and "high-capacity semiautomatic firearms" and stating that those "LCMs" jointly "appear to account for 22 to 36% of gun crimes in most places"); *NJ Rifle I* App. at 1118–26 (describing sixty-one mass shootings and the weapons used, including repeaters, semi-automatic firearms, and automatic firearms, along with magazines of varying capacities, ranging from 13-round magazines to 100-round magazines)). So the reader is left with the impression that the "LCMs" regulated in New Jersey are the same devices involved in a host of criminal acts across the country.

But they are not. Yet blending together this wide assortment of firearms and regulatory structures is critical to the prior panel's conclusion that "[n]ot only will the LCM ban reduce the number of shots fired and the resulting harm, it will present opportunities for victims to flee and bystanders to intervene." *Id.* at 119. I do not see how the current record supports that inference. At best, the record could be read to suggest that criminals use a variety of firearms to commit an

array of violent acts some, all, or none of which are impacted by the New Jersey Magazine Act.

### 3.    The Cumulative Result

It is the combination of these two unanswered questions that gives me greatest pause. The collective effect of declining to confirm that "large capacity magazines" enjoy constitutional protection while defining those same magazines to include sizes greater than the New Jersey Magazine Act allows leaves me unable to predict how the Second Amendment will apply in future cases. I do not believe the constitutional character of a "magazine" rises and falls on a single extra round of ammunition. Nor do I imagine the Second Amendment allows any government to diminish an individual's rights through nomenclature. I am, however, confident that new restrictions on firearms will continue to flourish throughout our Circuit. Under *NJ Rile I*, that leaves District Court judges with the difficult task of determining whether a magazine is small enough to satisfy the Second Amendment or large enough to slip outside its guarantee. And it leaves this Court with the certainty that we will need to address those unanswered questions.

Respectfully, we need not wait. "[T]he law of the case doctrine bars courts from reconsidering matters actually decided[;] it does not prohibit courts from revisiting matters that are 'avowedly preliminary or tentative.'" *Council of Alt. Pol. Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999) (quoting 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction § 4478 (3d ed. 1981)). So we have taken care to "to prevent the doctrine from being used to prevent a properly raised argument from being considered even *once*." *United Artists Theatre Cir., Inc. v.*

6

*Township of Warrington*, 316 F.3d 392, 398 (3d Cir. 2003) (emphasis in original). And that is why we have recognized that "[w]here there is substantial doubt as to whether a prior panel actually decided an issue, the later panel should not be foreclosed from considering the issue." *Id.*

Here, there is substantial doubt about whether all magazines enjoy the guarantee of the Second Amendment or if, instead, that protection turns on the number of rounds of ammunition inside. In my opinion, it is necessary to address that issue to settle the rights of the parties here. Given that uncertainty, I would decline to apply the law-of-the-case doctrine, as I do not believe it applies to these circumstances. For that reason, I would, and therefore do, consider the full question presented by the appellants.

## II. APPLICATION OF THE SECOND AMENDMENT

### A.    The Scope of the Second Amendment

I begin with *Heller* and the Supreme Court's consideration of the text, history, and tradition of firearms regulations in the United States to best understand the meaning of the Second Amendment.

Naturally, the Court began with the "operative clause" which provides that "the right of the people to keep and bear Arms, shall not be infringed." *Heller*, 554 U.S. at 576, 578–79. The Court observed that "[t]he 18th-century meaning [of 'arms'] is no different from the meaning today." *Id.* at 581 (citing 1 S Johnson, Dictionary of the English Language 106 (4th ed. 1773) (reprinted 1978) (defining "arms" as "[w]eapons of offence, or armour of defence")); 1 Timothy Cunningham, A New and Complete Law Dictionary (1771) (defining "arms"

7

as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."); *see also* N. Webster, American Dictionary of the English Language (1828) (reprinted 1989) (similar)). With this foundation, the Court held that "the Second Amendment extends . . . to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. In so holding, the Court rejected the "frivolous" argument "that only those arms in existence in the 18th century are protected by the Second Amendment." *Id*. An unsurprising observation, because "[w]e do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, *e.g.*, *Reno v. Am. C.L. Union*, 521 U.S. 844, 849 (1997), and the Fourth Amendment applies to modern forms of search, *e.g.*, *Kyllo v. United States*, 533 U.S. 27, 35–36 (2001), the Second Amendment extends" to modern bearable arms. *Id.*

Next, the Court held that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *Id*. As to "bear," the Court held that "[w]hen used with 'arms' . . . the term has a meaning that refers to carrying for a particular purpose—confrontation." *Id*. at 584; *see id.* ("From our review of founding-era sources, we conclude that this natural meaning was also the meaning that 'bear arms' had in the 18th century."). "Putting all of these textual elements together," and drawing on historical context, the Court held "that they guarantee the individual right to possess and carry weapons in case of confrontation." *Id*. at 592, 595.

But the Court acknowledged that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id*. at 626. For example, it did "not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of

8

confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." *Id.* at 595 (emphasis in original). "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. Rather, the Court acknowledged the propriety of "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. It also "recognize[d] another important limitation": that "the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). The Court held that this "limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (citation omitted). As a result, the Court held that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right." *Id.* at 625.

With this foundation, the Court turned to the handgun ban at issue, which prohibited keeping operable handguns in the home. *Id.* at 628. Rather than cabining the standard of review to a balancing of interests, the Court held that the law was unconstitutional because it banned an entire class of firearms commonly owned by citizens for the lawful purpose of self-defense in the home. *Id.* at 628–29. Although *Heller* focused its holding on the handgun ban before it, the Court acknowledged that "whatever else it leaves to future

evaluation," the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. *Heller* makes clear that judicial review of Second Amendment challenges proceeds from text, history, and tradition. This is because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634–35.[3]

## B. Applying *Heller* and This Court's Interpretative Framework

Since *Heller*, circuit and district courts have varied in their approaches to evaluating the Second Amendment. Most have now settled on some version of the two-pronged approach we created in *Marzzarella*.[4] As noted, we first "ask whether the

---

[3] Two years later, in *McDonald v. City of Chicago*, the Supreme Court reiterated that the right to keep and bear arms is a "fundamental" constitutional right "deeply rooted in this Nation's history and tradition." 561 U.S. 742, 767–68, 778 (2010) (citation omitted).

[4] *See* David B. Kopel, Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U. L. J. 193, 212 n.105 (2017) (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,* 804 F.3d 242, 254 (2d Cir. 2015); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *NRA v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010) ("*Heller* thus suggests

10

challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee," and, if it does, "we evaluate the law under some form of means-end scrutiny." *Marzzarella*, 614 F.3d at 89. I apply both steps, concluding that the New Jersey Magazine Act does not satisfy the rigorous scrutiny required for the fundamental rights of the Second Amendment.

    1.    Step One: Determining Whether the Challenged Law Imposes a Burden on Conduct Falling Within the Second Amendment

The "threshold inquiry, then, is whether [the Act] regulates conduct that falls within the scope of the Second Amendment." *Id.* at 89. That analysis turns on "whether the type of arm at issue is commonly owned," *id.* at 90–91, and "'typically possessed by law-abiding citizens for lawful purposes,' *Heller*, 554 U.S. at 625." *NJ Rifle I*, 910 F.3d at 116. I conclude the magazines, including those regulated by the New Jersey Magazine Act, are protected arms under the Second Amendment as best understood by history and tradition.

*i.    Defining the Regulated Arms*

I begin by defining the kinds of arms controlled by the New Jersey Magazine Act, which prohibits the possession of magazines "capable of holding more than 10 rounds of

---

a two-pronged approach to Second Amendment challenges to federal statutes.") (internal quotations omitted); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1261 n.34 (11th Cir. 2012); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1252 (D.C. Cir. 2011)).)

11

ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." N.J. Stat. Ann. § 2C:39-1(y).[5] As ordinarily understood, a "magazine" is "a device that holds cartridges or ammunition." *NJ Rifle I*, 910 F.3d at 116 (citing *Magazine*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/magazine (last visited Nov. 21, 2018)). What is more, this contemporary definition tracks the ordinary understanding of magazines since at least the 1800s.[6] Having defined what a magazine is, I

---

[5] At issue in this appeal are only magazines for semi-automatic firearms. A "semi-automatic" firearm is "a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994). This is distinct from an "automatic" firearm, which "fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Id.* Individual ownership of automatic firearms is prohibited in New Jersey. *See* N.J. Stat. Ann. § 2C:39-5(a) (making unlawful the possession of "a machine gun or any instrument or device adaptable for use as a machine gun"); N.J. Stat. Ann. § 2C:39-1(i) (defining "machine gun" as "any firearm, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the firearm, mechanism or instrument and fired therefrom").

[6] *Compare* Noah Webster, An American Dictionary of the English Language 510 (1842) (defining "magazine" as "[a] store of arms, ammunition or provisions; or the building in

next consider whether a magazine is an arm within the Second Amendment.

As the Supreme Court explained in *Heller,* regulation requiring "that firearms in the home be rendered and kept inoperable at all times" is unconstitutional as it necessarily makes "it impossible for citizens to use them for the core lawful purpose of self-defense[.]" *Heller*, 554 U.S. at 630. From this holding flows the logical conclusion that the Second Amendment's use of the term "arms" should be ordinarily understood as "operable arms," meaning that the Second Amendment likewise guarantees components required to make a protected firearm work for self-defense. *See Heller*, 554 U.S. at 581.

That necessarily includes ammunition and, by extension, magazines that hold ammunition, as components of an operable firearm. *See Miller*, 307 U.S. at 180 (observing that in the context of the colonial militia system, "[t]he possession

which such store is deposited; New Illustrated Edition of Dr. Webster's Unabridged Dictionary of All the Words in the English Language 799 (1864) (defining "magazine" as "[t]o store up or accumulate for future use"); Webster's Condensed Dictionary 336 (1887) (expanding the definition of "magazine" to include a "cartridge chamber of a repeating rifle"); Webster's Collegiate Dictionary 590 (3d ed. 1917) (defining "magazine" to include "[a] chamber in a gun for holding cartridges to be fed automatically to the piece"); Merriam-Webster Unabridged Dictionary (2020) (defining "magazine" to include "a supply chamber: such as . . . a holder that is incorporated in or attachable to a gun and that contains cartridges to be fed into the gun chamber by the operation of the piece").

13

of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former") (quoting The American Colonies In The 17th Century, Osgood, Vol. 1, ch. XIII). For these reasons, the best reading of "arms" in the Second Amendment includes magazines because "[a] regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson v. City & Cty. of San Francisco,* 746 F.3d 953, 967 (9th Cir. 2014).

### ii. *History and Tradition: The Development of Magazine-Operated Firearms and the Regulations That Followed*

That a magazine is an "arm" does not foreclose governmental regulation because "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. So I next consider what, if any, restrictions on magazines satisfy the history and tradition of the Second Amendment. Answering that question begins with a review of magazines and magazine-operated firearms to understand: 1) the use and ownership of these arms over time, 2) traditional regulations, and 3) common use.

### a. The Development of Repeating Firearms

"The desire for . . . repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century." Harold L. Peterson, Arms and Armor in Colonial America, 1526–1783, at 215 (1956). "Successful systems [of repeating arms] definitely had developed by 1640, and within the next twenty years they had

14

spread throughout most of Western Europe and even to Moscow." Harold L. Peterson, The Treasury of the Gun 229 (1962). "[T]he two principal magazine repeaters of the era [were] the Kalthoff and the Lorenzoni. These were the first guns of their kind to achieve success . . . ." *Id.* The Kalthoff repeater magazines held between six and thirty charges, and "were undoubtedly the first magazine repeaters ever to be adopted for military purposes." *Id.* at 230. Also developed during the 17th century, the Lorenzoni was "a magazine-fed Italian repeating pistol that 'used gravity to self-reload'" and held about seven shots. (Brief of Amici Curiae Professors of Second Amendment Law, et al. in Support of Appellants and Reversal ("Amici Professors") at 12 (quoting Martin Dougherty, Small Arms Visual Encyclopedia 34 (2011)).) *See also* Gerald Prenderghast, Repeating and Multi-Fire Weapons: A History from the Zhuge Crossbow Through the AK-47, at 97 (2018) ("The Lorenzoni is also referred to as the Cookson rifle by American collectors[.]"); David Westwood, Rifles: an Illustrated History of Their Impact 71 (2005).

By the mid-17th century, Americans also began developing repeaters. These repeaters "often employed a revolving cylinder that was rotated by hand." (Amici Professors Br. at 15 (citing 2 Charles Winthrop Sawyer, Firearms in American History 5 (1939) (six-shot flintlock); Charles Edward Chapel, Guns of the Old West 202–03 (1961) (revolving snaphance)).) For example, the *Boston Gazette* advertised the American Cookson in 1756 and boasted that it could "fire 9 Times distinctly, as quick, or as slow as you please[.]" Peterson, The Treasury of the Gun 232. In 1777, the Continental Congress ordered Belton rifles able to discharge sixteen or twenty rounds, but then later cancelled the order based on the extraordinary expense. (*See* Amici Professors Br.

15

at 18.) *See also* 7 Journals of the Continental Congress 1774–1789, at 324, 361 (1907) (describing the ordering of Belton rifles and later the cancellation of the same rifles over Belton's request for "an extraordinary allowance"); Peterson, The Treasury of the Gun 197. All of which documents both the existence and public knowledge of repeating weapons.

That public knowledge grew into private practice by at least the early 19th century, when repeaters began circulating for personal use. For instance, in 1821, the *New York Evening Post* described the invention of a new repeater as "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty." *Newly Invented Muskets*, N.Y. Evening Post, Apr. 10, 1822, *in* 59 Alexander Tilloch, The Philosophical Magazine and Journal: Comprehending the Various Branches of Science, the Liberal and Fine Arts, Geology, Agriculture, Manufactures, and Commerce 467–68 (1822). Technical challenges, however, limited widespread adoption and "none achieved real popularity." Peterson, The Treasury of the Gun 199.

Then, in the 1830s, Samuel Colt introduced the revolver, which fired repeating rounds using a rotating cylinder. Peterson, The Treasury of the Gun 202–03, 209–11 ("The real father of the revolver in its modern sense, however, was Samuel Colt."). *See also* Ian V. Hogg, The Complete Illustrated Encyclopedia of the World's Firearms 40 (1978) ("[Colt] had developed a percussion revolver and patented it in England in 1835 and in America in 1836."). By the mid- to late 19th century, some revolvers could fire up to twenty-one rounds. David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 856 (2015) ("Pin-fire revolvers with capacities of up to twenty or twenty-one entered the market in the 1850s[.]"). Around this time,

16

repeating rifles could fire between fifteen and sixty shots per minute. *Id*. at 854. In addition, the lever-action repeating rifle arrived by the 1850s, and could fire thirty times per minute. *Id.* at 854–55. The arms development during this time was "fueled by the Civil War market." Robert L. Wilson, Winchester: An American Legend (1991).

    b.  The Development of Semiautomatic Firearms and Magazines

  The first commercially successful rifles holding more than ten rounds of ammunition appeared around 1866, with handguns holding more than ten rounds following by 1935. *See* Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. at 849–50. And "[o]wing to their simplicity and ease of use, by the mid-twentieth century the use of detachable magazines loaded through the base of the grip far exceeded all other loading methods." Jeff Kinard, Pistols: An Illustrated History of Their Impact 174 (2003). Given that easy operation, "semiautomatic handguns grew from 28% of handgun production in 1973 to 80% in 1993." (*NJ Rifle I* App. at 1272.) As they became more readily available, semiautomatic handguns gradually became more predominant. "Pistol magazines manufactured before September 1994 commonly [held] five to 17 bullets, and magazines produced for some models [held] as many as 30 or more bullets." (*NJ Rifle I* App. at 1060.) As for rifles, the AR-15 semiautomatic rifle appeared in 1963 and sold with a standard twenty-round magazine. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. at 859–60. Since that time it has become "[t]he most popular rifle in American history." *Id.* at 859.

17

Possession of magazines exceeding ten rounds grew rapidly "given the growing popularity of semi-automatic rifles and of large-capacity handguns. Nearly 80 percent of ammunition magazines owned by gun owners at the time of [a 1994] survey held fewer than 10 rounds." Edward W. Hill, *How Many Guns are in the United States: Americans Own between 262 Million and 310 Million Firearms*, Urban Publications 3 (2013). By contrast, a market survey conducted in or around 2013 "of owners of semi-automatic assault rifles . . . showed that 63 percent of owners of these guns had ammunition magazines that held more than 10 rounds." *Id.*

Today, "there are at least 58.9 million civilian-owned [magazines capable of holding more than ten rounds] in the United States." (*NJ Rifle I* Opening Br. at 17 (emphasis omitted) (citing Gary Kleck, *How Many Large Capacity Magazines (LCMs) Are Possessed By Americans?*, SSRN (2018)); *see also NJ Rifle I* App. at 275 (Tr. 372:14–16 (Kleck)) (percentage of firearms with capacity to hold eleven or more rounds); App. at 516–17 (Hill, *How Many Guns are in the United States: Americans Own between 262 Million and 310 Million Firearms*, Urban Publications).) "Magazines capable of holding more than 10 rounds come standard on some of the most popular handguns and rifles, including the most popular rifle in America." (*NJ Rifle I*, Opening Br. at 17–18) (emphasis omitted) (citing *NJ Rifle I*, App. at 696–704 (Gun Digest 2018); App. at 753 (National Shooting Sports Foundation, Modern Sporting Rifle Comprehensive Consumer Report 2013 (2013); App. at 500 (Dan Haar, *America's Rifle: Rise of the AR-15*, Hartford Courant (Mar. 9, 2013)); App. at 1239 (Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849).)

18

The State does not appear to have rebutted the fact that magazines holding more than ten rounds are commonly owned.[7] The commonality of magazines holding more than ten rounds fits with findings by other courts as well. *See, e.g.*, *Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend" because "fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000.").

c.    Regulating Magazine Capacity

With the history of magazines and magazine-equipped firearms as a guide, I next consider traditional regulation. *Heller*, 554 U.S. at 627; *McDonald*, 561 U.S. at 786 (reaffirming that *Heller* "did not cast doubt on . . . longstanding regulatory measures" and "does not imperil every law regulating firearms"). That analysis first requires answering how a prohibition can be "traditional" or "longstanding" when it regulates arms of the modern era. That is because *Heller* permits "[s]tate and local experimentation with reasonable firearms regulations." *McDonald*, 561 U.S. at 785 (alteration in original). Logically, then, "when legislatures seek to address

---

[7] One of the State's experts also conceded the readily available nature of "large capacity magazines." (*NJ Rifle I* App. at 195 ("Many of the mass shooters did not seek out large capacity magazines, they just used what was easily available, and it would have been hard or impossible for many of those mass shooters to seek out [smaller-capacity] magazines.").)

new weapons that have not traditionally existed or to impose new gun regulations because of conditions that have not traditionally existed, there obviously will not be a history or tradition of banning such weapons or imposing such regulations." *Heller II*, 670 F.3d at 1275 (Kavanaugh, J. dissenting).

Instead, I believe "the proper interpretive approach is to reason by analogy from history and tradition." *Id.* (citing *Parker v. District of Columbia,* 478 F.3d 370, 398 (D.C. Cir. 2007) ("[J]ust as the First Amendment free speech clause covers modern communication devices unknown to the founding generation, e.g., radio and television, and the Fourth Amendment protects telephonic conversation from a 'search,' the Second Amendment protects the possession of the modern-day equivalents of the colonial pistol."), *aff'd sub nom. Heller,* 554 U.S. 570; Tr. of Oral Arg. at 77, *Heller,* 554 U.S. 570 (Chief Justice Roberts: "[Y]ou would define 'reasonable' in light of the restrictions that existed at the time the amendment was adopted. . . . [Y]ou can't take it into the marketplace was one restriction. So that would be—we are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well."); *cf. Kyllo v. United States,* 533 U.S. 27, 31–35 (2001) (applying traditional Fourth Amendment standards to novel thermal imaging technology); *California v. Ciraolo,* 476 U.S. 207, 213 (1986) (allowing government to view property from airplanes based on common-law principle that police could look at property when passing by homes on public thoroughfares)). So I turn to historical regulation of both magazines and other restrictions on ammunition capacity.

Limits on ammunition capacity emerged during the Prohibition Era, when six states adopted restrictions.[8] *See also* Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. at 864–68 (internal footnotes and citations omitted). But all were repealed over time. Only the District of Columbia maintained an uninterrupted ban on semi-automatic magazines holding more than twelve rounds from 1932 until 1975, when it banned all functional firearms in the home and handguns altogether. (*See* Amici Professors Br. at 33 (citing Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652).)

New Jersey first limited magazine capacity to fifteen rounds in 1990. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. at 867 (citing Act of May 30, 1990, ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws

---

[8] These states include California, Michigan, Minnesota, Ohio, Rhode Island, and Virginia. (*See* Amici Professors Br. at 31–32 (citing 1927 R.I. Pub. Laws 256, §§ 1, 4 (banning sales of guns able to fire more than twelve shots without reloading); 1927 Mich. Pub. Acts ch. 372, § 3 (banning sales of firearms "which can be fired more than sixteen times without reloading"); 1933 Minn. Laws ch. 190 (banning "machine gun[s]," including semi-automatics "which have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers"); 1933 Ohio Laws 189 (requiring a license for semi-automatics with capacity of more than 18); 1933 Cal. Laws, ch. 450 (requiring license for machine guns, which were defined to include semi-automatics with detachable magazines of more than ten rounds); 1934 Va. Acts ch. 96 s137, §§ 1(a), 4(d) (defining machine guns as anything able to fire more than sixteen times without reloading).))

217, 221, 235 (codified at N.J. Stat. Ann. § 2C:39-1(y), -3(j) (West 2014)). Around the same time, Hawaii enacted a limitation of ten rounds. (*See NJ Rifle I* App. at 9 (citing Haw. Rev. Stat. Ann. § 134-(8)).) A few years later, Congress passed the Violent Crime Control and Law Enforcement Act of 1994 prohibiting the possession or transfer of magazines holding more than ten rounds. *See* Pub. L. 103-322, § 110103 (Sep. 13, 1994). But that law expired in 2004 and has never been reauthorized. Since then, states including California, Colorado, Connecticut, Hawaii, Maryland, Massachusetts, and New Jersey have enacted or maintained regulations limiting magazine capacity. *See* Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. at 867–68.

This history reveals a long gap between the development and commercial distribution of magazines, on the one hand, and limiting regulations, on the other hand. The State reasons, "It is logical that state limits on such weapons do not predate their popularity." (*NJ Rifle I* Response Br. at 22.) That is doubtful, as New Jersey has actively regulated firearms lacking any popular use. *See, e.g.*, N.J. Stat. Ann. §§ 2C:39-3(m) (prohibiting "[c]overt or undetectable firearms," such as 3D printed firearms); Guidelines Regarding the "Substantially Identical" Provision in the State's Assault Firearms Laws, N.J. Att'y Gen. Op. (August 1996) (prohibiting "bayonet mounts" on rifles). At any rate, the State concedes that magazine-equipped rifles first achieved "mass-market success" in the 1860s and magazine-equipped handguns achieved similar success in the 1930s. (*NJ Rifle I* Response Br. at 22.) Yet regulations did not grow until the 1990s and 2000s, and even today, only a handful of states limit magazine capacity. Given that the "success" of magazine-equipped firearms predated

these first regulations by at least fifty years, I do not see evidence of the longstanding tradition required under *Heller* to remove magazines from the protection of the Second Amendment. *Cf. Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (holding New Jersey's permit requirement was longstanding because its origins dated to 1924). Nor is it clear that there is a longstanding tradition of regulating magazines as "dangerous and unusual." For one thing, more than eight states would have rushed to regulate magazine capacity following the end of the federal ban in 2004.

Some will argue there must be an outer boundary to this analysis that, when crossed, renders a magazine dangerous and unusual. If so, it does not appear in the history and traditions of our Nation. But in any event that question is not before us. So while "[t]here may well be some capacity above which magazines are not in common use . . . the record is devoid of evidence as to what that capacity is." *Heller II,* 670 F.3d at 1261 (Kavanaugh, J., dissenting). As a result, and limited to this record, I would hold that magazines are arms protected by the Second Amendment and an act limiting magazine capacity to ten rounds burdens the Appellants' Second Amendment rights.

> 2. Step Two: Evaluating the Challenged Law Under Means-End Scrutiny

Although not required by *Heller*, our precedent uses some form of means-end scrutiny. *See Marzzarella*, 614 F.3d at 96–97. *Marzzarella* does not insist on a uniform standard in all cases. Rather, we observed that if, like the First Amendment, "the Second Amendment can trigger more than one particular standard of scrutiny," then intermediate scrutiny should be applied when the challenged law does not burden the

"fundamental interest protected by the [Second Amendment]—the defense of hearth and home." *Id*. at 97. By extension, strict scrutiny should be applied when a challenged law does burden such a fundamental interest. I conclude that the New Jersey Magazine Act burdens the right to maintain operable protected arms without regard to location or circumstances, warranting strict scrutiny. But regardless of the level of scrutiny applied, the state does not satisfy its burden on this record.

i.      *Strict Scrutiny*

As the Supreme Court has not applied the tiers of scrutiny to gun regulations, *see Heller*, 554 U.S. at 634, "we look to other constitutional areas for guidance in evaluating Second Amendment challenges." *Marzzarella*, 614 F.3d at 89 n.4. Using this rationale, we concluded "the First Amendment is the natural choice. *Heller* itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment." *Id.*

Cases considering restrictions on speech and expression hold the appropriate level of scrutiny is a fact-specific inquiry tied to the type of regulation at issue. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restrictions in a public forum); *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Oh.*, 471 U.S. 626, 651 (1985) (applying rational basis review to disclosure requirements for commercial speech). Strict scrutiny applies to content-based restrictions that infringe on the First Amendment's core guarantee. *See, e.g.*, *Citizens United v. FEC*, 558 U.S. 310, 340 (2010) (applying strict scrutiny in the context of infringement on "political speech"); *United States v.*

24

*Playboy Ent. Grp.*, 529 U.S. 803, 813 (2000) (applying strict scrutiny in context of content-based speech restriction). So following the direction of *Marzzarella*, strict scrutiny applies to restrictions burdening rights at the core of the Second Amendment. *See NJ Rifle I*, 910 F.3d at 134 (Bibas, J., dissenting).

One of the Second Amendment's core purposes is to protect the "use [of] arms in defense of hearth and home." *Heller*, 554 U.S. at 591, 636. For that reason, prohibiting operable firearms in the home violates the Second Amendment. *Id*. The same result applies here, because the New Jersey Magazine Act prohibits the possession of magazines exceeding ten rounds at all times, including inside the home for defense. The State argues that the Act "does not ban magazines; it imposes a restriction on the capacity of a single magazine that can be inserted into a firearm" and does not restrict the number of magazines an individual may possess. (*NJ Rifle I* Response Br. at 34–35.) That is only partially correct, as it leaves owners of a "noncompliant" magazine without an operating firearm. But even assuming the Act is not a categorical ban on all magazines, it still burdens a core Second Amendment right without exception or limitation, including the defense of "hearth and home" specifically noted in *Heller*. Following our prior analogy to decisions applying the First Amendment jurisprudence, this "ban on a class of arms is not an 'incidental' regulation. It is equivalent to a ban on a category of speech." *See Heller II*, 670 F.3d at 1285 (Kavanaugh, J., dissenting); *see also NJ Rifle I*, 910 F.3d at 127 (Bibas, J., dissenting) ("I would apply strict scrutiny to any law that impairs the core Second Amendment right to defend one's home.").

New Jersey has not offered record evidence meeting that test. "Strict scrutiny asks whether the law is narrowly tailored to serve a compelling government interest." *Marzzarella*, 614 F.3d at 96 n.14. When "a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Ent. Grp.*, 529 U.S. at 813. As Judge Bibas observed, "[h]ere, the government has offered no concrete evidence that magazine restrictions have saved or will save potential victims. Nor has it made any showing of tailoring." *NJ Rifle I*, 910 F.3d at 134 (Bibas, J., dissenting). New Jersey once imposed a fifteen-round limit on magazine capacity. Now it claims ten is essential for public safety. The Second Amendment demands more than back-of-the-envelope math. At a minimum, it asks the government to explain, to offer but one example, why eleven rounds is too many while nine remains fine. Unless competent evidence answers those questions, New Jersey cannot show why a ten-round limit is the least restrictive means of achieving public safety. For this reason, I would hold that the Act fails to satisfy strict scrutiny.

### ii.   *Intermediate Scrutiny*

For largely the same reasons, the New Jersey Magazine Act does not satisfy intermediate scrutiny where "the government's asserted interest must be more than just legitimate but need not be compelling. It must be 'significant, substantial, or important.'" *Drake*, 724 F.3d at 436 (quoting *Marzzarella*, 614 F.3d at 98). "'[T]he fit' between the asserted interest and the challenged law need not be 'perfect,' but it must be 'reasonable' and 'may not burden more [conduct] than is reasonably necessary.'" *Id*. (quoting *Marzzarella*, 614 F.3d at 98).

Here, the record does not show the State reasonably tailored the regulation to serve its interest in public safety without burdening more conduct than reasonably necessary. First, the State rests on the ambiguous argument that "when LCM-equipped firearms are used, more bullets are fired, more victims are shot, and more people are killed than in other gun attacks." (*NJ Rifle I* Response Br. at 28.) Perhaps, but "this still begs the question of whether a 10-round limit on magazine capacity will affect the outcomes of enough gun attacks to measurably reduce gun injuries and death." (*NJ Rifle I* App. at 1280 (Christopher S. Koper, An Updated Assessment of the Federal Assault Weapons Ban 89 (2004)).) In fact, "studies suggest that state-level [assault-weapon] bans have not reduced crime[.]" (*NJ Rifle I* App. at 1272, Koper, *supra* at 81 n.95.)

Second, as Judge Bibas observed, "since 1990 New Jersey has banned magazines that hold more than fifteen bullets. The ban affects everyone. The challengers do not contest that ban. And there is no evidence of its efficacy, one way or the other." *NJ Rifle I*, 910 F.3d at 132 (Bibas, J., dissenting). Third, statistics in the record report that out of sixty-one "mass shootings,"[9] eleven used fifteen-round

---

[9] The term "mass shootings" does not appear to have an objective definition. *See*, *e.g.*, *NJ Rifle I* App. at 1042, Louis Klarevas, Rampage Nation: Securing America From Mass Shootings (2016) (defining mass shootings as "attacks that resulted in six or more people—not including the perpetrator(s)—*dying* as a result of gunshot wounds") (emphasis in original); App. at 1067, Cong. Rsch. Serv., Mass Murder with Firearms: Incidents and Victims, 1999-2013 (2015) (defining "mass shooting" as "a multiple homicide

magazines, two used fourteen-round magazines, and two used thirteen-round magazines. That alone casts doubt on the ten-round tailoring. As does the declaration of the Commissioner of the Baltimore Police Department's stating that the use of a ten round magazine offers more opportunities to intervene in a shooting incident than if "*30- or 50-round magazines, or 100-round drums*" are used. (*NJ Rifle I* App. at 865.) (emphasis added). So too, of course, would use of a magazine holding eleven or twenty-nine rounds. That is why narrow tailoring requires more than a ninety-round spread in logic.[10]

---

incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and in one or more locations in close geographical proximity); App. at 1118, Violence Pol'y Ctr., High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States (defining "mass shooting" as "3 or more fatalities").

[10] Diving deeper, the record evidence casts doubt on the State's intervention theory. For example, "it takes two to four seconds for shooters to eject an expended magazine from a semi-automatic gun, insert a loaded magazine, and make the gun ready to fire." (*NJ Rifle I* App. at 1197, Declaration of Gary Kleck in Support of Plaintiffs' Motion for a Preliminary Injunction at 12). Investigations from criminal attacks show "that the killers typically do not fire at high rates, instead firing deliberately, at rates far below the fastest rates that can be maintained with semiautomatic weapons." (*NJ Rifle I* App. at 1203, Kleck Decl. at 18.) In fact, "[t]he average interval between shots in mass shootings . . . is nearly always more than two to four seconds, which means that magazine changes do

28

All of this leads to one conclusion: "the Government bears the burden of proof on the appropriateness of the means it employs to further its interest[,]" but "the Government falls well short of satisfying its burden—even under intermediate scrutiny." *Binderup v. Att'y Gen.*, 836 F.3d 336, 353 (3d Cir. 2016) (en banc). New Jersey must "present some meaningful evidence, not mere assertions, to justify its predictive [and here conclusory] judgments[,]" and it failed to meet that burden here. *Id.* at 354 (alteration in original) (citing *Heller II*, 670 F.3d at 1259); *see also N.Y. State Rifle & Pistol Ass'n, Inc*, 804 F.3d 242, 264 (2d Cir. 2015) ("[O]n intermediate scrutiny review, the state cannot 'get away with shoddy data or reasoning.' To survive intermediate scrutiny, the defendants must show '*reasonable* inferences based on *substantial* evidence' that the statutes are substantially related to the governmental interest.") (emphasis in original) (internal citations omitted).

For these reasons, I would hold that the Act cannot satisfy intermediate, or any applicable level of, scrutiny.

## III. RECONSIDERING *MARZZARELLA* AND TIERED SCRUTINY

---

not even slow the shooter's rate of fire." (*NJ Rifle I* App. at 1203, Kleck Decl. at 18.) Shooters can "avoid the necessity of reloading by carrying several firearms, carry[ing] several magazines which can be exchanged quickly, or simply tak[ing] the time to reload." (*NJ Rifle I* App. at 748, Carlisle E. Moody, Large Capacity Magazines and Homicide, 160 C. Wm. & Mary Working Paper 6, 6 (2015).) Crediting all of this testimony seems to undermine the State's theory, and suggests that reducing magazine does not meaningfully assist intervention.

29

Decided two years after *Heller*, our decision in *Marzzarella* ushered in a two-part framework for analyzing the Second Amendment. That test has proved popular, and is now used by a majority of circuit courts. But our approach has come into question, and I have serious doubts that it can be squared with *Heller*. *See, e.g.*, *Rogers v. Grewal*, 140 S. Ct. 1865, 1867 (2020) (mem.) (Thomas, J., dissenting) (criticizing the two-part framework as "rais[ing] numerous concerns" that "yield[] analyses that are entirely inconsistent with *Heller*"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540 (2020) (Alito, J., dissenting) (explaining that *Heller* is based "on the scope of the right to keep and bear arms as it was understood at the time of the adoption of the Second Amendment"); *id.* at 1527 (Kavanaugh, J., concurring) ("I share Justice Alito's concern that some federal and state courts may not be properly applying *Heller* and *McDonald*."). I reach that conclusion on two grounds.

First, the widespread popularity of the two-step balancing test does not address the clear repudiation of interest-balancing by the Supreme Court in *Heller* and *McDonald*. When twice presented with the opportunity to import tiered scrutiny from decisions considering the First Amendment, the Supreme Court instead focused on text, history, and tradition. *See Heller*, 554 U.S. at 634 (declining to apply a specified level of scrutiny and observing that "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."); *McDonald*, 561 U.S. at 785 ("[W]e expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing"); *Binderup*, 836 F.3d at 378 (Hardiman, J., concurring) ("Applying some form of means-end scrutiny in an as-applied

challenge against an absolute ban—after it has already been established that the individual has a right to keep and bear arms—eviscerates that right via judicial interest balancing in direct contravention of *Heller*.").

Second, this historical approach is significant because, as *Heller* explains, "it has always been widely understood" that "[t]he very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.'" *Heller*, 554 U.S. at 592 (quoting *United States v. Cruikshank*, 92 U.S. 542, 553 (1876)) ("This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence."); *see also Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) ("The law is perfectly well settled that the first 10 amendments to the constitution . . . were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors[.]"). And rather than turning to the reservoir of decisions, doctrines, and debates flowing from generations of First Amendment cases and tiered tolerance of governmental speech restraints, *Heller* "pores over early sources to show that while preventing Congress from eliminating state militias was the 'purpose that prompted the [Amendment's] codification,'" that purpose did not limit the right's substance. *Wrenn v. District of Columbia*, 864 F.3d 650, 658 (D.C. Cir. 2017) (quoting *Heller*, 554 U.S. at 600). At its core, the Second Amendment recognizes the widely accepted principle at the Founding that the right to self-defense derived directly from the natural right to life, giving the people predictable protections for securing the "Blessings of Liberty." U.S. Const. pmbl.; *see also* Declaration of Independence para.

31

2.[11] So "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis in original).

For those reasons, I would follow what I believe to be the direction of the Supreme Court and focus our approach "based on text, history, and tradition" rather "than under an interest-balancing test." *Heller II*, 670 F.3d at 1275 (Kavanaugh, J. dissenting).

## IV. CONCLUSION

The law-of-the-case doctrine can serve important, practical purposes in litigation. But it remains a prudential rule

---

[11] Several Founding Era documents reflect this sentiment. Hamilton wrote in Federalist Paper 28 that the "original right of self-defense" is "paramount to all positive forms of government." The Federalist No. 28, at 146 (Alexander Hamilton) (Colonial Press, ed., 1901). Similarly, Samuel Adams listed self-preservation under "Natural Rights of the Colonists as Men": "First, a right to life; Secondly, to liberty; Thirdly, to property; together with the right to support and defend them in the best manner they can." Samuel Adams, The Rights of the Colonists: The Report of the Committee of Correspondence to the Boston Town Meeting Nov. 20, 1772 *reprinted in* Old South Leaflets no. 173 (Directors of the Old South Work 1906). Those sentiments, in turn, echo the classical understanding that "[s]elf-defence, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society." 3 William Blackstone, Commentaries *4.

that "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Messenger v. Anderson*, 225 U.S. 436, 444 (1912). I would decline to invoke that discretion here, as I conclude that determining whether magazines enjoy the guarantees of the Second Amendment, and whether that protection varies based on their capacity, would "not reopen issues decided in earlier stages of the same litigation." *Agostini v. Felton*, 521 U.S. 203, 236 (1997). Both issues affect the rights of individuals throughout our Circuit. Likewise, resolving those questions will allow state governments to design public safety solutions that respect the freedoms guarded by the Second Amendment. So I would reverse the order of the District Court, hold that magazines are arms under the Constitution, and remand this matter to permit the State to provide evidence that the Act is narrowly tailored to advance the State's interests. For these reasons, I respectfully dissent.