No. 19-3142

# In the
# United States Court of Appeals
# for the Third Circuit

◆

## ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.; BLAKE ELLMAN; ALEXANDER DEMBOWSKI,

*Plaintiffs-Appellants*,

v.

## ATTORNEY GENERAL NEW JERSEY; SUPERINTENDENT NEW JERSEY STATE POLICE; THOMAS WILLIVER, in his official capacity as Chief of Police of the Chester Police Department; JAMES B. O'CONNOR, in his official capacity as Chief of Police of the Lyndhurst Police Department,

*Defendants-Appellees.*

◆

On Appeal from the United States District Court
for the District of New Jersey
Case No. 3:18-cv-10507
The Honorable Peter G. Sheridan

◆

### APPELLANTS' OPPOSITION TO MOTION FOR SUMMARY ACTION

◆

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, N.J. 07450
Telephone: (201) 967-8040
dschmutter@hartmanwinnicki.com

John Parker Sweeney
James W. Porter, III
Marc A. Nardone
Candice L. Rucker
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 719-8216
jsweeney@bradley.com

*Counsel for Plaintiffs-Appellants*

4816-7265-9627.5

# INTRODUCTION

New Jersey prohibits law-abiding, responsible citizens from possessing standard capacity firearm ammunition magazines capable of holding more than ten rounds of ammunition. There is no dispute that the banned magazines are in common use and typically possessed for lawful purposes. Appellants challenged this ban of protected arms as facially unconstitutional under the Second Amendment. In a split decision, a panel of this Court affirmed the district court's denial of Appellants' motion for preliminary injunction. On remand, the district court granted summary judgment in favor of Appellees. Now Appellees have moved under Local Rule 27.4 for summary action affirming the district court's decision. As explained further below, the prior panel decision is not binding on a subsequent panel of this Court because it arose in a different procedural posture and was clear error that works manifest injustice. Appellants respectfully request this Court deny Appellees' motion for summary action because this appeal presents substantial questions requiring merits briefing and argument.

# STATEMENT OF FACTS

For years, New Jersey defined "large capacity ammunition magazine" as any magazine "capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm." N.J.S.A. §§ 2C:39-1(y), 2C:39-3(j). In 2018, the New Jersey legislature passed Assembly Bill

No. 2761 ("Act A2761") and revised the standard to define "large capacity" magazines as those capable of holding more than ten rounds of ammunition. Act A2761 § 1(y), *codified at* N.J.S.A. § 2C:39-1(y). Act A2761 criminalizes the knowing possession of magazines capable of holding more than ten rounds, with minor exceptions not relevant here. *See id.*; *see also* Act A2761 § 1(w)(4), *to be codified at* N.J.S.A. § 2C:39-1(w)(4).

Governor Philip Murphy signed Act A2761 into law on June 13, 2018. New Jersey residents who lawfully possessed the banned magazines as of this date had six months to surrender their arms to the government, transfer them to another (out of state) owner, destroy them, or permanently alter them so that they no longer fall within the scope of the ban. Act A2761 §§ 4(c), 5, *codified at* N.J.S.A. § 2C:39-19(a)–(c). Retired law-enforcement officers are specifically exempted from the ban. *See* Act A2761 § 2, *codified at* N.J.S.A. § 2C:39-17.

## ARGUMENT

**I.    This panel is not bound by the prior panel decision because (1) the procedural posture has changed, requiring factual inferences to be drawn in Appellants' favor and against Appellees, and (2) reconsideration is required to prevent clear error and manifest injustice.**

Appellees' motion for summary action is based upon the premise that the prior panel decision in this case, *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.*, 910 F.3d 106 (3d Cir. 2018), controls the outcome of this appeal. Mot. For Summary Action & Stay of Briefing Schedule, No. 19-3142, (3d Cir. Oct. 22, 2019), ECF No.

003113382422. Appellees' argument is undercut by two well-established exceptions to the law of the case doctrine applicable here: (1) the prior decision based its ruling on factual findings that are no longer appropriate, *ACLU v. Mukasey*, 534 F.3d 181, 192 (3d Cir. 2008) ("For this particular conclusion we relied upon factual findings the District Court made in granting the preliminary injunction, so to this extent it does not bind us on this appeal.") and (2) reconsideration of the prior opinion is necessary to prevent clear error or manifest injustice. *Id.* at 188.

In *ACLU*, this Court noted that it was not bound by the prior panel's decision where that decision rested on factual findings from the preliminary injunction hearing in the district court. *Id.* at 192. *ACLU* involved a trial after the appeal of the grant of a preliminary injunction that established facts and rendered the prior panel opinion non-binding. *Id.* at 185-86, 92. While the procedural posture of *ACLU* is different than that of this case, the rule is equally applicable. Here, the differing burdens and inferences associated with Appellants' prior motion for preliminary injunction and those associated with Appellees' instant motion for summary judgment render the prior panel opinion non-binding.

This Court reviews the entry or denial of preliminary injunction by viewing the facts in the light most favorable to prevailing party and reviews factual determinations of the lower court under an abuse of discretion standard. *Arrowpoint Capital Corp v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 316 n.1 & 6 (3d Cir.

2015). Thus, the facts and inferences relied upon by the prior panel were viewed in a light most favorable to Appellees.

In this appeal, however, this Court is called upon to review the grant of summary judgment in favor of Appellees. In this context, the Court must conduct a de novo review of the evidence, view the facts in the light most favorable to Appellants, and resolve any inferences in favor of Appellants. *E.g. Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 743 (3d Cir. 1996). This distinction is critical in framing the review of the evidence and resolving the issues presented because it dictates the way the evidence will be construed by this Court. Flipping the direction in which inferences are drawn likely will produce inferences rendering the prior panel opinion non-binding in the same way that establishing new facts at trial rendered the prior panel opinion non-binding in *ACLU*. 534 F.3d at 192.

Even if the differing standards applicable to a motion for summary judgment and a motion for preliminary injunction were not dispositive of Appellees' instant motion, this Court should decline to follow the prior panel opinion to prevent clear error and manifest injustice. As explained below, the prior panel opinion applied an incorrect standard to uphold a law that infringes upon the exercise of a fundamental right. *Cf. Thorpe v. Hous. Auth. of City of Durham*, 393 U.S. 268, 282 n.43 (1969) (explaining that *Greene v. United States*, 376 U.S. 149 (1964), departed from the

general rule that a court apply the law as it exists at the time of the decision to avoid the manifest injustice of denying an individual a vested right).

For these reasons, and as explained further below, this appeal presents substantial questions. Appellants respectfully request this Court deny Appellees' motion for summary action and set the case for merits briefing and argument.

## II.    The banned magazines are protected by the Second Amendment because they are typically possessed for lawful purposes by law-abiding, responsible citizens.

Magazines capable of holding more than ten rounds are commonly kept throughout the United States. There are approximately 133 million magazines capable of holding more than ten rounds owned throughout the country, constituting about half of the nation's ammunition magazines. Magazines capable of holding more than ten rounds come standard on some of the most popular handguns and rifles sold in the United States. *See generally* Decl. of Daniel Schmutter, at Ex. A, Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. of N.J., No. 3:18-cv-10507-PGS-LHG, (D.N.J. June 21, 2018), ECF No. 13-1 (documenting firearms sold standard with different capacity magazines and establishing that many popular firearms come standard with magazines with a capacity greater than 10 rounds).

The banned magazines are typically possessed by Americans for a variety of lawful purposes, including, but not limited to, recreational and competitive target shooting, self defense, collecting and hunting. *See e.g.*, *Duncan v. Becerra*, 366 F.

Supp. 3d 1131, 1134-35 (S.D. Cal. 2019) (recounting situations in which law-abiding citizens defending themselves with firearms needed more than ten rounds of ammunition). There are many reasons why a law-abiding, responsible citizen would choose not to be limited to restricted capacity ammunition magazines capable of holding ten or fewer rounds. The most obvious is to decrease the risk of running out of ammunition before being able to repel a criminal attack. Nearly 20% of the violent crimes occurring during any given year may involve multiple offenders. *See* U.S. Bureau of Justice Statistics, *Criminal Victimization in the United States, 2008 Statistical Tables* tbl. 37 (2010). And a citizen defending himself from an unanticipated attack will likely not have additional magazines, while a criminal committing a planned assault will. The unintended but practical result of magazine bans is to significantly diminish the ability of assault victims to defend themselves while simultaneously doing little to affect criminal outcomes.

There is no historical tradition of banning magazines capable of holding more than ten rounds. Firearms with the capacity to fire multiple rounds "are older than the United States." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev.849, 851 (2015). "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity," and the same was true "by the time ratification of the Fourteenth Amendment was completed in 1868." *Id*. at 864, 869. Around this latter time, "it was solidly

established that firearms with seventeen-round magazines were in common use." *Id.* at 869. Restrictions on magazine capacity did not appear before the Prohibition Era, and, even then, they were rare and generally short-lived. *Id.* at 864.    This    Court has already accepted these propositions as true. "[M]illions of magazines are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense,  and there is no longstanding history of [their] regulation." *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116 (record citations omitted). This should have been the end of the inquiry, because Supreme Court precedent is clear that these are protected arms and cannot be banned.

## III.    The prior panel opinion was wrongly decided.

New Jersey's magazine ban should be struck down because it infringes on the fundamental rights of all law-abiding, responsible citizens of New Jersey.

### A.    New Jersey's magazine ban violates the Second Amendment.

The Supreme Court has reviewed three Second Amendment challenges since 2008 and has—on each occasion—applied a text, history, and tradition analysis to conclude that the Second Amendment protects the right of law-abiding, responsible citizens to choose, acquire, and possess bearable arms that are typically possessed for lawful purposes. *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 790–91 (2010); *Caetano v.*

*Massachusetts*, 136 S. Ct. 1027, 1027–28 (2016). This trio of cases demonstrates that a ban of firearms typically possessed for lawful purposes is a policy choice that is "off the table." *Heller*, 554 U.S. at 636.

*Heller*'s principle applies directly to New Jersey's ban on magazines capable of holding more than ten rounds, which are indisputably possessed by a great number of Americans for the lawful purposes of self-defense, target shooting, and hunting. New Jersey's magazine ban cannot survive any more than the firearm bans in *Heller* and *McDonald* or the stun gun ban in *Caetano*.

In *Heller*, the Supreme Court struck down a ban on the possession of handguns and operable long guns, which included within its sweep many popular semiautomatic firearms. 554 U.S. at 574, 629–36. In doing so, the Court extensively analyzed the Second Amendment's text, history, and tradition to conclude "that the Second Amendment confer[s] an individual right to keep and bear arms," *id*. at 595, which "extends, prima facie, to all instruments that constitute bearable arms," *id*. at 582, and categorically protects the possession of firearms that are "typically possessed by law-abiding citizens for lawful purposes," *id*. at 625. Under this standard, any ban on bearable arms that are typically possessed for lawful purposes is an impermissible policy choice and must be struck down. *Id*. at 636.

*Heller* expressly rejected interest balancing as a method for resolving Second Amendment challenges to a ban on protected arms. *Id*. at 634–35. "Constitutional

rights [like the Second Amendment right] are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or . . . future judges think that scope [is] too broad." *Id*. at 635. In other words, "[t]he very enumeration of the right takes out of the hands of the government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id*. at 634 (emphasis in original). The Second Amendment "is the very product of an interest balancing by the people" at the time it was enacted, *id*. at 634-35 (emphasis omitted), and it "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.*

The District of Columbia's firearm ban could not survive under this framework because it prohibited "an entire class of arms" that was typically possessed by law-abiding, responsible citizens for the lawful purpose of self-defense. *Id*. at 628. The Court reached its conclusion notwithstanding evidence that handgun violence presents a serious problem in the United States. *Id*. at 634–35. Nor could the handgun ban be saved simply because other firearms may be available. *Id*. at 629. A ban on protected firearms is per se unconstitutional because it conflicts with the text, history, and tradition of the Second Amendment. *Id*. at 629.

Two years later, the Court held that the Second Amendment applies to the States by incorporation through the Fourteenth Amendment Due Process Clause because "the right to keep and bear arms [is] among those fundamental rights

necessary to our system of ordered liberty." *McDonald*, 561 U.S. at 778. *McDonald* also affirmed that *Heller*'s text, history, and tradition analysis is the only proper framework for evaluating the constitutionality of firearm bans. *Id*. at 767–68. And the Court again rejected interest balancing as the appropriate paradigm for evaluating Second Amendment challenges. *Id*. at 785-86. In doing so, the Court struck down two municipal handgun bans, confirming that any ban on bearable arms that are typically possessed for lawful purposes is per se unconstitutional. *See id*. at 791.

Six years later, the Court's again confirmed *Heller*'s analysis and holding. In *Caetano*, the Massachusetts Supreme Judicial Court had rejected *Heller* analysis and upheld Massachusetts' ban on the possession of stun guns. 136 S. Ct. at 1027–28. For the third time in as many cases, the Supreme Court used its text, history, and tradition analysis and reiterated that *Heller* controls the determination of cases involving a total ban on bearable arms. *See id*. at 1028. Again, the Court did not apply or approve of any form of interest balancing. The Massachusetts Supreme Judicial Court later followed *Caetano*'s instruction and faithfully applied *Heller*'s analysis to conclude that the "absolute prohibition . . . against the civilian possession of stun guns is in violation of the Second Amendment." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 819 (Mass. 2018). The court recognized that "the possession of stun guns may be regulated, but not absolutely banned" because any such ban "is

inconsistent with the Second Amendment and is therefore unconstitutional." *Id*. at 815.

This Court should have applied the text, history, and tradition analysis set forth and applied in *Heller*, *McDonald*, and *Caetano* to conclude that New Jersey's ban on magazines capable of holding more than ten rounds is unconstitutional. As a threshold matter, it is undisputed that magazines are "arms" within the meaning of the Second Amendment. *See Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116 ("[T]he question is whether a magazine is an arm under the Second Amendment. The answer is yes."); *see also Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("[W]ithout bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose."). This ends the inquiry under *Heller*. New Jersey's ban is unconstitutional because the text, history, and tradition of the Second Amendment demonstrate that a ban on protected arms is a "policy choice" that is "off the table." *Heller*, 636 U.S. at 635. The judgment of the district court should have been reversed under controlling Supreme Court precedent, and the failure to do so is clear error and works manifest injustice on all law-abiding, responsible citizens of New Jersey.

Even applying the law of this Circuit, this Court should have held that the challenged ban is unconstitutional. Rather than following *Heller's* text, history, and

tradition standard, this Court applies a "two-step framework" to evaluate Second Amendment challenges. *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116. First, the Court considers whether the regulation at issue "imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010). If it does, the Court must then "evaluate the law under some form of means-end scrutiny." *Id*. "If the law passes muster under that standard, it is constitutional. If it fails, it is invalid." *Id*. This Court's two-step framework is inconsistent with *Heller*'s text, history, and tradition analysis and should not have been applied. Nevertheless, New Jersey's ban is unconstitutional even under this analysis because a ban "would fail constitutional muster" "[u]nder any of the standards of scrutiny applied . . . to enumerated constitutional rights." *See Heller*, 554 U.S. at 628.

There is no doubt the banned magazines fall within the scope of the Second Amendment at the first step in the two-step framework. *Ass'n of N.J. Rifle & Pistol Clubs*, 910 F.3d at 116. At the second step in the two-step framework, New Jersey's magazine ban cannot survive any level of means-end scrutiny.

If the Court were to apply some form of heightened constitutional scrutiny, strict scrutiny is the only appropriate standard because New Jersey's ban "threatens . . . the right of a law-abiding, responsible adult to possess and use a [firearm] to defend his or her home and family." *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of*

*Alcohol, Tobacco, Firearms, and Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *accord Duncan*, 366 F. Supp. 3d at 1158 (applying strict scrutiny to analyze a magazine ban). New Jersey's ban is unconstitutional under strict scrutiny because a ban can never be the narrowest means possible to achieve whatever interest the state is trying to promote. *See, e.g., Heller*, 666 U.S. at 636 (rejecting the argument that a ban on handguns could be saved because it was tailored to ban the possession of handguns only and the evidence demonstrated that handguns were used in most gun crimes).

New Jersey's magazine ban also fails under intermediate scrutiny, even if this Court were to apply this incorrect standard.[1] Intermediate scrutiny requires that a law impacting a fundamental right also be narrowly tailored to serve a substantial government interest. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). New Jersey must demonstrate that the ban does not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interests." *Id.*

---

[1] As explained more fully in Appellants' motion for stay, the United States Supreme Court has granted certiorari in *New York State Rifle & Pistol Association, Inc. v. City of New York*, No. 18-280 (Jan. 22, 2019) ("*NYSRPA*"), which will address, among other things, the proper standard of review in Second Amendment cases. This Court should stay proceedings in this case to permit the resolution of *NYSRPA* so that this Court can benefit from the Supreme Court's guidance. This is especially true here, where *NYSRPA* is likely to completely change Second Amendment jurisprudence, as it relates to the applicable constitutional tests.

New Jersey's ban is not sufficiently tailored to further the state's interest in public safety because an absolute ban on the possession of bearable arms is not tailored at all—much less "narrowly tailored." *Id*. By its plain terms, New Jersey's ban addresses far more than the criminal misuse of firearms, reaching into the homes of law-abiding, responsible citizens who merely wish to exercise their core Second Amendment right to self-defense. *Heller* explicitly rejected the problem of firearm violence to justify a ban on firearms that are typically possessed for lawful purposes, *see* 554 U.S. at 636, and New Jersey cannot save its unconstitutional law by speculating it will somehow reduce firearm violence.

In any event, New Jersey's ban is not substantially related to furthering the state's interest in public safety. For a law to be substantially related to the government's interests, the government must prove that its "restriction will in fact alleviate" its concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). But Appellees have failed to identify a causal relationship between New Jersey's interest and its ban, offering nothing more than speculation that its ban will reduce firearm violence.[2] Appellees' speculative justification is more wishful thinking than sound policy and cannot justify this massive intrusion on the rights of law-abiding,

---

[2] As noted above in n.1, *NYSRPA* is likely to provide the guidance on the level of scrutiny that this Court and the other lower courts have been looking for since *Heller* was decided. This Court should not rush to decide this issue when that guidance should be forthcoming shortly. For the reasons stated in Appellants' motion to stay, this Court should hold this appeal until *NYSRPA* is decided.

responsible citizens to defend themselves, their families, and their homes with firearms that are typically possessed for lawful purposes.

**B.    New Jersey's magazine ban violates the Fifth Amendment Takings Clause.**

The Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend V. "While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes two conditions on the exercise of such authority: the taking must be for a 'public use' and 'just compensation' must be paid to the owner." *Brown v. Legal Found. of Washington*, 538 U.S. 216, 231–32 (2003).

Personal property, like ammunition magazines, can be "taken" within the meaning of the Fifth Amendment in one of two ways. A "physical taking" occurs when the government appropriates or otherwise physically dispossesses an owner of his property. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005). A "regulatory taking" occurs when the government regulates the use of that property in a manner that "is tantamount to a direct appropriation or ouster." *Id*.

Act A2761 effects a physical taking because it dispossesses New Jersey citizens of their personal property, for which the government is required to pay just compensation. *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2426 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."). According to the ban, citizens have four options

to avoid criminal penalties, the first of which being a total surrender of their ammunition magazines to the government. *See* N.J.S.A. § 2C:39-19(c). "[T]he classic taking is one in which the government directly appropriates private property for its own use." *Horne*, 135 S. Ct. at 2425.

The remaining options are no more constitutionally viable. A person who is unwilling to surrender his magazines may transfer them to "any person or firm lawfully entitled to own or possess that . . . magazine." N.J.S.A. § 2C:39-19(a). But a taking occurs when the government permits a third party (instead of itself) to dispossess a property owner of his private property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 n.9 (1982); *Int'l Paper Co. v. United States*, 282 U.S. 399, 408 (1931).

Finally, a person who is unwilling to surrender or transfer his magazines may destroy them or "[r]ender the . . . magazine inoperable" or permanently alter it to accept ten rounds or fewer. N.J.S.A. § 2C:39-19(b). But the government cannot escape its Fifth Amendment obligations by affording owners the alternative of modifying or destroying their property. In *Horne*, for example, raisin growers could have "plant[ed] different crops" or "[sold] their raisin-variety grapes as table grapes or for use in juice or wine." 135 S. Ct. at 2430. And, in *Loretto*, the owner could have converted her building into something other than an apartment complex. 458 U.S. at 439 n.17. These authorities make clear that New Jersey is effecting a taking.

Because New Jersey's magazine ban works a taking of property, the State has a categorical duty to compensate the former owner. *Horne*, 135 S. Ct. 2426. But the ban makes no provision for owners of the banned magazines to be compensated after relinquishing, destroying, or permanently altering their property. New Jersey's ban effects an unconstitutional taking by stripping law-abiding, responsible citizens of their private property without just compensation.

### C.    New Jersey's magazine ban violates the Fourteenth Amendment Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend XIV, § 1. This is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Because the principle of equal protection requires that similarly situated people be treated equally, a state can violate the Equal Protection Clause by drawing impermissible distinctions, even if the state would otherwise have the power to enact the statute at issue.

"[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). "[T]he right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778, and magazines capable of holding more than ten rounds are fully protected by the Second Amendment, *see supra* pp.

5-7. Because Act A2761 "establishes . . . classification[s] that implicate[] fundamental rights[,] . . . [it] must meet strict scrutiny analysis," *Tolchin v. Supreme Court of New Jersey*, 111 F.3d 1099, 1114 (3d Cir. 1997), and it must be "narrowly tailored to serve a compelling state interest," *Pemberthy v. Beyer*, 19 F.3d 857, 870 n.18 (3d Cir. 1994) (quotation marks omitted). As explained above, a ban cannot satisfy strict scrutiny.

But the classifications drawn by Act A2761 are unconstitutional even under the more lenient intermediate-scrutiny test. Under intermediate scrutiny, Appellees must show "at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (alteration in original) (quotation marks omitted). "The burden of justification is demanding," "rests entirely on the State," and must be "exceedingly persuasive." *Id.*

Act A2761 exempts retired law-enforcement officers from the magazine ban. In doing so, the ban creates two distinct classifications subject to the Court's equal-protection analysis. First, it distinguishes between retired law-enforcement officers (who are exempt from the ban) and law-abiding, responsible citizens of New Jersey (who are not). Second, it distinguishes between retired law-enforcement officers (who are exempt from the ban) and retired members of the armed forces (who are

not). Both classifications involve groups similarly situated in all relevant respects other than the classification at issue. *See Silveira v. Lockyer*, 312 F.3d 1052, 1091 (9th Cir. 2002).

These distinctions cannot survive review because they are not "substantially related to the achievement of" the State's interest in public safety—let alone narrowly tailored to achieve that interest. *See Virginia*, 518 U.S. at 533. As the Ninth Circuit previously held when reviewing a similar equal-protection challenge, exempting retired police officers from a general firearms prohibition "bears no reasonable relationship to the stated legislative purpose" of the prohibition. *Silveira*, 312 F.3d at 1091. "Rather, the retired officers exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs." *Id*. The Ninth Circuit held that the exemption fails even rational-basis review. *See id*. at 1091-92. The current ban fails even rational basis review for the same reasons.

That retired police officers may be better trained at handling ammunition magazines than the average citizen does not solve the constitutional quandary. Preliminarily, there is no requirement that any retired law enforcement office have obtained this training. Retired officers who had trained only with revolvers are exempt from the ban, despite having no training with the banned magazines. And there is no relationship between the asserted purpose of the ban—reducing mass

shootings—and the retired law enforcement officers exception. Furthermore, there is no requirement for ongoing training, and retired law enforcement officers cannot exercise police duties, rendering this class of individuals indistinguishable from ordinary citizens. Finally, there is no allowance in the law for individuals other than retired law enforcement officers who have received similar training, thereby undermining the rationale for the distinction.

The distinction between veterans of the police force and veterans of the armed forces is even harder to justify and fails for similar reasons. Appellant Dembowski served for four years in the Marine Corps, where he received annual training on the use of firearms and magazines Decl. of Alexander Dembowski, at 2, *Ass'n of N.J. Rifle & Pistol Clubs v. Attorney Gen. of N.J.*, No. 3:18-cv-10507-PGS-LHG, (D.N.J. June 21, 2018), ECF No. 9. He also served for a year as a Combat Marksmanship Instructor, which required an additional month of intensive training in the use of firearms and magazines. *Id*. While in the Marines, Appellant Dembowski used magazines capable of holding well in excess of ten rounds. *Id*. He currently serves as Chief Range Safety Officer at a private range in New Jersey, where he routinely trained customers using 15-round magazines for both rifles and pistols. *Id*. There is not even a rational basis for distinguishing between Appellant Dembowski and retired police officers with respect to their ability to possess and use magazines capable of holding more than ten rounds. The same is true of retired members of the

armed forces generally. This Court's decision to the contrary diminishes without reason the experience of trained military veterans and elevates law enforcement officers above the members of the public they are supposed to protect and serve.

The ban's exception for retired police officers fails the equal-protection analysis and should have been invalidated both on its face and as-applied to military veterans such as Appellant Dembowski because there is no rational basis to afford privileges to retired law enforcement officers that are not afforded to ordinary citizens. *Silveira*, 312 F.3d at 1091. The judgment of the district court should have been reversed.

## CONCLUSION

For the foregoing reasons, the prior panel decision is not binding on a subsequent panel of this Court and affirming on that basis alone would be clear error and a manifest injustice. Appellants have demonstrated this appeal presents substantial questions requiring merits briefing more substantial than the 5200 words allotted for this response, as well as oral argument. Appellants respectfully request this Court deny Appellees' motion for summary action.

Dated: November 8, 2019                    Respectfully submitted,

                                          */s/ John Parker Sweeney*
                                          John Parker Sweeney
                                          *Attorney for Plaintiffs-Appellants*


John Parker Sweeney
James W. Porter, III
Marc A. Nardone
Candice L. Rucker
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street N.W., Suite 1350
Washington, D.C. 20036
Telephone: (202) 393-7150
jsweeney@bradley.com

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, N.J. 07450
Telephone: (201) 967-8040
dschmutter@hartmanwinnicki.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 8, 2019, I filed the foregoing with the Clerk of the Court via CM/ECF, which will serve the following counsel of record:

Jeremy Feigenbaum
Stuart M. Feinblatt
Office of Attorney General of New Jersey
25 Market Street
Richard J. Hughes Justice Complex
Trenton, NJ 08625
jeremy.feigenbaum@law.njoag.gov
stuart.feinblatt@law.njoag.gov

Bryan E. Lucas
Evan A. Showell
Office of Attorney General of Jew Jersey
124 Halsey Street
P.O. Box 45029
Newark, NJ 07102
bryan.lucas@law.njoag.gov
evan.showell@law.njoag.gov

George C. Jones
John H. Suminski
McElroy Deutsch Mulvaney
    & Carpenter
1300 Mount Kimble Ave.
P.O. Box 2075
Morristown, NJ 07962
gjones@mdmc-law.com
jsuminski@mdmc-law.com

Carmine Richard Alampi
Jennifer Alampi
Alampi & Demarrais
One University Plaza
Suite 404
Hackensack, NJ 07601
calampi@alampi-law.com
jalampi@alampi-law.com

Respectfully submitted,

*/s/ John Parker Sweeney*
John Parker Sweeney
*Attorney for Plaintiffs-Appellants*